JAN 05 2007 16:00 FR LEGAL          952 937 7840 TO 915403456417     P.23/33

EXB
77223F   11

CHR ID# ____
ASN ID# ____

## CONTRACT CARRIER AGREEMENT

THIS AGREEMENT (hereinafter referred to as "the Contract") is made and entered into this day of __4/9/01__ at Eden Prairie, Minnesota, by and between the following parties (hereinafter referred to as "the Parties"):

C. H. Robinson Worldwide, Inc., a corporation with its principal place of business at 8100 Mitchell Road, Eden Prairie, Minnesota, 55344, for itself and on behalf of its affiliated companies and divisions identified on Appendix A hereto (as may be amended from time to time), which are also parties to this Contract, collectively hereinafter referred to as "Robinson".

and __Unlimited Xpress__ with its principal place of business at __P.O. Box _____, Norcross, GA 30091?__ hereinafter referred to as "Carrier".

## WITNESSETH

WHEREAS, Carrier is a motor contract carrier of property, authorized by the Federal Highway Administration (FHWA) in Docket No. MC-__494254__ and/or Interstate Permit No __239891__, all other applicable State or Federal governmental agencies which may be required to conduct operations and provide service in intrastate, interstate or foreign commerce in the transportation of General Commodities (except Household Goods), under continuing contracts) with Robinson; and

WHEREAS, Robinson is a motor carrier property broker duly licensed by the Federal Highway Administration (FHWA) to arrange the transportation of property by authorized motor carriers, which desires from time to time to use the services of Carrier to transport freight for or on behalf of its customers, the transportation of which Robinson contracts; and

WHEREAS, the Parties do hereby enter into this Contract pursuant to 49 U.S.C. 14101 (b) for the purposes of providing and receiving specified services under specified rates and conditions, and under which the parties intend to waive certain rights and remedies permitted to be waived under the Interstate Commerce Act, to the extent that any provisions therein are inconsistent with any of the provisions of this Contract.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises contained herein, Carrier and Robinson agree as follows:

1. **SERIES OF SHIPMENTS AND ROBINSON'S DISTINCT NEEDS**

Robinson hereby commits to tender, and Carrier hereby commits to transport, a series of at least three (3) shipments during the term of this Contract. Carrier agrees to provide service designed to meet the unique, distinct and continuing transportation service needs of Robinson and its Customers, which include but are not limited to the following: providing flexible contract freight rates which may be amended through a simplified

CHRW Carrier Agreement Ver No. 06.01.00          3          Carrier Representative Initial

PHONE NO. : 7702236771          Jun. 19 2002 04:38PM P3

EXHIBIT

A

*EB*

notice provision; providing Certificates of Insurance to Robinson; Carrier's agreement to issue invoices to and to accept payment from Robinson, rather than from the shipper or receiver; participating with Robinson to use various means of communications and transmitting information to permit the tracking and tracing of shipments accepted by Carrier; and the occasional granting of other business considerations.

## 2. CONTRACT RATES

Compensation shall be paid to Carrier solely and exclusively by Robinson on all shipments tendered to Carrier. Carrier's compensation shall be as follows:

     **a.**    Carrier's compensation for any specific shipment or shipments may be agreed to orally between the Parties, and the compensation shall subsequently be confirmed by Robinson to Carrier in writing or by electronic means, setting the new contract rate ("the Confirmation"). Unless Carrier objects to the terms and rates of the Confirmation within twenty-four (24) hours after receipt, Carrier shall be presumed to have agreed that the terms are fully and correctly stated. All such Confirmations shall become incorporated as addenda to this Contract, and the Parties agree to retain all such addenda for the period required by applicable law.

     **b.**    The Parties may agree in a separate agreement (such as Robinson's "Quick Pay Program Agreement," etc.) to a discount of the negotiated confirmed rate, which separate agreement may be attached to and become a part of this Agreement as Appendix C. If the Parties agree to an Appendix C, the discounted payment shall become the negotiated rate without specific separate notation on any Confirmation.

     **c.**    If the Parties fail to agree to a negotiated rate as described above, the Contract rate shall be the amounts set forth in Appendix B attached hereto and made a part hereof.

Carrier agrees that any interstate or intrastate tariffs, released value clauses or rates, or other liability limitations which now or in the future may exist in Carrier's schedules or tariffs shall not apply to transportation provided by Carrier to Robinson during the term of this Contract, unless they are expressly stated in this Contract or in a Confirmation addendum.

## 3. RESPONSIBILITY FOR PAYMENT OF RATES

Robinson shall be solely and exclusively liable for and responsible to Carrier for its freight charges arising out of this Contract, and Robinson's Customers' sole obligation with regard to the payment of transportation charges is to make payment to Robinson. Within twenty (20) days after Robinson's receipt of a clear delivery receipt (or according to the terms of a separate agreement identified in Appendix C, if any), Robinson agrees to pay to Carrier the contract rates and charges even if the Customer does not or cannot pay Robinson. In exchange for this guarantee of payment, Carrier: (i) appoints and designates Robinson as its agent for the purpose of billing and collection of freight charges from the shippers whose freight Robinson tenders to Carrier or arranges for Carrier to transport; (ii) will not communicate in any manner, directly or indirectly, with Robinson's customers, consignors, consignees or any party other than Robinson concerning the collection of any charges relating to transportation services accruing in connection with or as a consequence of this Contract; and (iii) waives any right it may

otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by Carrier under this Contract.

Compensation paid to Carrier under this Contract may be withheld in whole or in part by Robinson or any of its subsidiaries or related companies to satisfy claims or shortages arising out of this or other Contracts, or to satisfy advances made to, or on behalf of, Carrier, or to satisfy any debt owed by Carrier to Robinson or any of its subsidiaries or related companies. This offset may occur, at Robinson's discretion, only if the claim or debt has not been acknowledged in writing by Carrier within thirty (30) days of presentation or the claim has not either been paid or denied for a valid cause or reason within ninety (90) days of presentation.

Any claim for overpayment or underpayment of transportation charges in connection with shipments transported under this Contract shall be presented by the party asserting the claim to the other party within sixty (60) days of discovery of the claim by that party, but in no event will any such claim(s) be asserted more than one hundred eighty (180) days after the delivery of the shipment or shipments giving rise to any such claim.

**4. CARRIER'S SERVICE WARRANTIES.**

Carrier warrants that: (i) (unless Carrier is an "exempt carrier" solely transporting exempt commodities) it is a motor carrier of property authorized by the Federal Highway Administration (FHWA), that all transportation performed by it for or on behalf of Robinson and/or Robinson's customers shall be as a contract carrier pursuant to the terms and conditions of this Contract; (ii) all freight tendered to it by Robinson pursuant to this Contract shall only be transported by Carrier on, in or with equipment owned by Carrier or leased to Carrier under a lease having a duration of more than thirty (30) days, operating under Carrier's operating authorities; (iii) except to the extent that Carrier uses the services of "owner-operators" in the course of conducting its regular operations, Carrier shall not, in any manner, sub-contract, broker or tender to any third party for transportation any freight tendered to Carrier by Robinson for transportation pursuant to this Contract; (iv) while Carrier may also hold authority from the Federal Highway Administration (FHWA) to operate as a motor common carrier, no transportation will be performed by it for or on behalf of Robinson and/or Robinson's customers as a motor common carrier; (v) Carrier's rates and tariffs as a motor common carrier shall not, except as may be specifically provided in this Contract, be applicable to any transportation which it shall perform for and on behalf of Robinson; and (vi) Carrier will at all times have a U.S. DOT safety rating that is satisfactory, and that at no time will it allow its safety rating to become unsatisfactory.

In providing services, Carrier represents and warrants that the driver(s) utilized are competent and properly licensed, and are fully informed of their responsibilities for the protection and care of the involved commodities. Carrier agrees that neither Robinson nor its Customer is responsible for paying the involved driver's salary, wages, compensation or charges, nor are either responsible for Workman's Compensation coverage or any taxes based on salary, wages or compensation. Carrier agrees to provide and maintain the necessary equipment and to provide all fuel and pay all expenses necessary to operate the equipment, and Carrier agrees that in no instance shall Robinson or its Customer be responsible for any of the expense. Carrier represents that the transportation will be performed without violating local, state or

CHRW Carrier Approved Ver No. 05.01.99          5          Carrier Representative Initial

*EB*

federal laws or regulations, and that Carrier has complied and will comply with all laws and regulations of local, state and federal authorities and regulatory bodies having jurisdiction over the operation of its vehicles. Carrier further warrants that all motor vehicle equipment provided by Carrier for the transportation of food grade products will comply with the requirements of The Sanitary Food Transportation Act, and that none of the equipment provided for the transportation of food or food grade products has been or will be used for the transportation of any waste of any kind, garbage, hazardous materials or any other commodity that might adulterate or contaminate food, food products or cosmetics.

At the time each shipment is received by Carrier from Robinson's customer(s), Carrier will request and obtain instructions concerning all handling, securing and product or freight protection requirements of each shipment, including specifications noted on the bill of lading or otherwise. Carrier is responsible for insuring that all freight is properly blocked and braced for transportation unless tendered to Carrier in a pre-loaded, sealed trailer, and Carrier is instructed not to break the seal(s) on the trailer, which fact must be noted on the bill of lading. Carrier is responsible to determine that the goods being shipped are in apparent good order and condition, to the extent that such is ascertainable through a visual examination of the exterior of the goods shipped, before loading and, in the event that they are not, Carrier will contact Robinson for further instructions.

### 5. ROBINSON'S COMPENSATION

In consideration for performing services and its guarantee of payment, Robinson is hereby authorized and empowered to keep any amounts over the contract rates stated in the Contract or Confirmations as its broker's commission, and Robinson shall not be required to disclose the amount of its commission.

### 6. INDEPENDENT CONTRACTOR

The Parties understand and agree that the relationship of Carrier to Robinson hereunder is solely that of an independent contractor, and that Carrier shall and does employ, retain or lease on its own behalf all persons operating motor vehicles transporting commodities under this Contract, and such persons are not employees or agents of Robinson or its Customers. It is further understood and agreed that all drivers of motor vehicles and persons employed in connection with the transportation of commodities under this Contract are subject to the direction, control and supervision of Carrier, and not of Robinson or its Customers. Carrier represents and agrees that such employees are and will at all times be covered by adequate workmen's compensation insurance as provided by law.

### 7. CARRIER'S CARGO LIABILITY

Carrier agrees to transport the commodities to the specified destination with reasonable dispatch (defined as the length of time that it would customarily and ordinarily take to transport a like shipment, unless a specified delivery date and/or time is communicated to Carrier prior to the pick-up of any individual shipment. Carrier hereby assumes all liability for cargo loss and damage while such commodities are in Carrier's custody or control, except for loss, damage, injury or delay to the commodities caused by act of God, public enemy, authority of law, act or default of the shipper or owner or for natural

shrinkage; and Carrier has the burden of proving that cargo loss, damage, injury or delay was caused by one of the above exceptions. No released value conditions, whether stated in the rates or otherwise, shall apply against Robinson or its customers. In the event branded or labeled goods are damaged, Robinson's customers may determine, within its sole discretion, and subject to a reasonableness standard, whether the goods may be salvaged, and if salvageable, the value of such salvage. Any salvage receipts shall be credited against Robinson's customer's claims against Carrier. Robinson's customers shall have the right to remove all identifying marks or labels when Carrier pays Robinson or Robinson's customers for the full value of the damaged goods and requests possession of the goods for salvage. Alternatively, in the discretion of Robinson or its customers, the goods shall be permanently marked as "damaged" or a similar notation, without debiting or otherwise charging Robinson's customers on account of such notations.

## 8. INSURANCE

Carrier agrees to procure and maintain for the benefit of Robinson and its Customers, at Carrier's own expense, and to provide written proof of, all insurance coverage required by the U.S. Department of Transportation or the States in which services are to be performed, including appropriate insurance forms (B.M.C. 91 or 91X with regard to liability insurance, and B.M.C. 34 with B.M.C. 32 endorsement with regard to cargo insurance), and adequate insurance covering cargo damage, public liability, bodily injury/property damage, and workmen's compensation, all in the form and amounts required by Robinson.

## 9. CARRIER'S INDEMNIFICATION

The Parties agree that Carrier shall be the party solely responsible for operating the equipment necessary to transport commodities under this Contract. Carrier therefore agrees to indemnify Robinson and its Customers and to hold them harmless for: loss or damage to Carrier's equipment; loss resulting from injury, including death, sustained by any employee of Carrier, or by any other person while acting in the capacity of a driver or helper in connection with the operation of the equipment; for any bodily injury, property damage or cargo loss, including the defense of any lawsuits therefrom, arising out of the operation, maintenance or use by Carrier of motor vehicle equipment to perform services under this Contract, for damage sustained by Robinson or its Customers arising out of the furnishing by Carrier of equipment which has been used to haul waste or is otherwise not suitable for hauling food products or which may affect the safety or cleanliness of food products hauled by Carrier; and for any loss or damage sustained by Robinson as a result of any other violation of this Contract by Carrier, including loss or damage due to the negligence, incompetence or dishonesty of Carrier or Carrier's agents or employees; provided, however, that this paragraph shall not apply to any penalty or liability arising solely as a consequence of any wrongful or negligent acts, omissions, or violations by the Robinson, its Customers, agents or employees.

## 10. BILLS OF LADING AND DELIVERY RECEIPTS

Carrier will issue and sign a standard, uniform straight bill of lading or other receipt acceptable to Robinson and Robinson's customers upon acceptance of goods for transportation  All terms or conditions written or printed on the receipts or bills of lading which have not been specifically agreed to by Robinson, either in this Contract or on any

Carrier Carrier Agreement Ver No. 05.07.99          7          Carrier Representative initial

JAN 05 2007 16:01 FR LEGAL        952 937 7840 TO 915403456417      P.27/33

shrinkage; and Carrier has the burden of proving that cargo loss, damage, injury or delay was caused by one of the above exceptions. No released value conditions, whether stated in the rates or otherwise, shall apply against Robinson or its customers. In the event branded or labeled goods are damaged, Robinson's customers may determine, within its sole discretion, and subject to a reasonableness standard, whether the goods may be salvaged, and if salvageable, the value of such salvage. Any salvage receipts shall be credited against Robinson's customer's claims against Carrier. Robinson's customers shall have the right to remove all identifying marks or labels when Carrier pays Robinson or Robinson's customers for the full value of the damaged goods and requests possession of the goods for salvage. Alternatively, in the discretion of Robinson or its customers, the goods shall be permanently marked as "damaged" or a similar notation, without debiting or otherwise charging Robinson's customers on account of such notations.

### 8. INSURANCE

Carrier agrees to procure and maintain for the benefit of Robinson and its Customers, at Carrier's own expense, and to provide written proof of, all insurance coverage required by the U.S. Department of Transportation or the States in which services are to be performed, including appropriate insurance forms (B.M.C. 91 or 91X with regard to liability insurance, and B.M.C. 34 with B.M.C. 32 endorsement with regard to cargo insurance), and adequate insurance covering cargo damage, public liability, bodily injury/property damage, and workmen's compensation, all in the form and amounts required by Robinson.

### 9. CARRIER'S INDEMNIFICATION

The Parties agree that Carrier shall be the party solely responsible for operating the equipment necessary to transport commodities under this Contract. Carrier therefore agrees to indemnify Robinson and its Customers and to hold them harmless for: loss or damage to Carrier's equipment, loss resulting from injury, including death, sustained by any employee of Carrier, or by any other person while acting in the capacity of a driver or helper in connection with the operation of the equipment; for any bodily injury, property damage or cargo loss, including the defense of any lawsuits therefrom, arising out of the operation, maintenance or use by Carrier of motor vehicle equipment to perform services under this Contract, for damage sustained by Robinson or its Customers arising out of the furnishing by Carrier of equipment which has been used to haul waste or is otherwise not suitable for hauling food products or which may affect the safety or cleanliness of food products hauled by Carrier; and for any loss or damages sustained by Robinson as a result of any other violation of this Contract by Carrier, including loss or damage due to the negligence, incompetence or dishonesty of Carrier or Carrier's agents or employees; provided, however, that this paragraph shall not apply to any penalty or liability arising solely as a consequence of any wrongful or negligent acts, omissions, or violations by the Robinson, its Customers, agents or employees.

### 10. BILLS OF LADING AND DELIVERY RECEIPTS

Carrier will issue and sign a standard, uniform straight bill of lading or other receipt acceptable to Robinson and Robinson's customers upon acceptance of goods for transportation. All terms or conditions written or printed on the receipts or bills of lading which have not been specifically agreed to by Robinson, either in this Contract or on any

Jun. 15 2001 04:02PM P7          PHONE NO. : 7782186771          FROM : XCLLR

*ɛβ*

addenda hereto, shall have no binding effect against Robinson. The receipt or bill of
lading issued or separated by Carrier shall be prima-facie evidence of receipt of goods in
good order and condition by Carrier unless otherwise noted on the face of said
document.  Carrier shall submit to Robinson the original signed bill of lading evidencing
good delivery of the goods, unless otherwise specifically agreed by Robinson, and in
that case, Carrier shall maintain custody of the original signed bills of lading and will
provide them to Robinson upon request.  If Carrier fails to maintain and provide the bills
of lading as agreed, Carrier assumes all risk of loss resulting from the failure to prove
good delivery.  In the event that Carrier's personnel are not allowed or afforded an
opportunity to view and/or examine the goods in order to ascertain the condition of those
goods prior to loading on to Carrier's vehicle, Carrier's personnel shall immediately notify
Robinson and await instructions prior to transporting the shipment, and shall note on the
bill of lading that they were not allowed or afforded an opportunity to view and/or
examine the goods shipped.

## 11. FACTORING

Carrier shall provide Robinson written notice of any assignment, factoring, or other
transfer of its right to receive payments arising under this Contract thirty (30) days prior
to such assignment, factoring, or other transfer taking legal effect.  Such written notice
shall include the name and address of assignee/transferee, date, date assignment is to
begin, and terms of the assignment, and shall be considered delivered upon receipt of
such written notice by Robinson.  Carrier shall be allowed to have only one assignment,
factoring or transfer legally effective at any one point in time, and no multiple
assignments, factoring or transfers by the Carrier shall be permitted.  Carrier shall
indemnify Robinson against and hold Robinson harmless from any and all lawsuits,
claims, actions, damages (including reasonable attorneys fees, obligations, liabilities and
liens) arising or imposed in connection with, the assignment or transfer of any account or
right arising thereunder where the Carrier has not complied with the notification
assignment requirements of this section.  Carrier also releases and waives any right,
claim or action against Robinson for amount due and owing under this Contract where
Carrier has not complied with the notice requirements of this section

## 12. CONTRACT TERM AND TERMINATION

The initial term of this Contract shall be a period of one (1) year from the date hereof,
and shall continue in full force and effect from year-to-year unless it is terminated as
provided for herein.  Notwithstanding the above, either Party shall have the right to
cancel or terminate this contract upon thirty (30) days' prior written notice to the other
party.

## 13. COMMUNICATIONS AND CONFIDENTIALITY

Carrier and Robinson intend and hereby agree to use the entire variety of
communications and information means available, whether available presently or in the
future, to communicate agreements, modifications, rates, instructions, equipment and
load location, and any other information helpful or necessary to carry out the intentions
of the Parties herein.  Such communications and information transmission presently
includes telephone, telecopier, software, e-mail, internet, electronic funds transfer,
satellite, and information received from third parties (including affiliates of Robinson,

CHRW Carrier Agreement Ver. No. 06.01.98                    8                    Carrier Representative Initial

outside billing companies and freight payment entities), but this is not intended to be limiting the manner of future communications as they develop.

All information furnished to one Party to the other in the course of performing work or rendering services under this Contract shall be deemed to be the confidential and proprietary information of the disclosing Party and/or its customers. The Party receiving information agrees not to disclose any such information to any third party, nor to use such information other than in performance of work and/or rendering services under this Contract. Carrier agrees not to use Robinson or Robinson's customers' names for promotional or other purposes without prior written consent.

## 14. MISCELLANEOUS

The Parties hereby further agree as follows:

This Contract shall not be rendered unenforceable by virtue of any failure or alleged failure to comply with the provisions of any statute or regulation applicable to transportation contracts, and the parties expressly waive any right that they might otherwise have to challenge the validity of this contract on such grounds, which waiver shall be binding on their respective assigns, heirs, or successors in interest.

Neither party shall assign this Contract or any rights hereunder without the prior written consent of the other party. This Contract shall be binding upon all permitted assigns, heirs and successors of the respective Parties hereto.

All notices required to be given under any of the provisions of this Contract shall be properly given if made in writing and deposited in a United States Post Office by registered mail, postage prepaid, and addressed to the respective parties as set forth above.

Carrier shall have no lien, and hereby expressly waives its right to any lien on any cargo, freight or other property of Robinson or any of its customers.

This Contract constitutes the entire agreement and understanding between the parties and supersedes any and all prior agreements and understanding, either oral or written. Robinson may, from time to time, modify or amend the terms or conditions of this Contract, or the specific Robinson companies which are parties to this Contract and identified in Appendix A, by means of a written amendment which it shall promptly mail or otherwise transmit to Carrier. Said modification or amendment shall become effective three (3) days after transmission by Robinson. Carrier's continued acceptance of freight tendered by Robinson or Robinson's customers thereafter shall constitute acceptance by Carrier of such modification or amendment of this Contract. In the event that any portion of this Contract is declared void or unenforceable, then such provision shall be deemed severed from the Contract which shall otherwise remain in full force and effect.

This Contract may be executed in one or more counterparts and each of such counterparts shall, for all purposes, be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

In the event either party incurs attorney's fees, costs or expenses in enforcing any of the provisions of this Contract, or in exercising any right or remedy arising out of any breach

CHRW Carrier Agreement Ver No 04.01.00          8          Carrier Representative Initial

JAN 05 2007 16:03 FR LEGAL          952 937 7840 TO 915403456417     P.33/33

CHR ID# 772237
ASH ID#

## APPENDIX C

## QUICK PAY DISCOUNT AGREEMENT

By executing this Appendix C, Carrier is requesting that Robinson make early payment of freight charges in exchange for a discount off the agreed rates. Upon final completion of the load, and after providing the necessary documents to confirm completion of Carrier's responsibilities without loss or damage, Robinson agrees to pay to Carrier the amount of the freight bill as confirmed by Robinson, less a discount of 1.5% of the gross freight bill amount. Upon receiving the necessary documents, Robinson will make payment on the same day or the next business day, in a manner designated by Carrier, which may consist of depositing the amount via electronic funds transfer ("EFT") into Carrier's bank account, or depositing the funds into Carrier's T-Chek Account, or issuing a T-Chek Authorization number to the carrier for the same, or making payment to Carrier's factoring company assignee (if any).

Unlimited Xpress
_____
Carrier

By: E Don Bolen
_____
(Must be signed by an officer)

By: Elson Bolar
_____
(Please Print)

TITLE: President
_____

DATE: 6/13/01
_____

10

FROM : BOLAR

** TOTAL PAGE.33 **

312 660 4439

EB

Bolar Trucking Express
CHR ID# 4/590Ω
ABH ID#_____
NOW UNLimited Xpress

of this Contract by the other party, the prevailing party shall be entitled to an award of attorney's fees, costs and expenses against the defaulting party.

The Parties agree that this Contract shall be construed under the laws of the State of Minnesota, and agree that all disputes arising under this Contract may be submitted to the jurisdiction of the State or Federal Courts within the States or Districts of Minnesota or Illinois, or for administrative proceedings to the appropriate Federal or State government agency having jurisdiction over such matters.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date and year first written above.

UnLimited Xpress
Carrier

By: E Olan Bolar
(Must be signed by an officer)

By: Elsan Bolar
(Please Print)

TITLE President

DATE 4/17/01

C.H. Robinson Worldwide, Inc. and its Affiliated Broker Subsidiaries

By: Barry Britton
(C.H. Robinson Worldwide, Inc. official)

By: Barry Britton
(Please Print)

TITLE Sr. VP

DATE 4-23-01

JAN 05 2007 16:03 FR LEGAL          952 937 7840 TO 915403456417     P.31/33

CH-R ID# 41530
ASH ID #

## APPENDIX A

### C. H. ROBINSON WORLDWIDE
### AFFILIATED PROPERTY BROKER PARTIES

This Contract is between Carrier identified in the Contract and the following C.H. Robinson affiliated companies, each of which is a licensed Motor Property Broker:

C.H. Robinson Company, Inc.

C.H. Robinson Company LP

C.H. Robinson Company (under a license issued in the name of Robinson Transportation Services)

C.H. Robinson Company (Canada) LTD, La Compagnie C.H. Robinson Ltee.

Wagonmaster Transportation Co.

This Appendix A supercedes all prior versions, if any. Carrier agrees that this Appendix A may be further amended to add or delete affiliated brokers which will be Parties to this Agreement upon written notice from Robinson to Carrier which shall update, amend or supersede this Appendix A.

Date: 4/17/01

*EB*

CHR ID# _41530_

ASH ID# _____

## APPENDIX B

## CONTRACT CARRIER AGREEMENT ADDENDUM

The rates and charges to be assessed for transportation performed pursuant to this Contract Carrier Agreement unless changed for a specific shipment(s) as provided in paragraph two (2) of the Contract Carrier Agreement shall be as follows:

The rates and charges listed below shall be applicable on interstate and foreign shipments on freight of all kinds except household goods between points in the United States (except Alaska & Hawaii).

1)     The rate shall be computed on the basis of 6.90 per load mile

2)     The rate shall include a single pickup and single delivery

3)     Additional pickups and/or deliveries shall be charged at $25 per each additional stop.

## NOTE, the above charges shall only apply in the event that A Rate Confirmation Sheet has not been executed by the parties with respect to a specific shipment.

COPY

1
2                 UNITED STATES DISTRICT COURT
3           FOR THE WESTERN DISTRICT OF VIRGINIA
4                      ROANOKE DIVISION
5     -------------------------------
6     WINFORD DALLAS JONES,           : Civil Action No.
7            Plaintiff,               : 7:06-CV-00547
8     vs.                             :
9     C.H. ROBINSON WORLDWIDE, INC.;:
10    and C.H. ROBINSON COMPANY; and:
11    C.H. ROBINSON COMPANY, INC.;   :
12    and C.H. ROBINSON COMPANY,      :
13    L.P.; and C.H. ROBINSON         :
14    INTERNATIONAL, INC.; and C.H. :
15    ROBINSON OPERATING COMPANY,     :
16    L.P.; and C.H. ROBINSON         :
17    TRANSPORTATION COMPANY, INC., :
18            Defendants.             :
19    -------------------------------
20            30(b)(6) ORAL DEPOSITION OF
21        C.H. ROBINSON WORLDWIDE, INCORPORATED
22          TAKEN THROUGH ITS REPRESENTATIVE
23                 BRUCE W. JOHNSON
24            ON MONDAY, OCTOBER 8, 2007
25              MINNEAPOLIS, MINNESOTA

EXHIBIT

tabbies

B

1           BRUCE W. JOHNSON - 10.8.07

14:48  2      A.    Yeah.

14:48  3      Q.    Are all of those separate things?

14:48  4            And if they are, tell me what they

14:48  5   are.

14:48  6      A.    Yeah.  And I guess when I said branch

14:48  7   sales, what I was saying was kind of the whole

14:48  8   gamut, and then I broke it down better for you

14:48  9   later.  So I guess the term branch sales, I

14:48 10   would sell it to a customer, or I would sell to

14:48 11   a carrier, so both, and those are the main

14:48 12   selling areas.  So either selling to a shipper

14:48 13   or to a carrier.

14:48 14      Q.    And when you refer to a shipper,

14:48 15   you're talking about a customer.

14:49 16            Are those two words relatively

14:49 17   synonymous for you?

14:49 18      A.    They don't have to be.  We should say

14:49 19   customer.

14:49 20      Q.    Okay.  So we'll use the term customer

14:49 21   to refer to someone who has a product they need

14:49 22   moved, and they hire C.H. Robinson to move it,

14:49 23   correct?

14:49 24      A.    Yes.  Yes.

14:49 25      Q.    That's a customer?

1          BRUCE W. JOHNSON - 10.8.07

15:12  2  that call for any -- whatever reason.  If they

15:12  3  need a centralized point of contact, we have a

15:12  4  call center that answers those calls.

15:12  5          Q.     You mentioned a branded fuel card?

15:12  6          A.     Yes.

15:12  7          Q.     What's the name of the brand?

15:12  8          A.     Carrier's Advantage.

15:12  9          Q.     So your carrier services department

15:12  10  does some direct negotiations with carriers that

15:12  11  you're trying to bring on board as contract

15:13  12  carriers with C.H. Robinson, is that correct?

15:13  13          A.     I would word it differently, and say

15:13  14  we do some direct negotiations with carriers

15:13  15  that are contract carriers for C.H. Robinson.

15:13  16          Q.     All right.  Why don't you define for

15:13  17  me what a contract carrier is in C.H. Robinson's

15:13  18  vernacular?

15:13  19          A.     It's a carrier that's been qualified,

15:13  20  so we know what their -- or we have a copy of

15:13  21  their federal operating authority that we've

15:13  22  verified through the FMCSA websites.  We have an

15:13  23  insurance certificate on file, and then they

15:13  24  have a signed carrier contract agreement similar

15:13  25  to the one that was Exhibit Number 2 in this

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | BRUCE W. JOHNSON - 10.8.07                          |
| 15:13 | 2  | case.                                              |
| 15:13 | 3  | Q.    So those are the things that are             |
| 15:13 | 4  | necessary for a carrier to become a contract       |
| 15:13 | 5  | carrier, is that correct?                          |
| 15:13 | 6  | A.    Yes.                                          |
| 15:14 | 7  | Q.    Is there a -- well, strike that.             |
| 15:14 | 8  | Let me ask you some more questions                 |
| 15:14 | 9  | about what you do in the carrier services          |
| 15:14 | 10 | department.                                        |
| 15:14 | 11 | In those instances where a sales                   |
| 15:14 | 12 | person in one of the branch offices has            |
| 15:14 | 13 | negotiated with a carrier to try to bring them     |
| 15:14 | 14 | on board, explain to me how it works, how you      |
| 15:14 | 15 | get from those negotiations taking place to the    |
| 15:14 | 16 | carrier ultimately signing a contract, and what    |
| 15:14 | 17 | role you in the carrier services department play   |
| 15:14 | 18 | in that process.                                   |
| 15:14 | 19 | A.    So as a carrier would come in -- it          |
| 15:14 | 20 | could happen numerous ways.  The carrier could     |
| 15:14 | 21 | call us directly and take the branch out of        |
| 15:14 | 22 | really that negotiation I guess as you call it.    |
| 15:14 | 23 | If they just heard about us and wanted to sign     |
| 15:14 | 24 | up and were directed to our group, we could        |
| 15:15 | 25 | start that process.  If the branch -- the branch   |

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| **WINFORD DALLAS JONES,** | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **C. H. ROBINSON WORLDWIDE, INC.,** *et al.,* | : |
| | : |
| **Defendants/Third Party Plaintiffs** | : |
| | : |
| **v.** | : **Case No. 7:06-cv-00547** |
| | : |
| **AKJ ENTERPRISES, INC., d/b/a** | : |
| **Unlimited Express** | : |
| **and** | : |
| | : |
| **ELSON BOLAR** | : |
| | : |
| **and** | : |
| | : |
| **DIONNIE BOLAR,** | : |
| | : |
| **Third Party Defendants.** | : |

## PLAINTIFF'S ANSWERS TO ROBINSON DEFENDANTS' FIRST REQUESTS FOR ADMISSIONS AND SECOND INTERROGATORIES

### REQUESTS FOR ADMISSION

**COMES NOW** Plaintiff, Winford Dallas Jones, by counsel, in response to Robinson Defendants' First Requests for Admissions, and states as follows:



**EXHIBIT**

C

1.    Admit that AKJ Enterprises, Inc.'s, truck was not overweight at the time of the subject crash on September 12, 2004.

>           RESPONSE:        **Plaintiff is without sufficient information to admit or deny this request, as Plaintiff is aware of no accurate record of the weight of the AKJ Enterprises, Inc. truck at the time of the subject crash.    As Plaintiff has previously informed Defendants, formal discovery to AKJ Enterprises, Inc. in the prior Interpleader action could not be had due to AKJ's bankruptcy filing.    A subpoena *duces tecum* has previously been served upon Dionnie Bolar, as an officer of the corporation, in respect of which she claims to be unable to produce responsive documents.    Plaintiff is still pursuing other avenues of information.**

2.    Admit that the weight of AKJ Enterprises, Inc.'s, truck did not cause the subject crash on September 12, 2004.

>           RESPONSE:        **Plaintiff is without sufficient information to admit or deny this request, as set forth more fully in response to the foregoing request.**

3.    Admit that Kristina Arciszewski was driving AKJ Enterprises, Inc.'s, truck at the time of the subject crash on September 12, 2004.

>           RESPONSE:        **Admitted, based upon the conclusions of the Virginia State Police, who investigated the subject crash.    Plaintiff has no independent recollection of having seen the driver of the vehicle belonging to AKJ Enterprises, Inc. prior to, during, or subsequent to the subject crash.**

4.      Admit that you have no evidence that at the time of the subject crash on September 12, 2004, Kristina Arciszewski had exceeded her permissible allotment of driving hours for that period.

> REPONSE:          **Plaintiff admits that as of the date of this response, he has no evidence that at the time of the subject crash on September 12, 2004, Kristina Arciszewski had exceeded her permissible allotment of driving hours for that period. However, discovery is still ongoing and Plaintiff reserves the right to amend this response based upon additional evidence discovered.**

5.      Admit that Kristina Arciszewski's driving hours did not cause the subject crash on September 12, 2004.

> RESPONSE:          **Plaintiff is uncertain what this request specifically asks Plaintiff to admit, but presumes that Defendants intend to ask for an admission that the subject crash was not caused by fatigue on the part of Kristina Arciszewski due to having driven more than her permissible allotment of driving hours for the period in which the accident occurred. Plaintiff admits, as set forth above, that he has no evidence at this time that Ms. Arciszewski had exceeded her permissible allotment of driving hours, but, as discovery is still ongoing, Plaintiff is without sufficient information at this time to admit or deny this request as Plaintiff construes it.**

6.      Admit that the subject crash on September 12, 2004, was not caused by the driver abandoning the vehicle.

RESPONSE:          **Admitted, in that Plaintiff has no evidence or reason to believe that the AKJ vehicle was abandoned at the time the subject crash occurred.**

7.      Admit that the subject crash on September 12, 2004, was not caused by the driver failing to have proper copies of paperwork.

RESPONSE:          **Admitted to the extent that Plaintiff cannot envision how "failing to have proper copies of paperwork" could have caused the subject crash; however, Plaintiff denies that issues underlying, or evidenced by, a lack of "proper paperwork," such as, for example, licensure issues, are not factors involved in, or causes of, the subject crash.**

8.      Admit that the subject crash on September 12, 2004, was not caused by the driver's cell phone failing to work.

RESPONSE:          **Admitted, in that Plaintiff cannot envision how "the driver's cell phone failing to work" could have caused the subject crash.**

9.      Admit that the subject crash on September 12, 2004, was not due to AKJ Enterprises, Inc.'s, truck breaking down.

RESPONSE:          **Plaintiff is without sufficient information to admit or deny this request, as discovery is still ongoing, but directs Defendants' attention to the Virginia State Police Division Four Crash Team Report, which does not clearly indicate that any mechanical issues led to the subject crash, although some deficiencies in the condition of the tractor and/or trailer were noted. Among those deficiencies were**

insufficient tire tread and a loose steering gear assembly, in violation of applicable federal regulations.

10.     Admit that the document attached hereto as **Exhibit A** is a copy of the Contract Carrier Agreement between AKJ Enterprises, Inc., d/b/a Unlimited Express, and Robinson.

          RESPONSE:     **Admitted that, to the best of Plaintiff's knowledge, the parties to the attached agreement have represented such instrument to be a true and accurate copy of the Contract Carrier Agreement between AKJ Enterprises, Inc., d/b/a, Unlimited Express, and C. H. Robinson. Plaintiff does not anticipate disputing the authenticity of this document at this time.**

11.     Admit that you have no evidence that **Exhibit A** is not a true and correct copy of the Agreement.

          RESPONSE:     **Admitted.**

12.     Admit that **Exhibit A** governs the relationship between Robinson and AKJ Enterprises, Inc.

          RESPONSE:     **Admitted that, upon information and belief, C. H. Robinson and AKJ Enterprises, Inc. entered into the agreement at issue, and that said document is evidence of the parties' relationship, which Plaintiff believes is contradicted by the actual behavior and conduct of the parties. Denied that such document**

is conclusive evidence as to the parties' relationship in fact or as to any legal conclusion to be reached in this case.

13.    Admit that at the time of the subject crash, AKJ Enterprises, Inc., was an independent contractor of Robinson.

RESPONSE:    **Denied on the basis that the evidence developed to date demonstrates that C. H. Robinson exerted sufficient control over AKJ Enterprises, Inc. to meet the requirements for an employer/employee relationship, as set forth in Plaintiff's Complaint.**

14.    Admit that at the time of the subject crash, AKJ Enterprises, Inc., was not an employee of Robinson.

RESPONSE:    **Denied on the basis that the evidence developed to date demonstrates that C. H. Robinson exerted sufficient control over AKJ Enterprises, Inc. to meet the requirements for an employer/employee relationship, as set forth in Plaintiff's Complaint.**

15.    Admit that at the time of the subject crash, the Agreement attached as Exhibit A was in full force and effect.

RESPONSE:    **Plaintiff admits that he presently has no evidence suggesting that the Agreement attached as Exhibit A was not the most recent agreement entered into between AKJ and C. H. Robinson prior to the time of the subject crash, and that plaintiff is unaware of**

any evidence indicating the Agreement had been terminated, but as discovery is still ongoing, Plaintiff is otherwise without sufficient information to admit or deny this request. Plaintiff does not anticipate disputing the authenticity of this document at this time. Denied to the extent that this request asks for a legal conclusion as to the parties' relationship in fact or the nature and/or effect of such document, and to the extent that this request implies that the Agreement is conclusive evidence of the parties' relationship.

16.    Admit that the document attached hereto as **Exhibit B** is a copy of the Independent Contractors Agreement between AKJ Enterprises, Inc., and Kristina Arciszeweki.

RESPONSE:    **Admitted that, to the best of Plaintiff's knowledge, the attached agreement has been represented to Plaintiff to be a true and accurate copy of an agreement entered into between Kristina Arciszewski and AKJ Enterprises, Inc.  Plaintiff does not anticipate disputing the authenticity of this document at this time; however, as discovery is still ongoing, Plaintiff reserves the right to amend this response based upon additional evidence discovered. Denied to the extent that this request asks for a legal conclusion as to the parties' relationship in fact or the nature and/or effect of such document, and to the extent that this request implies that the Agreement is conclusive evidence of the parties' relationship.**

17.    Admit that you have no evidence that **Exhibit B** is not a true and correct copy of the Agreement.

RESPONSE:    **Admitted.**

18.   Admit that **Exhibit B** governs the relationship between Ms. Arciszewski and AKJ Enterprises, Inc.

RESPONSE:   **Admitted that, upon information and belief, AKJ Enterprises, Inc. and Kristina Arciszewski entered into the agreement at issue, and that said document is evidence of the parties' relationship which evidence is contradicted by the actual behavior and conduct of the parties. Denied that such document is conclusive evidence as to the parties' relationship in fact or as to any legal conclusion to be reached in this case.**

19.   Admit that at the time of the subject crash, Arciszewski was an independent contractor of AKJ Enterprises, Inc.

RESPONSE:   **Denied on the basis that evidence developed to date demonstrates that AKJ Enterprises, Inc. exerted sufficient control over Kristina Arciszewski to meet the requirements for an employer/employee relationship, as set forth in Plaintiff's Complaint.**

20.   Admit that at the time of the subject crash, Arciszewski was not an employee of Robinson.

RESPONSE:   **Denied on the basis that evidence developed to date demonstrates that C. H. Robinson exerted sufficient control over Kristina Arciszewski to meet the requirements for an employer/employee relationship, as set forth in Plaintiff's Complaint.**

21.    Admit that at the time of the subject crash, the Agreement attached as **Exhibit B** was in full force and effect.

> RESPONSE:    Plaintiff admits that he presently has no evidence suggesting that the Agreement attached as Exhibit B was not the most recent Agreement entered into between AKJ and Arciszeweki prior to the time of the subject crash, and that plaintiff is unaware of any evidence indicating the Agreement had been terminated, but as discovery is still ongoing, Plaintiff is otherwise without sufficient information to admit or deny this request. Plaintiff does not anticipate disputing the authenticity of this document at this time. Denied to the extent that this request asks for a legal conclusion as to the parties' relationship in fact or the nature and/or effect of such document, and to the extent that this request implies that the Agreement is conclusive evidence of the parties' relationship.

22.    Admit that you were in possession of a copy of **Exhibit B** prior to filing this lawsuit.

> RESPONSE:    Plaintiff objects to this request on the grounds that it does not seek an admission as to the truth of any matters within the scope of Rule 26(b)(1), in that it does not relate to matters that are relevant to the issues or facts in dispute in this litigation or that are reasonably calculated to lead to the discovery of admissible evidence.

23.    Admit that you were in possession of a copy of **Exhibit A** prior to filing this lawsuit.

RESPONSE:   Plaintiff objects to this request on the grounds that it does not seek an admission as to the truth of any matters within the scope of Rule 26(b)(1), in that it does not relate to matters that are relevant to the issues or facts in dispute in this litigation or that are reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the foregoing objection, Defendants' request is denied.  Plaintiff had reason to believe that an agreement similar to Exhibit A existed, based upon information from the Schramm case and from language contained in the "Load Confirmation Sheet" pertinent to the subject accident that *was* in Plaintiff's possession, but Plaintiff did not have a copy of the actual agreement attached to Defendants' request as Exhibit A prior to the filing of the present lawsuit, as has been repeatedly explained by Plaintiff's counsel.

24.   Admit that Robinson was not negligent in assigning the subject load to AKJ Enterprises, Inc.

RESPONSE:   **Denied.**

25.   Admit that at the time of the subject crash, AKJ Enterprises, Inc., had valid Federal Operating Authority.

RESPONSE:   Admitted to the extent that Plaintiff may rely upon the records of the Federal Motor Carrier Safety Administration available via its internet website as of the date of this response.

## CERTIFICATE OF MAILING

I do hereby certify that I have this __15th__ day of February 2008 mailed a true and accurate copy of the foregoing Plaintiff's Responses to Defendants Robinson's First Requests for Admission and Second Interrogatories to Paul C. Kuhnel, Esquire, Wooten Hart PLC, P.O. Box 12247, Roanoke, Virginia 24024-2247, Counsel for C.H. Robinson Worldwide, Inc.; C. H. Robinson Company; C. H. Robinson Company Inc.; C. H. Robinson Company LP; C. H. Robinson International, Inc.; C. H. Robinson Operating Company LP; and C. H. Robinson Transportation Company Inc.

_____
Of Counsel

**Annette Sandbreg, Esq.**

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

------------------------x

WINFORD DALLAS JONES,        :

      Plaintiff        : Civil Action No.7:06-CV-00547

v.                           :

C.H. ROBINSON                :

WORLDWIDE, INC., et al., :

 Defendants/Third Party   :

   Plaintiffs             :

v.                           : PAGES 1 through 192

AKJ ENTERPRISES, INC.,       :

d/b/a Unlimited Express      :

and ELSON BOLAR and          :

DONNIE BOLAR,                :

  Third Party Defendants :

------------------------x

Deposition of Annette M. Sandberg, Esquire

Washington, DC

Tuesday, March 18, 2008

Reported by:  Joanne Liverani, RMR   JOB NO.   186251


EXHIBIT
D

**Annette Sandbreg, Esq.**

Page 90

1  rating.

2       Q      Well, based upon the information that

3  you have, what is your understanding of

4  C.H.~Robinson's process as of 2004 for selecting

5  carriers with which it would contract?

6       A      My understanding of their process as of

7  2004, and I have to amend my earlier answer.   I

8  believe that they said they wouldn't take a carrier

9  that had an unsatisfactory rating.

10              But as far as conditional and

11  satisfactory, it was -- it wasn't in their

12  criteria.   So they would make sure the carrier had

13  current operating authority, with the FMCSA, that

14  they had insurance on file, and that they had

15  either a satisfactory or conditional.   And my

16  understanding is at that time if they had a

17  conditional, they would ask the conditional carrier

18  for their plan that they were required to submit to

19  FMCSA, and they would put a copy of that plan in

20  their file.   And then they would sign the -- the

21  carrier agreement, and the carrier agreement

22  specified that the carrier was responsible for

**Annette Sandbreg, Esq.**

1 following the laws.

2       Q    Did the documentation that they entered

3 into with the carrier include any time frame during

4 which the carrier was required to upgrade its

5 status from conditional to satisfactory?

6       A    Not to my knowledge, no.

7       Q    So is it your understanding that as of

8 2004 the only component of C.H.~Robinson's process

9 of selecting carriers that pertained to safety was

10 their review of the safety rating on the FMCSA

11 website?

12      A    Yes.

13            Now, with one caveat.  They had told me

14 that they had met with FMCSA people about the

15 potential use of SafeStat and were told not to use

16 the data, and rightfully so.

17      Q    Well, do you know when that meeting took

18 place when they were told not to use the data?

19      A    I don't have the specific date on the

20 meeting.

21      Q    Did you understand that they had a

22 meeting before this accident in 2004?

**Annette Sandbreg, Esq.**

Page 99

1  I mean ideally you want to know if there is a

2  rating change.  Whatever you use to trigger that I

3  think, is, you know, whatever the business

4  practices are, but I think you would want to know

5  when there's a rating change.

6       Q    In your view, is there a minimal

7  acceptable practice in that respect?

8                    MR. DOHERTY:  Same objection.

9  You can answer.

10                    THE WITNESS:  In 2004, I don't

11  believe that there was any standard practice for

12  anybody.

13  BY MR. KIRTNER:

14       Q    They have not talked to you about a

15  conditional carrier program that they presently

16  have?

17       A    They briefly mentioned a conditional

18  carrier program.

19       Q    Do you have any understanding of what

20  the conditional carrier program that they currently

21  use involves?

22       A    If it's the same as what they had in

**Annette Sandbreg, Esq.**

Page 108

1 drop all insurance but continue to operate.  So

2 they might not appear to be active, and they

3 haven't been inspected recently, those -- that's

4 one of the dilemmas that FMCSA has with this very

5 large database is really determining who's active

6 and who's not.

7     Q    Understanding that from your perspective

8 there are you say hundreds of thousands of carriers

9 who don't have compliance reviews; correct?

10     A    That's correct.

11     Q    And therefore don't have safety ratings

12 at all?

13     A    That's correct.

14     Q    So those that don't have a safety rating

15 at all have a no rating; is that their status?

16     A    No.

17     Q    What is their status?

18     A    Just shows that they're an active

19 carrier.  It doesn't show anything.  It doesn't

20 show satisfactory, conditional, it's just -- it's

21 blank in that category.  Have you looked at the

22 FMCSA web page?  Because if you go down, it just

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| WINFORD DALLAS JONES, | : | |
| Plaintiff | : | |
| v. | : | |
| C. H. ROBINSON WORLDWIDE, INC., *et al.*, | : | |
| Defendants/Third Party Plaintiffs | : | |
| v. | : | Case No. 7:06-cv-00547 |
| AKJ ENTERPRISES, INC., d/b/a<br>Unlimited Express | : | |
| and | : | |
| ELSON BOLAR | : | |
| and | : | |
| DIONNIE BOLAR, | : | |
| Third Party Defendants. | : | |

## PLAINTIFF'S AMENDED ANSWERS TO ROBINSON DEFENDANTS' FIRST REQUESTS FOR ADMISSIONS[1]

**COMES NOW** Plaintiff, Winford Dallas Jones, by counsel, in response to

Robinson Defendants' First Requests for Admissions, and states as follows:

---

[1] Requests for Admission for which no Amended Response is being made are not included in this Amended Response.

Page 1 of 6

**EXHIBIT**

*tabbies*

E

5.     Admit that Kristina Arciszewski's driving hours did not cause the subject crash on September 12, 2004.

> RESPONSE:     **Plaintiff admits, as set forth above, that he has no evidence at this time that Ms. Arciszewski had exceeded her permissible allotment of driving hours. Plaintiff notes, however, that there are certain irregularities in the driver logs allegedly prepared by Ms. Arciszewski and her co-driver. For instance, plaintiff's counsel has never been provided with an original driver's log. The copies provided did not include separate log books for Mr. Morris and Ms. Arciszewski. See also response to Request for Admission No. 17 below. However, plaintiff does not have any evidence at this time that such irregularities are indicative that Ms. Arciszewski had exceeded her allowable driving hours.**

13.     Admit that at the time of the subject crash, AKJ Enterprises, Inc., was an independent contractor of Robinson

> RESPONSE:     **Denied. Numerous facts demonstrate that the relationship between Robinson and AKJ was not that of an independent contractor. Those facts include, but are not limited to, the following: Drivers used by AKJ were required to frequently report their positions and load status to C. H. Robinson. Drivers used by AKJ relied on Robinson's T-check service, not on AKJ, for incidental expenses incurred during trips. When problems arose on trips, drivers called Robinson. The document that allegedly created an independent contractor relationship was disregarded by the parties in certain respects. For instance, although the document required AKJ to maintain a "satisfactory" rating, AKJ was allowed to continue to transport loads even while its rating was "conditional."**

14.    Admit that at the time of the subject crash, AKJ Enterprises, Inc., was not

an employee of Robinson.

> RESPONSE: Denied.  Numerous facts demonstrate that the relationship between Robinson and AKJ was not that of an independent contractor.  Those facts include, but are not limited to, the following: Drivers used by AKJ were required to frequently report their positions and load status to C. H. Robinson.    Drivers  used  by  AKJ  relied  on Robinson's T-check service, not on AKJ, for incidental expenses incurred during trips.  When problems arose on trips, drivers called Robinson. The   document   that   allegedly   created   an independent   contractor   relationship   was disregarded by the parties in certain respects.  For instance, although the document required AKJ to maintain a "satisfactory" rating, AKJ was allowed to continue to transport loads even while its rating was conditional.

17.    Admit that you have no evidence that **Exhibit B** is not a true and correct

copy of the Agreement.

> RESPONSE:          Denied.  A close inspection of the document reveals that   certain   handwritten   information   on   the document has been "whited out" and written over. Accordingly, plaintiff cannot admit the truth or correctness of the document.  Plaintiff does admit that Exhibit B is the only document that has been represented to him as allegedly documenting the relationship between AKJ and Ms. Arciszewski.

18.    Admit that **Exhibit B** governs the relationship between Ms. Arciszewski

and AKJ Enterprises, Inc.

> RESPONSE:          **Denied for the reasons set forth in response to Request for Admission No. 17, and on the grounds that the document is not conclusive evidence as the parties' relationship in fact or as to any legal conclusion to be reached in this case.**

19.    Admit that at the time of the subject crash, Arciszewski was an independent contractor of AKJ Enterprises, Inc.

> RESPONSE:          **Denied.    The only document describing Ms. Arciszewski as an independent contractor is the document attached as Exhibit B.   The truth and correctness of that document is called into question for the reasons described in the response to Request for Admission No. 17.  Contrary to that document, see documents attached hereto as Exhibit 1.**

20.    Admit that at the time of the subject crash, Arciszewski was not an employee of Robinson.

> RESPONSE:          **Denied.  See responses to Requests for Admission Nos. 5, 13, and 19.**

21.    Admit that at the time of the subject crash, the Agreement attached as Exhibit B was in full force and effect.

> RESPONSE:          **Denied for the reasons set forth in response to Request for Admission Nos. 17 and 18 above, and further denied to the extent that this request asks for a legal conclusion as to the parties' relationship in fact or the nature and/or effect of such document, and to the extent that this request implies that the Agreement is conclusive evidence of the parties' relationship.**

22. Admit that you were in possession of a copy of **Exhibit B** prior to filing this lawsuit.

> RESPONSE:
>
> **Plaintiff objects to this request on the grounds that it does not seek an admission as to the truth of any matters within the scope of Rule 26(b)(1), in that it does not relate to matters that are relevant to the issues or facts in dispute in this litigation or that are reasonably calculated to lead to the discovery of admissible evidence. Plaintiff reserves the right to object to such information being considered by a court or a jury in any proceeding for any purpose in this case. Without waiving this objection, this request is admitted.**

Respectfully submitted,

**WINFORD DALLAS JONES**

By _____
                 Of Counsel

Gary C. Hancock, VSB #16704
Timothy E. Kirtner, VSB #36938
Ann L. Bishop, VSB #43847
GILMER, SADLER, INGRAM, SUTHERLAND & HUTTON
P. O. Box 878, 65 East Main Street
Pulaski, VA 24301
540/980-1360 (telephone)
540/980-5264 (facsimile)

Byron R. Shankman, VSB #13485
P. O. Box 1859
Dublin, VA 24084

Counsel for Plaintiff, Winford Dallas Jones

## CERTIFICATE OF MAILING

I do hereby certify that I have this __4 4 h__ day of March 2008 mailed a true and accurate copy of the foregoing Plaintiff's Amended Responses to Defendants Robinson's First Requests for Admission to Paul C. Kuhnel, Esquire, Wooten Hart PLC, P.O. Box 12247, Roanoke, Virginia 24024-2247, Counsel for C.H. Robinson Worldwide, Inc.; C. H. Robinson Company; C. H. Robinson Company Inc.; C. H. Robinson Company LP; C. H. Robinson International, Inc.; C. H. Robinson Operating Company LP; and C. H. Robinson Transportation Company Inc.

_____
Of Counsel

## GILMER, SADLER, INGRAM, SUTHERLAND & HUTTON, L.L.P.
### ATTORNEYS AND COUNSELLORS AT LAW
MIDTOWN PROFESSIONAL OFFICE BUILDING
65 EAST MAIN STREET
POST OFFICE BOX 878
PULASKI, VIRGINIA 24301

TELEPHONE (540) 980-1360
FACSIMILE NO. (540) 980-5264

## FACSIMILE TRANSMISSION

DATE: _3/4/08_

TO: _mike Doherty_

FIRM: _____

FAX NO.: _540-345-6417_

FROM: _Jim Kidner by 1st_

TOTAL NUMBER OF PAGES (INCLUDING COVER): _7_

MESSAGE: _Amended Response to_
_Requests for Admission_
_attached._

## IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL IMMEDIATELY.

**Note:** The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above addresses via the U.S. Postal Service. Thank you. If there is any problem during transmission, please call the telephone number shown above.

IN THE STATE COURT OF DEKALB COUNTY

STATE OF GEORGIA

THERESA LATIMORE,
    Plaintiff,

vs.

CIVIL ACTION NO. 04-A-27871-2

WILLIE J. CARTER, JR.;
W.C. TRUCKING, INC.;
C.H. ROBINSON CO.; and
ZURICH AMERICAN INSURANCE CO.,
    Defendants.

### ORDER AND JUDGMENT

**I.    FACTS AND PROCEDURAL HISTORY**



The above-styled case came before this Court on its January 16,2007 Civil Motions Calendar, for consideration of Defendants C.H. Robinson Co. ("CHR") and Zurich American Insurance Company's ("Zurich") Motion for Summary Judgment. In their Motion, CHR and Zurich (collectively, "Defendants") contend that they are entitled to summary judgment because Plaintiff cannot establish any set of facts which would make Defendants liable for the alleged negligence of Defendant Carter and Defendant W.C. Trucking, Inc. ("WCT"). In support of their Motion, Defendants submitted the Second Affidavit of Bruce W. Johnson, and the depositions of Robert Bade, Bruce Johnson, and John Strange. In response, Plaintiff contends that there are material issues of fact remaining which preclude summary judgment.

The basic facts of this case are not in dispute. In May 2000, CHR and WCT signed a Master Transportation Contract ("Agreement"). Second Bruce W. Johnson Affidavit, ¶ 4, Exhibit "A." Under that Agreement, WCT "retain[ed] the services of [CHR] as [WCT's] agent for the solicitation and dispatch of freight

EXHIBIT
F

available for transportation by motor vehicle, with the authority to act on [WCT's]

behalf for the sole purposes for securing freight and accepting from [CHR's]

Customers payment for transportation." Id., Exhibit "A" at 3.  From time to time,

CHR would offer freight carriage assignments to WCT, who would have sole

discretion to accept or reject any such offer.  Id.  As part of the Agreement, WCT

expressly represented and warranted that it would use only competent and

properly licensed drivers who were fully informed of their responsibilities for the

protection and care of the freight.  Id., Exhibit "A" at 4.  Importantly, the Agreement

expressly stated that WCT was an independent contractor and that none of WCT's

employees was an employee of CHR.  Id., Exhibit "A" at 5.  WCT also explicitly

agreed to maintain adequate worker's compensation coverage and liability

insurance as required by the U.S. Department of Transportation, including valid

operating authority from the Federal Motor Safety Carrier Administration (FMCSA)

and adequate insurance for cargo liability ($25,000.00) and automobile liability

($750,000.00).  Id., ¶ 10; Johnson Depo. at 9.  Finally, the Agreement explicitly

stated that WCT would be "the party solely responsible for operating the equipment

necessary to transport commodities under this Contract" and that WCT would

indemnify CHR and its customers for any loss or damage due to the negligence or

incompetence of WCT or its agents or employees.  Second Johnson Affidavit, ¶ 5,

Exhibit "A" at 6.

On December 4, 2002, WCT was carrying a load for Slim Fast Foods, one of

CHR's shippers/customers, originating in Olive Grove, Mississippi.  CHR

contracted with WCT for the transportation of that load.  On that date, Defendant

Carter made a delivery on behalf of WCT at the warehouse where Plaintiff was

working.  Plaintiff was using a forklift to move cargo from the back of Carter's

tractor-trailer to a loading dock, when Carter started to move the truck away from

the dock.  The forklift fell on its side, injuring Plaintiff's left leg and causing

2

permanent impairment.  Neither Carter nor WCT had valid insurance at the time of the accident.

In her original Complaint, Plaintiff contended that CHR was responsible for the negligence of Carter and WCT under agency principles.  Plaintiff also alleged that CHR was acting as a carrier of goods, that CHR had held itself out to the public as a carrier of goods, and that CHR had actively engaged in the shipment of goods.  CHR answered by claiming that it acted merely as a broker, making arrangements between WCT and shippers for the transport of freight.  Plaintiff named Zurich as a defendant in this action in its capacity as CHR's liability insurer.[1]

Neither Carter nor WCT filed answers to the Complaint, and this Court entered default judgment against them on June 21, 2005 and August 1, 2005, respectively.  On February 6, 2006, Plaintiff filed her First Amended Complaint, in which she added claims of negligent hiring and retention and apparent agency against Defendant CHR.  Specifically, Plaintiff contends that CHR was negligent in hiring and retaining Carter because CHR knew or should have known that Carter was an unsafe driver.  Plaintiff's Amended Complaint, ¶¶ 4-6.  Claiming that CHR held itself out to the public as a common carrier and held out WCT as its agent, Plaintiff also alleges that CHR is liable for the negligence of Carter and WCT under a theory of apparent agency.  Id., ¶¶ 7-9.  Although the Court initially stayed this case pending the outcome of bankruptcy proceedings initiated by Carter and WCT, the stay ended automatically when Carter was discharged from bankruptcy on February 27, 2006.

In their Motion, Defendants contend that CHR is not liable under the doctrine of respondeat superior because Carter and WCT were independent contractors,



---

[1] Under O.C.G.A. § 46-7-12(c), a plaintiff who alleges certain types of claims against a motor common carrier may join the carrier and its insurer as parties in the same action.

3

rather than employees, of CHR. Furthermore, Defendants allege that there was no actual or apparent agency, because there is no evidence that CHR held itself out as WCT's principal, that WCT held itself out as CHR's agent, that Plaintiff justifiably relied on any such alleged representation, or that Plaintiff was injured as a result of any such reliance. Defendants also claim that Plaintiff cannot establish agency merely through declarations by the alleged agent. *See, e.g.*, <u>McManus v. Turner</u>, 266 Ga. App. 5 (2004). Finally, Defendants assert that, because Zurich was named as a defendant in this suit only in its capacity as the insurer of a motor common carrier under O.C.G.A. § 46-7-12(c), Zurich would be entitled to summary judgment.

In contrast, Plaintiff contends that CHR is a carrier, rather than a broker. Plaintiff also alleges that WCT and Carter were statutory employees of CHR under 49 U.S.C. § 13102(2), because CHR agreed in its contract with a shipper to be responsible *to the shipper* as would an interstate motor common carrier under 49 U.S.C. § 14706. *See* Plaintiff's Brief in Opposition to Defendants' Motion, Exhibit "F." Plaintiff states that CHR is subject to an exception to the general no-liability rule regarding independent contractors because (1) the wrongful act was in violation of a statutory duty, (2) the wrongful act was in violation of an express contractual duty, and (3) the employer retained or assumed the right to direct or control the time and manner of WTC's actions. *See* O.C.G.A. § 51-2-5 (2006). In this regard, Plaintiff asserts that CHR had a statutory duty as a motor carrier under 49 C.F.R. § 373.101 and 49 C.F.R. § 373.103, which require issuance of certain bills related to shipments. Plaintiff also argues that public policy demands that the Court disregard the law regarding nonliability for the actions of independent contractors. In support of her apparent agency claim, Plaintiff seeks to rely on an unanswered request for admission served on Carter to establish that Carter was the agent of CHR. Finally, Plaintiff does not dispute that her right to recover from



4

Zurich depends on whether she is entitled to recover from CHR or that she would have no claim against Zurich if the Court were to grant summary judgment in favor of CHR.

## II.  SUMMARY JUDGMENT STANDARD

Georgia law provides that summary judgment is appropriate when the court, viewing all the facts and all reasonable inferences therefrom in the light most favorable to the non-moving party, concludes that the evidence does not create a triable issue as to any essential element of the case. Groutas v. McCoy, 219 Ga. App. 252 (1995); O.C.G.A. § 9-11-56 (2006). Any doubts as to the existence of a genuine issue of material fact must be resolved against the movant. Speed v. Muhanna, 274 Ga. App. 899 (2005). A party moving for summary judgment must show that the documents, affidavits, depositions, and other evidence in the record reveal that there is no evidence sufficient to create a genuine jury issue on at least one essential element of the plaintiff's case. Palermo v. Winn-Dixie Atlanta, Inc., 221 Ga. App. 532 (1996). If the moving party satisfies its burden, the non-moving party may not rely on its pleadings, but rather must point to specific evidence giving rise to a triable issue. Lau's Corp. v. Haskins, 261 Ga. 491 (1991). To obtain summary judgment, a defendant need not produce any evidence, but rather need only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. Johnson v. Amer. Nat'l Red Cross, 253 Ga. App. 587 (2002), citing Lau's Corp., supra, at 491.



## III.  DEFENDANTS' ALLEGED LIABILITY UNDER RESPONDEAT SUPERIOR PRINCIPLES

The primary issue before the Court on Defendants' Motion for Summary Judgment is whether Carter and WCT were employees of CHR or independent contractors. It is an undisputed principle of Georgia law that an employer generally is not legally responsible for the torts of an independent contractor. O.C.G.A. § 51-

2-4 (2006); U.S. v. Aretz, 248 Ga. 19 (1981); Bowman v. C. L. McCord Land & Pulpwood Dealer, Inc., 174 Ga. App. 914 (1985). Additionally, Georgia law is clear that an employer is not subject to suit for negligent hiring of an independent contractor. Mason v. Gracey, 189 Ga. App. 150 (1988); Finley v. Lehman, 218 Ga. App. 789 (1995).

The test to determine whether a particular person or entity was an employee or an independent contractor is whether the employer has the right to control the time and manner of executing the work to be done, as opposed to merely the right to require performance of the work. Williams v. Ga. Dep't of Corrections, 224 Ga. App. 571 (1997). In making this determination, "the key is to determine whether the contractor is truly independent or whether he is simply the employer's alter ego." Perry v. Soil Remediation, Inc., 221 Ga. App. 386, 387 (1996). As long as the contractor is allowed to perform the work by his own method and manner, the fact that the employer retains the right to require results in conformity with the contract between the parties does not make the employer liable for the contractor's acts.  Martin v. Johnson-Lemon, 271 Ga. 120 (1999); Forte v. Lewis, 241 Ga. 109 (1978). Furthermore, merely alleging the facts required to establish an agency, without presenting sufficient proof in support thereof, is not sufficient for a plaintiff to survive a defendant's motion for summary judgment. See Johnson v. Amer. Nat'l Red Cross, 253 Ga. App. 587 (2002); Lau's Corp. v. Haskins, 261 Ga. 491 (1991). Indeed, a defendant's "denial of the existence of an agency relationship may constitute an uncontradicted fact which will sustain a motion for summary judgment." McDaniel v. Peterborough Cablevision, Ltd., 206 Ga. App. 437, 439 (1992). In such instance, the party opposing summary judgment may not rest on its pleadings, but rather must present specific facts revealing a genuine issue for trial. Dennis v. Malt, 196 Ga. App. 263, 266 (1990). "Exhibiting the mere

possibility of a control situation falls short of the specific facts required." McDaniel, 206 Ga. App. at 439.

In the instant case, the evidence before the Court shows that CHR did not control the time, manner, or means by which WCT performed under the contract with CHR, and that Carter was not an agent or employee of CHR at the time of the accident at issue. *See* Second Johnson Affidavit, ¶¶ 5-6. CHR did not control WCT's routes, pay for WCT's operating expenses, withhold income tax from payments made to Carter, or pay for worker's compensation coverage of Carter or WCT. Id., Exhibit "A" at 4-5. To the extent that one of CHR's shippers may have designated CHR as a carrier on bills of lading or similar documents, this was done without the consent of CHR and did not represent the true relationship between shipper, carrier, and CHR as broker. Id., ¶¶ 8-9. WCT was required to list CHR as a certificate holder on WCT's liability insurance, and CHR did not receive any notice of cancellation of insurance for WCT before the subject incident. Johnson Depo. at 14-15.



For purposes of whether Carter was an independent contractor, this case is analogous to Perry v. Soil Remediation, Inc., 221 Ga. App. 386 (1996), which also involved the hiring of independent truck drivers. In Perry, the evidence showed that the defendant paid various independent truckers to make deliveries from time to time. The defendant paid each driver by the job, based on time and mileage, and the driver owned or leased his own equipment and was required to carry his own worker's compensation and liability insurance. The defendant did not control the defendant's routes in making shipments, and the driver was free to work for other employers. The Court of Appeals found that in those circumstances, the driver "clearly functioned independently" of the defendant company, and, thus, was an independent contractor rather than an employee. Id. at 387. In the instant case, as in Perry, CHR contracted with numerous carriers and drivers for

7

transportation of cargo.  WCT was free to accept or deny any particular assignment, and CHR did not control the routes taken by WCT's drivers.  When CHR offered a job and WCT accepted the assignment, WCT's driver was paid by the job.  WCT supplied its own equipment and was required by the parties' Agreement to carry its own worker's compensation and liability insurance.  Moreover, CHR was not actually the party for whom WCT was carrying cargo; CHR was merely a broker of transportation services which facilitated a relationship between various shippers and WCT as carrier.  Thus, it is apparent that WCT and Carter were "truly independent," and not merely CHR's "alter ego."  Perry, 221 Ga. App. at 387.  It follows that CHR is not responsible in tort for any negligent acts of WCT or Carter, nor may Plaintiff recover from CHR for any alleged negligent hiring of WCT or Carter.

## IV.   DEFENDANTS' ALLEGED LIABILITY FOR CARTER AND WCT'S NEGLIGENCE UNDER O.C.G.A. § 51-2-5

In her response to Defendants' Motion, Plaintiff raised for the first time the argument that Defendants were liable to Plaintiff under O.C.G.A. § 51-2-5(3) and (4).[2]  Specifically, Plaintiff now contends that Defendants are liable for the negligent acts of Carter and WCT because Defendants violated an express contractual duty and/or a statutory duty.  Pretermitting for these purposes whether Plaintiff's Amended Complaint was sufficient to put Defendants on notice of these claims, the evidence before the Court does not support a claim under O.C.G.A. § 51-2-5(3) or (4).

Georgia law provides that an employer is liable for a contractor's negligence where:  (1) the work "is wrongful in itself" or constitutes a nuisance when performed



---

[2] Plaintiff also argued that Defendants retained or assumed the right to control Carter and WCT's actions.  Because any liability under O.C.G.A. § 51-2-5(5) would arise under the same circumstances which would give rise to common-law respondeat superior liability, however, the Court will not address that issue separately here.  See Section IV, infra.

in the ordinary manner; (2) the employer knew that the work was inherently dangerous; (3) the wrongful act violates a duty imposed on the employer by express contract; (4) the wrongful act violates a statutory duty; (5) the employer retains the right to control the time and manner of executing the work or later assumes control in such fashion and the injury is traceable to the employer's interference; or (6) the employer ratifies the contractor's unauthorized wrong. O.C.G.A. § 51-2-5 (2006).[3]

Plaintiff argues that pursuant to O.C.G.A. § 51-2-5, CHR is liable for the negligent acts of Carter and WCT, because CHR violated express provisions of its contract with one or more of its *shippers*. Plaintiff's Brief in Opposition to Defendants' Motion, at 13. The Georgia Court of Appeals recently addressed this very issue in the case of Kidd v. Dentsply Int'l, Inc., 278 Ga. App. 346 (2006). In



Kidd, the Court of Appeals specifically stated that under O.C.G.A. § 51-2-5(3), "the contractual duties under which the employer would be liable for the acts of the independent contractor cannot be enforced by one not a party to the contract." Kidd, 278 Ga. App. at 350. Because Plaintiff is not a party to the contract, she cannot impute liability to CHR; therefore, Plaintiff's arguments based on O.C.G.A. § 51-2-5(3) must fail as a matter of law.

Even assuming, *arguendo*, that Plaintiff could avail herself of this provision, Plaintiff's claim still would fail because she has cited no express contractual provision that would create liability on the part of CHR. Indeed, Georgia law is clear that in order to find an employer liable for the acts of a contractor pursuant to O.C.G.A. § 51-2-5(3), a plaintiff must show an express obligation under the contract. Toys 'R' Us, Inc. v. Atlanta Economic Dev. Corp., 195 Ga. App. 195

---

[3] Plaintiff does not allege that the work to be performed by Carter and WCT was wrongful in itself, constituted a nuisance when performed in the ordinary manner, or was inherently dangerous, or that Defendants ratified any unauthorized wrong by Carter or WCT. *See* O.C.G.A. § 51-2-5(1), (2), (6) (2006).

(1990). In this case, Plaintiff relies primarily on the provision of the contract between CHR and a shipper which states that "CHR will assume all of the liability of an interstate motor common carrier as defined in 49 U.S.C. Section 14706." Plaintiff's Brief in Opposition to Defendants' Motion, at 8-9. That section, however, does not provide a cause of action for personal injuries, but rather permits a civil action against a *carrier* for damage to property suffered as a result of the carrier's failure to comply with certain requirements regarding receipts and bills of lading. *See* 49 U.S.C. § 14706(d).

Plaintiff also seeks to rely on O.C.G.A. § 51-2-5(4), in conjunction with various parts of Title 49, Subtitle IV of the U.S. Code, to establish a duty of the Defendants to Plaintiff. Importantly, federal law provides that a "motor carrier" is a person who provides commercial motor vehicle transportation for compensation, while a "broker" is a person, other than a motor carrier or an agent or employee thereof, who as principal or agent sells, offers for sale, negotiates for, or holds itself out as selling, providing, or arranging for transportation by motor carrier for compensation. 49 U.S.C. § 13102(2), (14). In the instant case, the evidence shows that CHR is a broker of shipping services, rather than a shipper or carrier. Strange Depo. at 16. CHR does not, and did not at the time of the accident, own any trucks or directly hire drivers. Id. at 16. For any shipment brokered through CHR, the individual shipper, rather than CHR, generates any applicable freight bill or bill of lading. Bade Depo. at 17. CHR simply obtains information from shippers about loads to be shipped, conveys this information to appropriate carriers, and transmits money from the shipper to the carrier. Id. at 10. Thus, based on the facts of this case, CHR clearly was a "broker" rather than a "motor carrier" for purposes of any action permitted by Title 49, Subtitle IV; therefore, most of the federal provisions cited by Plaintiff do not apply. Plaintiff also has not provided any authority to support her claim that 49 U.S.C. § 14704(a)(2), which clearly is



10

regulatory in nature, creates a private cause of action. Finally, Plaintiff cannot successfully establish liability of the Defendants under O.C.G.A. § 51-2-5(4) because Plaintiff has not shown that any specific negligent act committed by Carter or WCT was, in itself, violative of a duty imposed by statute. To the contrary, Plaintiff merely alleges that CHR violated various federal regulatory requirements. Even assuming that Plaintiff's allegations in this regard are true, this would not fit the requirements of O.C.G.A. § 51-2-5(4), especially in light of the fact that there is no evidence that Plaintiff was a member of the class of persons the federal statutes were intended to protect or that the harm complained of was the harm the statutes were intended to guard against. *See* Brazier v. Phoenix Group Mgmt., 280 Ga. App. 67, 70 (2006); Hubbard v. DOT, 256 Ga. App. 342, 350 (2002). For these reasons, O.C.G.A. § 51-2-5(4) does not provide a vehicle through which Plaintiff can hold CHR responsible for the actions of Carter or WCT.

## V.    DEFENDANTS' ALLEGED LIABILITY UNDER APPARENT AGENCY PRINCIPLES



Similarly, there is no evidence to support Plaintiff's claim of apparent agency. To recover on a theory of apparent agency, a plaintiff must prove the following three elements: (1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the alleged agent's skill or care, based on the alleged principal's representation; and (3) that the justifiable reliance led to injury to plaintiff. BP Exploration & Oil, Inc. v. Jones, 252 Ga. App. 824, 826 (2001); Butkus v. Putting Greens Int'l Corp., 222 Ga. App. 661, 663 (1996). Even if the plaintiff can establish that a person held himself out to the plaintiff as the agent of another, this does not support a claim of apparent agency unless the plaintiff also shows that the alleged principal held out the other party as its agent. Coldwell Banker Real Estate Corp. v. DeGraft-Hanson, 266 Ga. App. 23 (2004). In the instant case, Plaintiff cannot satisfy the three prongs of the apparent agency test.

11

Even assuming that Carter held himself out CHR's agent, which is dubious inasmuch as it is based on *Carter's* deemed admission, Plaintiff has not presented any evidence that CHR represented *to Plaintiff* that Carter or WCT was CHR's agent.  Furthermore, even if Plaintiff could establish that either CHR, WCT, or Carter made any representation of agency to Plaintiff, there is no evidence whatsoever that Plaintiff relied on any such representation in any fashion, or that her injuries were the proximate result of any such reliance.  Consequently, CHR is entitled to summary judgment on Plaintiff's apparent agency claim.

## VI.    CONCLUSION

Based on the foregoing, and after reviewing the facts of the case, the applicable law, and all other matters properly before the Court, the Court finds that Defendant CHR is entitled to summary judgment as to all of Plaintiff's claims. Furthermore, because Plaintiff has conceded that her claims against Defendant Zurich are dependent on the success of her claims against CHR, Plaintiff's claims against Zurich also fail.  Consequently, Defendants C.H. Robinson Co. and Zurich American Insurance Company's Motion for Summary Judgment is hereby **GRANTED**.


**IT IS SO ORDERED, ADJUDGED, AND DECREED**, this 21st day of February, 2007.

_____
HON. J. ANTONIO DELCAMPO
STATE COURT OF DEKALB COUNTY

cc:     Jonathan P. Sexton, Esq., Attorney for Plaintiff
        John G. Walrath, Esq., Attorney for Defendants Carter and W.C. Trucking, Inc.
        James J. Brissette, Esq., Attorney for Defendants C.H. Robinson Co. and Zurich American
                    Insurance Co.
        Clerk's File

FILED IN THIS OFFICE
THIS ___ DAY OF Feb 20__

Clerk, State Court, Dekalb County

12

1

2              UNITED STATES DISTRICT COURT

3          FOR THE WESTERN DISTRICT OF VIRGINIA

4                    ROANOKE DIVISION

5     ------------------------------

6    WINFORD DALLAS JONES,           : Civil Action No.

7            Plaintiff,              : 7:06-CV-00547

8    vs.                            :

9    C.H. ROBINSON WORLDWIDE, INC.;:

10   and C.H. ROBINSON COMPANY; and:

11   C.H. ROBINSON COMPANY, INC.;   :

12   and C.H. ROBINSON COMPANY,      :

13   L.P.; and C.H. ROBINSON         :

14   INTERNATIONAL, INC.; and C.H. :

15   ROBINSON OPERATING COMPANY,     :

16   L.P.; and C.H. ROBINSON         :

17   TRANSPORTATION COMPANY, INC., :

18            Defendants.            :

19   ------------------------------

20          30(b)(6) ORAL DEPOSITION OF

21      C.H. ROBINSON WORLDWIDE, INCORPORATED

22       TAKEN THROUGH ITS REPRESENTATIVE

23            MICHAEL T. ATKINSON

24        ON MONDAY, OCTOBER 8, 2007

25          MINNEAPOLIS, MINNESOTA

EXHIBIT

C

1           MICHAEL T. ATKINSON - 10.8.07

09:50   2   that connection.

09:50   3           What other services, if any, are

09:51   4   provided to the driver by C.H. Robinson once he

09:51   5   picks up the load and to the time he gets to the

09:51   6   consignee's place of business?

09:51   7       A.    Services?

09:51   8       Q.    Yes.

09:51   9       A.    Well, we have -- we do have our

09:51   10  twenty-four hour dispatch line that they're able

09:51   11  to call and log the different -- the different

09:51   12  stages of the load.  You know, they can call for

09:51   13  T-Check services.  We're able to advance

09:51   14  carriers money.  Once they pick up the freight

09:51   15  and provide proper, you know, bill of lading

09:51   16  information to verify that they were loaded

09:51   17  correctly, we're able to give them a fuel

09:51   18  advance.  The drivers are able to make check

09:51   19  calls to us in terms of service issues.  If

09:51   20  there's any problems on the load, they're able

09:52   21  to call us, and we're able to log those problems

09:52   22  as well.  That's it.

09:52   23      Q.    Okay.  Through the T-Check system,

09:52   24  the drivers can call you -- call you, being C.H.

09:52   25  Robinson --

1          MICHAEL T. ATKINSON - 10.8.07

09:52    2      A.      Uh-huh.

09:52    3      Q.      -- and get money while they're on the

09:52    4  road, is that correct?

09:52    5      A.      Correct.

09:52    6      Q.      And what sorts of things do they call

09:52    7  you needing money for while they're on the road?

09:52    8      A.      The main thing is fuel, and that's a

09:52    9  big reason why drivers like to use T-Check is

09:52   10  because we're able to front them a portion of

09:52   11  the load in order to pay for their fuel.

09:52   12          Also, there are some shippers and

09:52   13  receivers that require funds to load the truck

09:53   14  or to unload the truck, and so we're able to use

09:53   15  T-Check to help pay for those services.

09:53   16      Q.      Well, what do you call the folks who

09:53   17  load and unload those trucks?

09:53   18      A.      A lumper.

09:53   19      Q.      So if the drivers need a T-Check for

09:53   20  whatever reason, they call you to authorize

09:53   21  that, is that correct?

09:53   22      A.      Correct.

09:53   23      Q.      Does C.H. Robinson rate its carriers

09:54   24  in some fashion?

09:54   25      A.      There is a function in Express where

1              MICHAEL T. ATKINSON - 10.8.07

12:05  2       Q.     Monday morning.  I'm sorry, yes.

12:05  3       A.     Yes, but that's up to the driver to

12:05  4  determine their own stopping, fueling, and stuff

12:05  5  like that.

12:06  6       Q.     If they stop and lay over somewhere

12:06  7  with a load, is that something they need to let

12:06  8  you know where they are, and that they're laying

12:06  9  over before they get back on the road?

12:06  10      A.     They're required to make check calls

12:06  11  to us, but, you know, we're not -- we don't tell

12:06  12  them where to stop or when they have to make the

12:06  13  exact check call.

12:06  14      Q.     Is there some general frequency with

12:06  15  which they're supposed to make check calls?

12:06  16      A.     I think it's encouraged for carriers

12:06  17  to, you know, call at least once a day, you

12:06  18  know, with an update.

12:06  19      Q.     Do you recall how you found out that

12:06  20  there had been an accident involving this load?

12:07  21             And let -- before you answer that --

12:07  22      A.     Yeah.

12:07  23      Q.     -- just to clarify the record, and I

12:07  24  apologize for interrupting you, is there a load

12:07  25  number on this log spreadsheet?

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF VIRGINIA

 3                  ROANOKE DIVISION

 4  WINFORD DALLAS JONES,                )

 5                Plaintiff,             )

 6      -vs-                            )   Civil Action No.

 7  C.H. ROBINSON WORLDWIDE, INC.;       )   7:06-CV-00547

 8  and C.H. ROBINSON COMPANY; and       )

 9  C.H. ROBINSON COMPANY, INC.;         )

10  and C.H. ROBINSON COMPANY, L.P.;    )

11  and C.H. ROBINSON INTERNATIONAL,    )

12  INC.; and C.H. ROBINSON             )

13  OPERATING COMPANY, L.P.; and        )

14  C.H. ROBINSON TRANSPORTATION        )

15  COMPANY, INC.,                      )

16                Defendants.           )

17                March 6, 2008

18                  8:57 a.m.

19      The 30(b)(6) deposition of C.H. Robinson

20  Worldwide, Inc. taken through its representative

21  MICHAEL T. ATKINSON, resumed pursuant to

22  adjournment at the offices of Seyfarth Shaw LLP,

23  Suite 2400, 131 South Dearborn Street, Chicago,

24  Illinois.
```

COPY

EXHIBIT

tabbies

H

1        MR. DOHERTY:   I object to the form.   But you

2    can answer.

3    BY THE WITNESS:

4        A.     They used T-Chek.

5    BY MR. KIRTNER:

6        Q.     Well, I'm asking you in your own

7    experience it was not unusual for an AKJ driver to

8    call you and say I need a T-Chek for a lumper, I

9    need a T-Chek for fuel or some other incidental,

10   correct?

11       A.     No, it was not unusual.

12       Q.     And, in fact, there are some references

13   in here I want to ask you about that I'm not clear

14   on whether they were T-Chek-related or not.

15            Let's look at page 5, line 183, column

16   K, and line 198, column K.   Now, I understand those

17   entries weren't made by you, but they refer to you.

18            Do you have an understanding of what

19   "More money OK per Mike Atkinson" means?

20       A.     No.

21       MR. DOHERTY:   What line number is this?

22       MR. KIRTNER:   183 and 198.

23   BY MR. KIRTNER:

24       Q.     Do you understand what that notation

MICHAEL T. ATKINSON, MARCH 6, 2008

1    means?

2         A.    No.

3         Q.    Do you agree with me that the problem

4    that was being dealt with there was the -- was that

5    the AKJ truck was having mechanical difficulties?

6         A.    According to column F that's what it

7    looks like.

8         Q.    And understanding that, that still

9    doesn't provide you any insight as to what "More

10   money OK per Mike Atkinson" means?

11        A.    I don't know if the money was for fuel

12   or repair or parts.  I don't know.

13        Q.    But someone at AKJ, whether it be the

14   driver or the owner, had to come to -- had to

15   contact somebody at C.H. Robinson to get money

16   authorized to deal with that problem, is that

17   correct?

18        A.    True, yes.

19        Q.    Mr. Atkinson, let me kind of get back to

20   something we touched on.  Again, I am not asking

21   you what you and your attorney talked about.  Okay.

22             But, you know, a lot of the questions I

23   ask you about this, you don't seem to have a lot of

24   understanding about some of these things before we

## SECOND INTERROGATORIES

COMES NOW Plaintiff, Winford Dallas Jones, by counsel, in response to Defendant Robinsons' Second Interrogatories, and states as follows:

1.   For each and every Request for Admission which you deny in whole or in part, please explain in detail the reason for each and every factual basis for any such denial.

ANSWER:   **See explanations included with responses to Request for Admissions Nos. 1, 2, 5, 7, 9, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, and 24.**

Respectfully submitted,

**WINFORD DALLAS JONES**

By_____
                    Of Counsel

Gary C. Hancock, VSB #16704
Timothy E. Kirtner, VSB #36938
Ann L. Bishop, VSB #43847
GILMER, SADLER, INGRAM, SUTHERLAND & HUTTON
P. O. Box 878, 65 East Main Street
Pulaski, VA 24301
540/980-1360 (telephone)
540/980-5264 (facsimile)

Byron R. Shankman, VSB #13485
P. O. Box 1859
Dublin, VA 24084

Counsel for Plaintiff, Winford Dallas Jones