## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| **WINFORD DALLAS JONES,** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| | : |
| **C. H. ROBINSON WORLDWIDE, INC.,** *et al.*, | : |
| | : |
| **Defendants/Third Party Plaintiffs** | : |
| | : **Case No. 7:06-cv-00547** |
| **v.** | : |
| | : |
| **AKJ ENTERPRISES, INC., d/b/a** | : |
| **Unlimited Express** | : |
| | : |
| **and** | : |
| | : |
| **ELSON BOLAR** | : |
| | : |
| **and** | : |
| | : |
| **DIONNIE BOLAR,** | : |
| | : |
| **Third Party Defendants.** | : |
| | : |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

**COMES NOW** Plaintiff, Winford Dallas Jones, by counsel, and files this Brief in Support of his Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**INTRODUCTION**

Plaintiff's cause of action arises from a collision that occurred on September 12, 2004, along Interstate 81 in Wythe County, Virginia, between the tractor-trailer then being operated by Plaintiff on behalf of his employer, Purdy Brothers Trucking Company, Inc., and a tractor-trailer that was owned by AKJ Enterprises, Inc. ("AKJ"), a now bankrupt Georgia corporation, and operated by Kristina Mae Arciszewski ("Arciszewski"), who died in the collision.  Plaintiff's evidence is undisputable that Arciszewski was negligent in the operation of her vehicle, as set forth in the Virginia State Police Division Four Crash Team Report and affidavits of eyewitnesses Susan Cannedy, Richard Peele, and Billy Downs, as well as Plaintiff's affidavit, which are attached to this memorandum as Exhibits 1, 2, 3, 4, and 5, respectively, and addressed in more detail below.  There is no genuine issue or dispute as to any of the facts set forth in Exhibits 1-5.[1]

The load of cable reels being hauled by Arciszewki, along with her co-driver and boyfriend, Charles Kevin Morris ("Morris"), had been entrusted to the care of Defendant C. H. Robinson Worldwide, Inc. ("C. H. Robinson"), by Coleman Cable, Inc., a Delaware corporation, with its principal offices in Waukegan, Illinois, which is primarily engaged in the business of manufacturing wire and cable products.  C. H. Robinson is a self-described third-party logistics company, whose services include arranging for the transport of freight by air, rail, sea, but primarily by roadway via its network of motor carriers, who have contractual relationships with C. H. Robinson, and who put at C. H. Robinson's disposal over 500,000 power units (the tractor components

---

[1] The Virginia State Police Division Four Crash Team Report was attached as "Exhibit 1" to the deposition of Virginia State Trooper K. Scott Clarke, taken by Defendant on February 7, 2008.

of the tractor-trailer vehicle).  (See Exhibit 6, from C. H. Robinson's website). [2]

In the present case, C. H. Robinson agreed to accept responsibility for the timely and safe delivery of Coleman Cable's cargo, for a specific fee negotiated between C. H. Robinson and its shipper/customer.  C. H. Robinson then, in turn, selected and hired AKJ from among its pool of tens of thousands of "contract carriers" to physically haul the subject load for the sum of $1,450.00,[3] with C. H. Robinson retaining the difference between the fee negotiated with Coleman Cable, Inc. and the fee negotiated with AKJ as C. H. Robinson's profit on that load.  The subject load was arranged by C. H. Robinson's Chicago Central branch office, which divides its sales representatives into two groups – one that deals primarily with the shippers/customers and one that deals primarily with C. H. Robinson's contract carriers.  In the present case, two sales representatives – Max Cortis, on the shipper/customer side, and Mike Atkinson, on the carrier side – independently negotiated with the customer and carrier, respectively, to maximize the profit of C. H. Robinson on the subject load.  (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, page 33; Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 32-33).[4]   Attached hereto as Exhibit 9 is a copy of the document

---

[2] Plaintiff asks that the Court take judicial notice of this statement having been made on C. H. Robinson's website at http://www.chrobinson.com/over_the_road.asp, pursuant to Fed. R. Evid. 201(b).

[3] AKJ was one of C. H. Robinson's many carriers who utilized its QuickPay Program, which guarantees payment for loads within 48 hours of C. H. Robinson's receipt of the paperwork related to that load from the carrier.  The cost to a carrier of utilizing the QuickPay Program is a 1.5% reduction in its fee, which, as Plaintiff understands it, would have put AKJ's actual fee at $1,428.25.  (See Exhibits 9 and 10).  Exhibit 10 was authenticated by Defendant in its answers to Plaintiff's First Requests for Admissions, RFP No. 3, attached hereto as Exhibit 11.

[4] Plaintiff's counsel have taken the following depositions:  (1) Bruce W. Johnson, manager of the carrier services department, individually and as a Rule 30(b)(6) corporate representative; (2) Michael T. Atkinson, carrier sales representative, who booked the load at issue with AKJ, individually and as a Rule 30(b)(6) corporate representative; (3) Maximillian F. Cortis, customer sales representative, who accepted the load at issue from Coleman Cable, Inc.; (4) Keith Obiala,

confirming the hiring of AKJ for this specific load, referred to herein as the "Load Confirmation Sheet."[5]

As is abundantly clear from Plaintiff's evidence, AKJ Enterprises, Inc., the owner of the negligently operated tractor-trailer, had an abysmal safety record, as documented at the time of the accident in publicly available information posted by the Federal Motor Carrier Safety Administration ("FMCSA") on its website concerning the safety rankings and performance of motor carriers in its database, including but not limited to a safety rating from the FMCSA that never rose above "conditional," [6] and  "SafeStat"[7] driver

cargo claims manager for the Chicago Central branch office of C. H. Robinson, who dealt with claims related to the subject collision and load; (5) Lori J. Taylor, carrier services operations manager, who currently oversees the contract and insurance divisions, which are charged with, among other things, contracting with new carriers and checking on the insurance coverage and safety ratings of new and existing contract carriers; (6) Deborah A. Herd, insurance lead/insurance specialist, who checked the status of AKJ's insurance coverage and safety rating in the months prior to the subject collision; (7) Mike J. Lakotish, III, a business analyst with C. H. Robinson, individually and as a Rule 30(b)(6) corporate representative; and (8) Annette M. Sandberg, former Administrator for the FMCSA and expert witness for C. H. Robinson.

[5] A copy of the Load Confirmation Sheet was attached as "Exhibit 3" to the deposition of Michael T. Atkinson, taken by Plaintiff's counsel on October 8, 2007.

[6] Safety ratings are derived from compliance reviews conducted by the FMCSA with respect to specific carriers, which generally involve audits performed at the carrier's place of business. Accordingly, at any given time, there will be carriers that have no rating because they have not yet had a compliance review.  Of those carriers that have received a compliance review, the available ratings are "satisfactory," "conditional," and "unsatisfactory."

[7] On its website, the FMCSA defines "SafeStat" (Motor Carrier **Safe**ty **Stat**us Measurement System) as "an automated data-driven system that calculates the safety fitness on motor carriers."  The SafeStat methodology involves analytically assessing a motor carrier in four Safety Evaluation Areas (SEAs):  Accident SEA; Driver SEA; Vehicle SEA; and Safety Management SEA.  These scores may potentially incorporate compliance review data, but are largely based upon roadside inspections by state police and any available crash data.  Carriers who have sufficient data in FMCSA's system are assigned values for one or more of the individual SEAs from 0 to 100, with 0 being the best score and 100 being the worst possible score.  A score in any area of 75 or greater is considered deficient, in and of itself.  In addition, an overall SafeStat score is calculated for each carrier who is deficient in two or more SEAs, using a formula that incorporates scores from the four SEAs.  Carriers with overall SafeStat scores between 225 and 350 are given a "B" rating, and carriers with overall SafeStat scores between 350 and 550 are given an "A" rating.  Carriers with "A" and "B" scores are considered

and vehicle safety evaluation area ("SEA") scores compiled by the FMCSA, which ranked AKJ within the worst three percent (3%) of motor carriers in the country in terms of safety performance in the areas of driver and vehicle safety.[8],[9]   AKJ's known deficiencies in these specific areas of safety performance[10] are further reflected in

---

[8] by the FMCSA to be "at risk" in terms of the likelihood of such carrier causing a crash.  At the time the subject load was assigned to AKJ, this carrier was deficient in its Driver SEA, Vehicle SEA;, and Safety Management SEA, and had a "B" rating.  (See Exhibit 12, "MCMIS SafeStat Information," received from the FMCSA in response to a "Freedom of Information Act" request, and which was entered as "Exhibit 5" to the deposition of Defendant's expert, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008.

[8] Also publicly available on the FMCSA's website was information showing that AKJ had a history of repeated insurance cancellations (8 separate cancellations in a little over three years, to be exact), a significant period of time between July and September of 2001 where the carrier had no primary insurance coverage (AKJ continued to haul loads for C. H. Robinson during this period, as set forth in its response to Request for Admission No. 20, attached hereto as a part of Exhibit 11), and a period during September of 2001 in which the carrier's federal operating authority had been revoked (during which, again, AKJ continued to haul loads for C. H. Robinson, as set forth in its response to Request for Admission No. 21, attached as a part of Exhibit 11).  Attached as Exhibit 13, is a printout from the FMCSA's website concerning AKJ's insurance coverage and operating authority, which was entered as "Exhibit 21" to the deposition of Deborah A. Herd, taken by Plaintiff's counsel on March 14, 2008, and of which the Court may also take judicial notice pursuant to Fed. R. Evid. 201(b).  (See also Exhibit 14, Deposition of Deborah A. Herd, March 14, 2008, pages 34-35).  Plaintiff further notes that those employees of C. H. Robinson responsible for actually hiring motor carriers to haul individual loads are not privy to whether such carrier actually has insurance coverage or federal operating authority at the time of assigning such load, only knowing whether C .H. Robinson's Express System permits them to book a load with the carrier as a technical matter.  (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 116-119).

[9] Studies published on the FMCSA's website show a correlation between deficient SEAs and crash rates.  Specifically, carriers that have a deficient Driver SEA value are 63% more likely to be involved in a crash.  (See Exhibit 15, "SafeStat Effectiveness Study Update," dated March 2004, currently published on the FMCSA's website, of which the Court may take judicial notice pursuant to Fed. R. Evid. 201(b), and which was also attached as "Exhibit 6" to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).  Carriers that have a deficient Vehicle SEA are 6% more likely to be involved in a crash. (See Exhibit 15).  Carriers that have a deficient Safety Management SEA are 53% more likely to be involved in a crash.  (See Exhibit 15).  As noted previously, at the time the subject load was assigned to AKJ, this carrier was deficient in all three areas.  (See Exhibit 15, "MCMIS SafeStat Information"; see also Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 135-141).

[10] Attached hereto as Exhibit 17 is a copy of AKJ's first compliance review, conducted on May of

---

notations made by employees of C. H. Robinson in the internal records of C. H. Robinson, itself, which maintained, through its proprietary "Express System," extensive documentation of the company's dealings with AKJ, including, for example, numerous references to, or descriptions of, specific incidents of equipment- and driver-related problems involving AKJ Enterprises, Inc. that came to the attention of C. H. Robinson employees during the transport of specific loads hauled by AKJ for C. H. Robinson, including but not limited to numerous equipment breakdowns and failures, numerous claims from shippers/customers for damaged cargo,[11] drivers admitting to operating their vehicles in violation of hours of service requirements and other federal safety regulations, drivers abandoning or disappearing for days with their vehicles and the loads they contained, drivers being refused admittance at certain facilities for lack of acceptable credentials, such as a hard-copy driver's license, and even drivers threatening customers with knives, as well as the fact that C. H. Robinson actually had a

---

2003, a little over one year prior to the subject collision, showing that AKJ's proposed rating based upon this review was "unsatisfactory," and that imposed fines upon AKJ for two specific violations deemed "critical" in terms of safety.  Plaintiff wishes to draw the Court's attention to the fact that each of the loads in respect of which a fine was imposed were, in fact, loads assigned to AKJ by C. H. Robinson (Load #13652839, for example, referenced in the report for the May 2003 compliance review, is also one of the "problem" loads referenced in the Excel spreadsheets attached hereto as Exhibit 18, lines 765-782).  Attached hereto as Exhibit 19 is a copy of AKJ's follow up compliance review, conducted in July of 2003, which shows that AKJ committed many of the same violations between the first review and the follow up review that were cited in the first report, including the type of violation for which AKJ had been fined.  Both Exhibits 17 and 18 were attached as "Exhibit 3" and "Exhibit 4," respectively, to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008.

[11] Although the Express System records maintained by C. H. Robinson are replete with references to claims, including separate files created for such claims, Plaintiff has been unable to acquire copies of the actual files created for such claims because, as he has only recently been informed, (and after a hearing had been held and Defendant had already been ordered to produce such documents), C. H. Robinson's document retention policy with respect to such "claims files" differs from its retention policy on other types of electronic data, which upon information and belief, are archived off-site after two years.  In the case of "claims files,"

suit pending against AKJ for damaged cargo at the time the subject load was assigned to this carrier.[12],[13]   In continuance of its inadequate safety practices, AKJ employed Arciszewski, an inexperienced young driver who had only very recently obtained her commercial driver's license, and Morris, whose commercial driver's license had been revoked, to physically transport the subject load from Hayesville, North Carolina, to East Longmeadow, Massachusetts.  (See Exhibits 20 and 21, respectively, which are certified records from the State of Utah Department of Public Safety – Driver License Division and State of Georgia Driver Services Department, and which were also attached as "Exhibits 2 and 3," respectively, to the deposition of Virginia State Trooper K. Scott Clarke, taken by Defendant on February 7, 2008).

It is undisputed in this case that C. H. Robinson did not, at any time prior to the accident, check the SafeStat score or individual SEA scores for AKJ, and that it did not check these scores for any of its carriers as a matter of policy at the time of the subject

---

apparently, that data is completely destroyed after two years.

[12] See Exhibit 18, which is a document created by Defendant C. H. Robison for purposes of responding to certain requests for production from Plaintiff, and which was attached as "Exhibit 4" to the deposition of Bruce W. Johnson, taken by Plaintiff's counsel on March 13, 2008, among others.  Defendant has provided information concerning loads assigned to and hauled by AKJ Enterprises, Inc. by essentially lifting information from their Express system and arranging it in Excel spreadsheet format.

[13] Plaintiff should note that, approximately two months before the subject load was assigned to AKJ, Bruce Johnson, manager of the carrier services department, and who testified as a Rule 30(b)(6) corporate representative, was apparently specifically alerted by another C. H. Robinson employee, as a "heads up," that AKJ was being sued by C. H Robinson but that AKJ was "still doing business with several branches."  (See Exhibit 23, email to Bruce Johnson dated July 15, 2004).  Plaintiff presumes that this message was intended as some sort of warning, or at minimum, an invitation for Mr. Johnson to consider the propriety of such other branches continuing to do business with this carrier.  As C. H. Robinson failed to produce this document prior to Mr. Johnson's deposition on March 13, 2008, Plaintiff's counsel was unable to specifically question Mr. Johnson about this communication at his deposition.

accident.[14]  (See Exhibit 22, Deposition of Bruce W. Johnson, October 8, 2007, pages 91-92).  Further, it is undisputed that, although AKJ's safety rating was checked by C. H. Robinson employee, Deborah Herd, sometime between June and August of 2004, who would have found that AKJ's safety rating was "conditional," in violation of its contractual obligations to C. H. Robinson under the contract attached hereto as Exhibit 10,[15] C. H. Robinson took no action in response to this information or to enforce its contractual rights under the "contract carrier agreement," and made no attempt whatsoever to address this issue with AKJ or seek any further information or explanation as to why AKJ had received this rating, or to obtain this information directly from the FMCSA or any other source.[16]  Further, actual knowledge of AKJ's "conditional" safety rating did not prompt C. H. Robinson to review AKJ's appalling SafeStat scores.[17]  It is also undisputed that C. H. Robinson gave no consideration to numerous references to AKJ's unsafe practices in its own records in making the decision to hire AKJ to haul the load at issue.[18]  (See Exhibit 25, Deposition of Michael T.

---

[14] Plaintiff notes further that, despite the opinion of Judge Motz of the United States District Court for the District of Maryland in *Schramm v. Foster, et al*, 341 F. Supp. 2d 536 (D. Md. 2004*)*, that C. H. Robinson did have a duty to consider safety information in selecting carriers to haul its loads and further, that this duty included consideration of SafeStat information, C. H. Robinson still refuses to do so to this day.  (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, page 139).

[15] See Exhibit 26, Defendants' Answers to Interrogatory No. 6; Exhibit 14, Deposition of Deborah A. Herd, March 14, 2008, pages 29-30, 36-37.

[16] See Exhibit 22, Deposition of Bruce W. Johnson, October 8, 2007, pages 36-37, 42; Exhibit 14, Deposition of Deborah A. Herd, March 14, 2008, page 29.

[17] Bruce W. Johnson, in his Rule 30(b)(6) deposition, stated that, even if C. H .Robinson had been aware of AKJ's ultra high SEA scores in the weeks immediately prior to assigning the subject load to AKJ, C. H. Robinson would have taken no action whatsoever with respect to this knowledge.  (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, pages 164-165).

[18] Plaintiff notes that C. H. Robinson does have an internal system in place that evaluates carriers and provides them a rating based upon performance based factors (other than safety), such as issues relating to timeliness, claims, etc.  (See Exhibit 22, Deposition of Bruce W.

Atkinson, March 6, 2008, page 236).  Moreover, C. H. Robinson takes the position that, even if it had possessed actual knowledge of (1) AKJ's grossly deficient SEA scores; (2) AKJ's "conditional" safety rating, which was in violation of its contractual obligations to C. H. Robinson; (3) the numerous incidents of driver- and vehicle-related problems with AKJ noted in its own Express System, including notations of AKJ's drivers operating in violation of federal safety regulations, C. H. Robinson still would have refused to do any further investigation into the safety practices of AKJ and further, that C. H. Robinson would have continued to do business with this carrier if it appeared that this carrier was making is deliveries and servicing C. H. Robinson's customers, i.e., that this carrier was making money for C. H. Robinson.  (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, pages 166-188).   In fact, Bruce Johnson, C. H. Robinson's Rule 30(b)(6) corporate representative and head of the department that was ostensibly in charge of monitoring C. H. Robinson's carriers, testified at his deposition that he could not recall a single instance in which any information concerning any carrier that had come to his attention had caused him to make inquiry into that carrier's safety practices.  (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, page 187).[19]

---

Johnson, October 8, 2007, pages 45-46).  This system, known as the "Logipoint" system, is the only system of evaluating its carriers routinely employed by C. H. Robinson.  Plaintiff notes with interest that this system appears to incorporate a program which permits C. H. Robinson's Express System to automatically calculate the Logipoint rating for a particular carrier, based, presumably, upon information entered by employees into the Express System, which rating would change over time in response to the entry of new information.  (See Exhibit 22, Deposition of Bruce W. Johnson, October 8, 2007, pages 45-46); Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 58-59).  Plaintiff questions why C. H. Robinson could not just as easily have had a program or system in place to automatically review Express System records to look for patterns or abnormally high rates of safety-related notations, and either calculate a separate score based on these factors, or incorporate these factors into the Logipoints rating.

[19] C. H. Robinson essentially made safety considerations only a passing concern, at best, doing nothing more than periodically (or haphazardly) verifying that a carrier did not have an

Plaintiff wishes to draw the Court's attention to the fact that even C. H. Robinson's own expert witness believes that C. H. Robinson was unreasonable in not doing more.  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 112-117, 122-123).[20],[21]

Plaintiff notes that, despite having these egregious and undisputed facts brought to its attention, and despite having been instructed as to its obligations by Judge Motz

---

"unsatisfactory" rating, which would make it unlawful for the carrier to haul any loads in interstate commerce, such that the purpose of checking for an "unsatisfactory" rating may have had as much to do with the issue of whether the carrier could lawfully haul loads for C. H. Robinson, as opposed to whether the carrier could also haul such loads safely.  See 49 CFR 385.13(a).

[20] Ms. Sandberg testified at her deposition that it was, in fact, her opinion that a third-party logistics company, such as C. H. Robinson, should have, in 2004, conducted the following investigation upon learning that one of its carriers had a "conditional" rating:  (1) look at the information generated from the carrier's compliance review and determine the areas in which the carrier was deficient; (2) consider the plan of improvement proposed by the carrier, to correct the deficiencies; and (3) consider any internal records of the company related to the carrier's safety performance; as well as potentially (4) consider the financial soundness of the carrier.  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 112-117, 122-123).  This corresponds with the view of Plaintiff's expert, Thomas M. Corsi, Ph.D., who opines that C. H. Robinson should have investigated further with AKJ its safety practices, based on its "conditional" rating and "abysmal" SEA scores, if C. H. Robinson was considering continuing to do business with such a carrier.  (See Exhibit 27, Affidavit of Dr. Thomas Corsi, with expert report and deposition attached).  It is undisputed that C. H. Robinson did none of these things.

[21] Ms. Sandberg also testified to the fact that, as Administrator of the FMCSA, she personally made the determination to continue to make Driver, Vehicle, and Safety Management SEAs publicly available information because she considered the data underlying these scores to be "more reliable."  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, page 150).  Ms. Sandberg further stated that she believed that these SEA scores had "some value" and would "be some help" to private entities that were sophisticated enough to understand the data and methodology underlying such scores.  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 156-157).  Plaintiff submits that, as an international third-party logistics company maintaining the largest network of motor carriers in North America, C. H. Robinson was or should have been, in 2004, sophisticated enough, wealthy enough, and most certainly should have been motivated enough, to have a reasonable, if not firm, grasp of any issues surrounding these scores.  SafeStat and SEA scores have been published on the FMCSA's website since 1999 and, at the time the subject load was assigned to AKJ, all four individual SEA scores, as well as the overall SafeStat scores were still publicly available via the FMCSA's website.

in the *Schramm* decision,[22] Defendant C. H. Robinson still unabashedly takes the position that it has no duty whatsoever to give consideration to the safety performance, record, or fitness of the carriers that it employs to haul those loads entrusted to it by its customers, no matter how easily such information might be obtained.[23]   Apparently, unless or until C. H. Robinson comes to its own conclusion that it has a duty to take reasonable measures to ensure that it is hiring carriers who operate in a safe manner and in compliance with applicable federal safety regulations, including reviewing readily available public information, as well as its own records as to its past dealings

[22] Specifically, Judge Motz stated that "I believe that [C. H. Robinson's] self-proclaimed status as a 'third party logistics company' providing 'one point of contact' service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers.  This duty to use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMSCA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings. . . . imposing a common law duty upon third party logistics companies to use reasonable care in selecting carriers furthers the critical federal interest in protecting drivers and passengers on the nation's highways." See *Schramm v. Foster, et al*, 341 F. Supp. 2d 536, 551-552 (D. Md. 2004); see also Exhibit 22, Deposition of Bruce W. Johnson, October 8, 2007, pages 92-93, confirming that C. H. Robinson still represents itself to be the "one point of contact" for both its shippers/customers and its carriers.

[23] Defendant C. H. Robinson essentially takes the position that its status as a "broker" insulates it from any duty whatsoever to give consideration to safety issues.  Plaintiff's evidence, however, shows that C. H. Robinson is not the typical "broker," and, in fact, expressly markets itself as fulfilling, and does fulfill, a far greater role than that of the typical broker, as confirmed by its own expert.  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 18-19, 36)  As is clear from the evidence, the "shippers" or "customers," as C. H. Robinson calls them, contract with C. H. Robinson as their "one-point" contact for the transport of a specific load and have no knowledge whatsoever as to the qualifications of the carrier that will actually show up to their warehouses to haul their loads.  They rely upon the size and reputation of C. H. Robinson, which promises to "obtain the best truck for your shipment."  (See Exhibit 6).  Plaintiff submits that many shippers/customers would not have hired AKJ to haul loads for them if they had been approached by AKJ directly.  By virtue of placing itself between its customers and its carriers, as well as its repeated assurances of its own reliability and the reliability of its carriers, C. H. Robinson fosters an environment in which unsafe motor carriers can remain in business far longer than they otherwise would, and certainly far longer than they

with its carriers, C. H. Robinson has absolutely no intention of considering safety, even under the guise of good corporate citizenship.

Plaintiff notes, however, that C. H. Robinson is more than willing to advance at least the impression of good corporate citizenship in its advertising materials if there is some possibility of increasing its customer base, such as is set forth in Exhibit 28, C. H. Robinson's TransportFolio publication, Volume 15, Issue 3.[24]  In the *Schramm* decision, Judge Motz criticized the "cynical view" advocated by C. H. Robinson that shippers did not really care about such advertising materials, which expressed C. H. Robinson's intent to "step forward" and take responsibility when liability issues arose, because the shippers supposedly could not be held liable for personal injuries such as the catastrophic injuries to the plaintiff in that case:

> It should not be assumed, as implicit in Robinson's argument, that American businessmen and businesswomen are concerned only about saving every nickel and dime and protecting themselves from liability.  It is not only government regulators and others in the public sector who have a sense of public responsibility.  Moreover, even if business executives engaged only in a cost/benefit analysis, they may very well conclude that the loss to their goodwill resulting from a source of adequate compensation for third parties suffering dreadful injuries in accidents caused by carriers shipping their products far outweighs the marginal increase in cost they must pay for excess insurance coverage to third party logistics companies through whom they arrange their shipments.

*Schramm v. Foster, et al*, 341 F. Supp. 2d at 552-553.   As it turns out, Judge Motz was correct, and the trucking industry appears to have taken note of, and responded to, the *Schramm* decision.   For example, several months after the *Schramm* decision, in

---

should, putting the motoring public at substantial risk.

[24] The document attached as Exhibit 28 was authenticated by Defendant in its answers to Plaintiff's First Requests for Admissions, RFP No. 1, attached hereto as Exhibit 11.

November of 2004, the Transportation Intermediaries Association (TIA) endorsed the use of TransCore's CarrierWatch (TM) online service to "provide freight brokers with an efficient and cost-effective method of prospecting for as well as validating and monitoring carrier credentials," including reducing the risk of using "unauthorized, unsafe, or underinsured" carriers.  (See Exhibit 29).[25]  Further, there is now an internet company known as Carrier411 (a competitor of TransCore's CarrierWatch) that devotes itself to helping its customers choose safer carriers, based, in part, on safety ratings and SafeStat scores.  (See Exhibit 30, from Carrier411's website).[26]

Plaintiff believes that Judge Motz, in his decision in the *Schramm* case, was correct and that C. H. Robinson has (and had) a duty to the general motoring public, including Plaintiff, each and every time it assigns a load to one of its carriers.   Plaintiff further believes that this duty was breached in the present case by the negligence of C. H. Robinson in selecting and hiring AKJ to haul, and/or entrusting AKJ with responsibility for safely transporting, the subject load.  This negligence on the part of C. H. Robinson set in motion the series of events that led to Plaintiff's injuries and was the proximate cause of the subject collision.  Plaintiff submits that the negligence of AKJ and Arciszewski was or should have been foreseeable to C. H. Robinson when it committed the negligent act of selecting AKJ to haul the load at issue, as well as the very real potential for innocent drivers sharing the highways with Arciszewski, such as Plaintiff, to be seriously harmed as a result of her negligence and the negligence of AKJ.

---

[25] Plaintiff asks that the Court take judicial notice of the article containing this information being found on the website for Findarticles.com at http://findarticles.com/p/articles/mi_m0EIN/is_2004_Nov_22/ai_n7073256, pursuant to Fed. R. Evid. 201(b).

[26] Plaintiff asks that the Court take judicial notice of the attached article being found on the website for Carrier411 at H. Robinson's website at http://www.carrier411.com/safety-ratings-safestat-scores.cfm, pursuant to Fed. R. Evid. 201(b).

## BACKGROUND

I.     **THE KEY PLAYERS:**

    A.     **AKJ ENTERPRISES, INC.**

Defendant AKJ was a motor carrier company which was operated out of Jonesboro, Georgia, by Elson and/or Dionnie Bolar, who have been made third-party defendants in this matter, along with AKJ, itself.[27]  C. H. Robinson's records show that AKJ entered into a "Contract Carrier Agreement" with C. H. Robinson on or about April 19, 2001, a copy of which is attached hereto as Exhibit 10.[28]  AKJ commenced hauling loads for C. H. Robinson shortly thereafter and continued routinely hauling

---

[27] To the best of Plaintiff's knowledge, neither Dionnie Bolar nor Elson Bolar have received proper notice of the present third-party complaint from Defendant C. H. Robinson.

[28] As noted on Page 10 of this document, AKJ Enterprises, Inc., which did business as "Unlimited Express," was a successor entity to Bolar Trucking Express, Inc., another motor carrier that had been owned by Elson and Dionnie Bolar, and which had also hauled loads for C. H. Robinson.  In light of this notation on C. H. Robinson's contract, it is clear that C. H. Robinson had actual knowledge of the relationship between AKJ Enterprises, Inc., and Bolar Trucking Express, Inc.  Furthermore, Mike Atkinson, the carrier sales representative who booked the load at issue and who was the specific account representative at C H. Robinson for AKJ Enterprises Inc., testified at his deposition that he had been aware that Elson Bolar had done business with C. H. Robinson under the name of another company.  (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 97, 99).  Additionally, in his deposition on March 13, 2008, Bruce Johnson, manager of carrier services for C. H. Robinson and the company's Rule 30(b)(6) representative, stated that he would consider information as to the manner in which Elson and Dionnie Bolar ran Bolar Trucking Express to be instructive as to how they would run AKJ Enterprises, Inc.  (See Exhibit 24, Deposition of Bruce Johnson, March 13, 2008, page 189).  Accordingly, it is Plaintiff's position that evidence relating to the safety practices of Bolar Trucking Express, Inc., is pertinent to any inquiry into the issue of C. H. Robinson's negligence in assigning the subject load to AKJ Enterprises, Inc., or any load, for that matter.  Although Plaintiff has still be unsuccessful in retrieving any information from C. H. Robinson concerning its relationship with this predecessor entity, Plaintiff submits for the Court's attention Exhibit 31, from the FMCSA's website, showing repeated insurance cancellations and revocation of operating authority in respect of Bolar Trucking Express, Inc., which would have been available to C. H. Robinson in 2004 and of which Plaintiff requests the Court take judicial notice pursuant to Fed. R. Evid. 201(b).

loads for Defendant over the course of the next three to four years, even after the occurrence of the subject collision and two prior accidents involving C. H. Robinson loads in June and November of 2002, respectively.  (See Exhibit 18, lines 264 and lines 401-465).

As noted previously, records of the FMCSA show that AKJ received a proposed "unsatisfactory" rating on its first compliance review from the FMCSA in May of 2003, which was only slightly upgraded to "conditional" in respect of AKJ's follow up compliance review in July of 2003.  This "conditional" safety rating was never upgraded to "satisfactory" by the FMCSA.  Further, AKJ's  SafeStat score placed it as an "at risk" carrier in the "B" category for most of 2004, and, in fact, AKJ had deficient Driver SEA scores continuously from July of 2002 through the date of the accident.  (See Exhibit 12). From July 2003 through the date of the accident, AKJ had no Safety Management SEA score that was not deficient.  (See Exhibit 12).  In addition to the foregoing, AKJ apparently experienced great difficulty maintaining any insurance policy for its entire term, and had, in fact, eight separate cancellations of its insurance during the period of a little over three years in which it worked for C. H. Robinson.  (See Exhibit 13).  All of this information was publicly available.

In addition, C. H. Robinson's own internal records from its "Express System," show that numerous incidents occurred during the period that AKJ hauled loads for C. H. Robinson, which should have put Defendant on notice that it was dealing with an unsafe and unfit motor carrier.  Specifically, there are over 22 separate incidents noted of equipment or vehicle breakdowns; two separate instances of AKJ drivers arriving at their destination without proper credentials, one such incident involving Charles Kevin

Morris, the co-driver on the subject load;[29] several different instances of AKJ drivers notifying C. H. Robinson that either they or their vehicles had been pulled over by police and that they or their vehicles were being taken out of service; two separate instances prior to the subject collision where AKJ drivers were involved in crash while hauling C. H. Robinson loads, one instance of an AKJ trailer being rejected by a customer on safety grounds; one instance of an AKJ driver simply walking off and abandoning his tractor-trailer, with keys in the ignition, along with C. H. Robinson's load; one instance of an AKJ driver disappearing with his tractor-trailer and a load worth approximately $150,000.00 for nearly a week, while multiple police departments searched for him, ultimately ending up in jail; and once instance of an AKJ driver threatening employees of one of C. H. Robinson's customers with a knife when they asked him to remove his flip-flops and put on a pair of boots (presumably for safety purposes).[30]   (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, pages 168-186; Exhibit 18, for example, including but not limited to lines 121, 174, 189, 239, 243, 273, 284, 303, 336, 412, 414-418, 440-, 455, 496, 498, 583, 625, 676, 705, 801, 830, 1105, 1263-1303, 1615, 1693, 1709-1715, 1733, 1747, 1816-1820, 1828-1834, 1897, 1974, 2165,

---

[29] Mike Atkinson, who booked the subject load and was considered the account representative for AKJ, testified at his deposition that he thought Morris had hauled loads for him before and confirmed that Morris had been the driver on another load for AKJ and C. H. Robinson, namely Load No. 20652169, which the records attached hereto as Exhibit 18 indicate was a load that experienced problems relating to the driver's credentials.   (See Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, pages 214, 223-235; Exhibit 18, lines 2280-2300).

[30] One of C. H. Robinson's Rule 30(b)(6) corporate representatives, Mike Atkinson, testified at his deposition that if he were informed by a driver or the driver's carrier that the driver was running behind schedule because he had been taken out of service by law enforcement authorities for being over his hours in violation of federal safety regulations, or because he was taking an alternate route to avoid weigh-in scales because the tractor-trailer was overweight, again in violation of federal safety regulations, the only response that Mr. Atkinson would take would be to reschedule the delivery.  (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 108-109, 111-113).

2169, 2260-2263, 2284-2286, 2360, 2364, 2400, 2408, 2411, 2433, 2438-2467, including 2454).   Further, at the time of the subject accident, AKJ and C. H. Robinson were actually embroiled in a lawsuit in the Northern District of Illinois over a damaged load that AKJ had delivered but in respect of which AKJ had refused (or been unable to) reimburse C. H. Robinson, despite "frequent and repeated" demands from C. H. Robinson that it do so.   (See Exhibit 32, Complaint from electronic records of the United States District Court for the Northern District of Illinois, *CH Robinson Co v. AKJ Enterprises Inc.*, Civil Action No. 1:04-cv-04672).[31]   C. H. Robinson ultimately obtained default judgment in that case because of issues with the responsive pleading filed by AKJ.

Additionally, as noted in Plaintiff's Complaint, C. H. Robinson was or should have been aware that AKJ was impaired financially.   Specifically, C. H. Robinson was aware that many of its smaller carriers, such as AKJ, relied upon its QuickPay Program and its T-Chek System to keep their vehicles on the road.   (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, pages 127-135).[32]   The importance of AKJ's financial condition is that there is a demonstrated link between poor financial standing on the part of a carrier and safety performance, in that carriers who are struggling financially appear to be more likely to experience safety issues.   Attached hereto as Exhibit 33 is a study conducted on behalf of the FMCSA by the Supply Chain Management Center of the Robert H. Smith School of Business, University of Maryland, which was co-authored by Plaintiff's expert, Dr. Thomas M. Corsi.   This study was completed prior to the

---

[31] Plaintiff asks that the Court take judicial notice of the electronic records of the United District Court for the Northern District of Illinois, pursuant to Fed. R. Evid. 201(b).

[32] Seventy-five percent (75%) of C. H. Robinson's current contract carriers are smaller carriers with less than 100 power units (tractors).   (See Exhibit 24, Deposition of Bruce M. Johnson,

accident and was publicly available.  Defendant's own expert, Annette M. Sandberg, also testified in her deposition as to the correlation between poor financial performance and poor safety performance.  (See Exhibit 16, Deposition of Annette M. Sandberg, March 18, 2008, pages 60-61; 123-124).  It should also be noted that this same study found a correlation between poor safety performance and carrier fleet size.  (See Exhibit 33).

AKJ obtained a Chapter 7 discharge in the Northern District of Georgia, by Order dated May 25, 2006, but it appears that this motor carrier ceased operations in or around November of 2004, according to documents filed in the context of the bankruptcy proceeding.[33]  Elson and/or Dionnie Bolar apparently then reformulated AKJ Enterprises, Inc. as AKJ Logistics, LLC, but this successor entity apparently only operated for a period of several months in 2005.  (See Exhibit 34, from the FMCSA website, showing an involuntary revocation of this entity's operating authority on or about October, 24, 2005).  C. H. Robinson continued to do business with AKJ Logistics, LLC, which was clearly known to be a successor entity to AKJ Enterprises, Inc., despite continued instances of equipment breakdowns and, again, drivers reporting that they had been taken out of service for violations of their hours of service limitations.  (See Exhibit 35, Excel spreadsheet data from C. H. Robinson's Express System).  C. H. Robinson apparently only ceased doing business with AKJ Logistics, LLC, after Elson Bolar, the principal of AKJ Enterprises, Inc., refused to reimburse C. H. Robinson for the remaining balance of the cargo-related damages stemming from the subject collision.  (See Exhibit 36, recently provided in compliance with Judge Urbanski's Order

---

March 13, 2008, page 133).

[33] In the United States Bankruptcy Court for the Northern District of Georgia, 05-70896-jem.

compelling production; Exhibit 37, Deposition of Keith Obiala, March 6, 2008, pages 55-57).  Plaintiff believes that it is noteworthy that AKJ Logistics, LLC appears to have gone out of business shortly after C. H. Robinson decided to cease its business relations with this carrier, which underscores the dependence that Elson Bolar and the various reformulations of his trucking company had on the business provided by C. H. Robinson.[34]

### B.   KRISTINA MAE ARCISZEWSKI and CHARLES KEVIN MORRIS

At the time of the subject collision, it appears that the tractor-trailer owned by AKJ Enterprises, Inc., and hauling the load of cable reels entrusted to AKJ by C. H. Robinson, was being operated by Kristina Mae Arciszewski.  Arciszewski and her reputed boyfriend, Charles Kevin Morris, were hired by AKJ to transport the subject load entrusted to AKJ's care by C. H. Robinson and both took turns driving the tractor-trailer during the trip in question.  Plaintiff's evidence indicates that, at minimum, Arciszewski and Morris were driving as a team on behalf of AKJ and C. H. Robinson. (Exhibit 38, Morris' Answers to Interrogatories No. 5, from previous Interpleader action; Exhibit 37, Deposition of Keith Obiala, March 6, 2008, pages 71-72; See Exhibit 39, Automobile Loss Notice authored by AKJ's insurance broker;).  Mike Atkinson, who booked the load at issue and testified in his deposition as a Rule 30(b)(6) corporate representative, stated that it was his understanding when he booked the load with AKJ that Charles Kevin Morris would be the driver on the subject load.  (See Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, page 256).

---

[34] Exhibit 34 shows that AKJ Logistics, LLC was given notice by the FMCSA of the agency's intent to revoke its operating authority in September of 2005, approximately one month after the spreadsheets attached as Exhibit 36 show that C. H. Robinson made the decision to place

Records of the State of Georgia Department of Driver Services show that Morris had his license to operate any type of motor vehicle cancelled in August of 2004, prior to the subject collision and such that his operation of the AKJ tractor-trailer during the trip in question was in violation of federal and state law, including but not limited to 49 CFR 391.15.  (See Exhibit 21, Motor Vehicle Report).  Plaintiff's evidence is further that Arciszewski had only possessed a commercial driver's license for a little over one month at the time of the accident.   (See Exhibit 20, Utah Driver License Record).  Additionally, as shown by various certified motor vehicle reports attached hereto as "Exhibit 40," Arciszewski had apparently moved from place to place frequently within the few years prior to being hired to drive the subject load and had apparently retained active driver's licenses in multiple states despite §53-3-406 of the Utah Code, as well as 49 CFR 383.21 of the Federal Motor Carrier Safety Regulations, which prohibit the holder of a commercial driver's license from having any other driver's licenses.

Evidence obtained in the course of the prior Interpleader proceeding, ostensibly from AKJ Enterprises, Inc., indicates that AKJ failed to investigate Morris or Arciszewski prior to sending them to Hayesville, North Carolina, to pick up the load at issue, including but not limited to failing to require them to provide the information in their applications for employment required under 49 CFR 391.21 or to make any inquiries into their respective driving records and employment history as required under 49 CFR 391.23.[35],[36]   Alternatively, to the extent that there is some question as to

_____

AKJ Logistics, LLC on its "do not use" list.

[35] There appears to be some confusion in the evidence as to when Morris and Arciszewski first began working for AKJ.  Although the information initially received by Plaintiff through discovery in a prior, related Interpleader proceeding, *Canal Ins. Co. v. AKJ Enterprises, Inc., et al*, 7:05-cv-00312, indicated that these individuals were hired only the day before the load at issue was to have been picked up in North Carolina, records received from Defendant C. H. Robinson indicate that Morris, at least, had hauled one or more loads for AKJ and C. H.

when Morris and/or Arciszewski first became associated with AKJ, it would be Plaintiff's position that AKJ either had actual knowledge of the status of Morris and Arciszewski or neglected to investigate the status of these drivers for an even longer period than originally believed.

At the time of the accident, Arciszewski and Morris were engaged in the process of driving a load from Hayesville, North Carolina, to East Long Meadow, Massachusetts, on behalf of AKJ and C. H. Robinson.  In his answers to interrogatories prepared in the context of the previous Interpleader proceeding, Morris indicated that he may have done the majority of the driving during the trip in question and implied that Arciszewski was nervous about undertaking the trip at issue.  (See Exhibit 38).

### C.   C. H. ROBINSON WORLDWIDE, INC.

C. H. Robinson generally holds itself out as one of the world's largest third-party logistics companies, which, among other things, connects shippers and carriers for purposes of arranging the transport and delivery of various types of cargo.  C. H. Robinson reports on its website that it amassed as much as $7.3 billion in gross revenues in 2007,[37] and currently has relationships with over 48,000 carriers.[38]  In fact, C. H.

---

Robinson prior to the load at issue and, in fact, had experienced problems during such prior trip at a security checkpoint of the Jacksonville Port Authority because of his inability to produce acceptable credentials.  (See Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, pages 214, 224-235).  Further, copies of the purported employment agreements between AKJ and each of Morris and Arciszewski, which had also been provided to Plaintiff during the Interpleader proceeding appear to have been altered.  Plaintiff has never seen originals of any of this supposed documentation and questions whether any of the documentation ostensibly provided by AKJ is authentic.

[36] §391.11 of the Federal Motor Carrier Safety Regulations prohibits a motor carrier from employing a driver who lacks a valid CDL.

[37] This company has been so successful, financially speaking, that in its 10-Q Quarterly and 10-K Annual filings with the SEC since having received notice of the present suit, C. H. Robinson

Robinson boasts on its website that it has "the single largest network of motor capacity in North America."  On its "CRWTrucks," website, C. H. Robinson notifies potential carriers that it directs approximately 20,000 shipments over the public highways per business day.  (See Exhibit 41, from CRWTrucks website).[39]  Financial information about this entity, made publicly available on its website, indicates that the great majority of C. H. Robinson's total gross profits have been consistently derived through its arrangement for the transport of freight over the country's public highways through its numerous contract carriers.  (See Exhibit 42, from C. H. Robinson's website).[40]

The annual budget for C. H. Robinson's "carrier services" department, which is the department responsible for a wide variety of issues relating to the tens of thousands of carriers who do business with C. H. Robinson, including any monitoring of insurance status, operating authority, and safety ratings, was approximately $4 Million for 2007. (See Exhibit 24, Deposition of Bruce Johnson, March 13, 2008, page 195).[41]  Among the

---

has consistently lumped Plaintiff's lawsuit in with its collection of "routine litigation arising in the ordinary course of our business operations, none of which is expected to have a material adverse effect on our financial condition, results of operations, or cash flows."

[38] Although C. H. Robinson once possessed authority as a motor carrier from the FMCSA, it only held authority as a "broker" at the time the subject load was entrusted to AKJ and Arciszewski.

[39] Plaintiff asks that the Court take judicial notice of this statement having been made on the website for CHRWTrucks.com at https://www.chrwtrucks.com/mktg/car_programs.aspx, pursuant to Fed. R. Evid. 201(b).

[40] Plaintiff asks that the Court take judicial notice of this statement having been made on Defendant's website at http://media.corporate-ir.net/media_files/irol/97/97366/Q47_financial_summary_FINAL.pdf, pursuant to Fed. R. Evid. 201(b).

[41] Within the "carrier services" department are two divisions, known as the "contract division" and the "insurance division," which are both currently overseen by Lori J. Taylor, C. H. Robinson's Carrier Services Operations Manager, who testified that there are currently only six individuals in the insurance division, which is responsible for checking and monitoring the insurance status of C. H. Robinson's approximately 48,000 carriers.  (See Exhibit 43, Deposition of Lori J. Taylor, March 14, 2008, pages 42-43).  Ms. Taylor further testified that there were only nine individuals working in the contract division, which is responsible for handling contract

responsibilities of this department are handling cargo claims, resolving disputes between carriers and C. H. Robinson; sales and marketing efforts directed at carriers; promoting C. H. Robinson's myriad of programs aimed at carriers, such as its fuel card; maintaining the carrier website known as CHRWTrucks.com; maintaining C. H. Robinson's call center for communications with carriers; as well as the insurance and contracting functions. (See Exhibit 22, Deposition of Bruce W. Johnson, October 8, 2007, pages 29-30). Assuming that C. H. Robinson had 48,000 carriers that it was overseeing in 2007, this would amount to a little over $83.00 being spent per carrier that year in terms of the wide range of activities performed by the carrier services department, including any efforts at monitoring insurance, operating authority, and safety ratings.[42]

---

issues with C. H. Robinson's contract carriers, and that, of these nine individuals, only four such individuals performed the role of reviewing contracts entered into between C. H. Robinson and new contract carriers. (See Exhibit 43, Deposition of Lori J. Taylor, March 14, 2008, page 45).

[42] Plaintiff notes here that it is unclear what precisely is done to "monitor" the status of C. H. Robinson's carriers, in any area. Specifically, C. H. Robinson stated in its response to Plaintiff's First Set of Interrogatories that "Robinson used an automated internal computer system, called Express, to track insurance policy expiration dates and anniversaries to ensure that each carrier's status with the FMCSA is reviewed not less than annually." (See Exhibit 26, Defendant's Answers to Plaintiffs First Set of Interrogatories, Interrogatory No. 10). However, Deborah A. Herd, who is the only employee of C. H. Robinson ever known to have checked the safety ratings of AKJ, and Lori J. Taylor, her supervisor and manager for carrier services operations, both denied the existence of any such policy of regular or "scheduled" checks to the extent motivated by some internal scheduling system. Specifically, Deborah Herd testified that any checks of the insurance status of one of C. H. Robinson's contract carriers only occurred when C. H. Robinson received an insurance certificate from some outside source, such as the insurer or the carrier, itself. (See Exhibit 14, Deposition of Deborah A. Herd, March 14, 2008, pages 13-14, 22-24, 25-26). Lori J. Taylor testified that the insurance status and safety ratings of C. H. Robinson's carriers were checked by her staff only if they were prompted to do so by the receipt of some externally generated communication that required them to access this information. (See Exhibit 43, Deposition of Lori J. Taylor, March 14, 2008, pages 17-190. As these ladies were most directly involved in these areas, Plaintiff must presume that their testimony most accurately states the actual practices of C. H. Robinson, which is not to keep an internal record of when insurance certificates are scheduled to expire and checking insurance status, operating authority, and safety ratings when prompted to do so by some internal scheduling system but, rather, to only check this information when some event happens to

In 2004, the year in which the subject collision occurred, C. H. Robinson reported as much as $4.3 billion in gross revenues, and over $500 million in gross profits stemming specifically from its arrangement for the transport of freight over the country's public highways, with over 3.8 million shipments having been delivered utilizing C. H. Robinson's services.  (See Exhibit 44, publication produced by Defendant in discovery; Exhibit 45, excerpt from 10-K Report for 2004)[43]  At that time, C. H. Robinson was reporting that it had relationships with over 35,000 carriers.  (See Exhibit 45).

Shippers (or "customers," as C. H. Robinson prefers to call them) are drawn to do business with C. H. Robinson in light of its promise to act as "one point of contact" for the customer with respect to any particular load by managing and monitoring the performance of the carrier during the transport of such load so that the customer does not have to, as set forth on C. H. Robinson's website.  (See also Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, pages 19-21).  C. H. Robinson further promises, via its extensive website, that "Once you tender the shipment to us, we take total responsibility.  We dispatch the load, make sure carriers meet appointments, and monitor service.  Carriers provide tracking information via satellite, EDI, the Internet, or phone while in transit.  We pay carriers, handle issues, and resolve claims."  (See Exhibit 46, from C. H. Robinson's website)  C. H. Robinson has even been known to promise to "step forward when liability issues arise," insulating shippers by (1) working with carriers who carry full insurance coverage; (2) working with carriers who have agreed to indemnify both the shipper and C. H Robinson from liability; and (3) "in

---

prompt C. H. Robinson to do so.

[43] Plaintiff asks that the Court take judicial notice of Defendant's 10-K Report for 2004 being made publicly available on C. H. Robinson's website, http://www.chrobinson.com, pursuant

the rare event that the damage goes beyond the carrier's insurance limits, CHRW maintains a liability insurance policy that pays the rest." (See Exhibit 28, TransportFolio, Volume 15, Issue 3, published by C. H. Robinson in 2002 for "the exclusive use and benefit of shippers and receivers."). Plaintiff notes that C. H. Robinson has yet to "step forward" in the present case.

C. H. Robinson surmises on its website that motor carriers are drawn to do business with C. H. Robinson because of its "large freight volumes" and "prompt payment programs." C. H. Robinson further claims that it helps carriers "keep their assets rolling." (See Exhibit 46, from Defendant's website).[44] Bruce Johnson, manager of C. H. Robinson's carrier services department, confirmed in his deposition that carriers were attracted to C. H. Robinson by its special programs providing for faster payment, freight opportunities, and its national presence. (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, page 127). Mr. Johnson felt that smaller carriers, particularly, were drawn to his company because of cash flow issues. (See Exhibit 24, Deposition of Bruce W. Johnson, March 13, 2008, page 134).

With respect to its network of "contract carriers," C. H. Robinson's business model is such that sales representatives, such as Mike Atkinson, who booked the subject load, make the determination as to which carrier to employ in respect of an individual load. In making that determination, it is admitted that safety ratings are not considered by such employees in this process, and oftentimes, not even C. H. Robinson's own "Logipoint" ratings. (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 61-68, 176-177). SafeStat SEA scores are not (and were not at the time of the

---

to Fed. R. Evid. 201(b)
[44] Plaintiff asks that the Court take judicial notice of this statement having been made on Defendant's website at http://www.chrobinson.com/truckload.asp, pursuant to Fed. R. Evid.

subject collision) considered by such employees when selecting a carrier to haul a particular load.  (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, page 178).   Further, the sales representatives make no effort to check into information concerning the past performance of a particular carrier before assigning a load to such carrier, even though such information is readily accessible to them through C. H. Robinson's Express System.  (See Exhibit 25, Deposition of Michael T. Atkinson March 6, 2008, page 236).  Mike Atkinson, in particular, who booked the subject load and was considered the account representative for AKJ, specifically denied taking any action in respect of specific incidents of safety related problems and/or problems indicating lack of compliance on AKJ's part with applicable federal regulations, which occurred during the course of loads that he booked with AKJ, prior to booking the load at issue in the present case, whether by addressing the issue with his supervisors, the carrier, or anyone else.  (See Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, page 235, 251, 253-254, 261, 278-279).   Specifically, Mr. Atkinson stated "we're not the driver watchdogs of C. H. Robinson" and "that's not part of what's in my job description to be calling [Carrier Services] about, you know, drivers and their fleet."  (See Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, page 253).

Under the system put in place by C. H. Robinson, the individual sales representatives charged with selecting the carriers who will be hauling loads for C. H. Robinson are paid commission based upon the profit margin made on each load.  (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 68-69). Accordingly, the only factor that C. H. Robinson appears to promote as a key consideration in selecting a carrier to haul a particular load is how cheaply that carrier

---

201(b).

can be pressed to transport the load.  Certainly, the commission structure put in place by C. H. Robinson to compensate those sales representatives responsible for booking loads would foreseeably lead to an almost exclusive focus on "the bottom line."  This, however, would appear to be precisely what C. H. Robinson intends to accomplish.  As C. H. Robinson's Rule 30(b)(6) corporate representative, Bruce M. Johnson, testified at his deposition, C. H. Robinson considered, and then rejected, the notion of checking SafeStat or SEA scores for purposes of evaluating the safety performance of its carriers because this could lead to the suspension of its relationship with as much as twenty-five to fifty percent of its carriers, which would obviously impact C. H. Robinson's "bottom line."  (See Exhibit 24, Deposition of Bruce M. Johnson, March 13, 2008, pages 210-212).

## II.    LOAD NO. 21422065 and THE ACCIDENT:

As noted previously, terms relating to the subject load, designated by C. H. Robinson as Load #21422065, were negotiated by the customer, Coleman Cable, Inc., with one of C. H. Robinson's customer sales representatives, Max Cortis, who then input information into C. H. Robinson's "Express System" concerning the particulars of the load, including the pick-up destination (Coleman Cable's facility in Hayesville, North Carolina), the pick-up date and time (September 10, 2004, between 2:00 and 3:00 p.m.), the delivery address (Coleman Cable's facility in East Longmeadow, Massachusetts), and the delivery date and time (September 13, 2004, between 9:00 a.m. and 2:00 p.m.).  (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, page 25; Exhibit 9, Load Confirmation Sheet for Load #21422065).  This load was then booked with AKJ by Mike Atkinson, one of C. H. Robinson's carrier sales representatives, after the carrier's fee was negotiated and agreed to.  (See Exhibit 8, Deposition of Michael T.

Atkinson, October 8, 2007, pages 32-33; Exhibit 9, Load Confirmation Sheet).

Mike Atkinson, testifying as a Rule 30(b)(6) corporate representative for C. H. Robinson, testified that a driver hauling a load for C. H. Robinson would ordinarily be required to call in as many as five or more times during the period between the driver's dispatch to pick up the load and the delivery of the load. (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 48-49). Specifically, the driver (or carrier's dispatcher) is to call C. H. Robinson (1) when dispatched to go pick up the load; (2) when the driver arrives at the pick up address; (3) when the trailer is loaded and the freight checked by the driver; (4) regular status update calls during the actual transport of the load to advise C. H. Robinson of the driver's progress, which would vary in frequency depending upon the time required to make the trip; and (5) when the driver arrives at the delivery address. In addition, the driver would call C. H. Robinson to report any problems or issues associated with the transport of the load, whether equipment problems, problems experienced at either the pick up or delivery address; problems that are driver-related in nature; traffic or other delays; and/or problems with, or a need for, advances to the driver via C. H. Robinson's T-Chek System. (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 51, 55, 185).[45] C. H. Robinson's Express System records indicate that Arciszewski's co-driver, Charles Kevin Morris, called in on one or more such occasions, as corroborated in his answers to interrogatories in the underlying Interpleader action, attached hereto as Exhibit 38. (See

---

[45] T-Chek Systems, Inc., a wholly owned subsidiary of C.H. Robinson Worldwide, Inc., can help. T-Chek provides a menu of services, including the T-Card, which "enables drivers on the road to pay for fuel, repairs, scales, hotel rooms, receive cash, and other necessities at retail fueling and terminal locations across North America." (See Exhibit 47, from website of T-Chek Systems, Inc., http://www.tchek.com/tchek_tcard.asp, of which Plaintiff requests the Court take judicial notice in accordance with Fed. R. Evid. 201(b)).

also Exhibit 18.1, line 3840, showing communications having been received from Morris).

C. H. Robinson's internal "Express System" records show that the subject load was designated as "hot," which in the vernacular of C. H. Robinson's employees means that there is some particular degree of time sensitivity associated with the load.  (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, page 67- 70; see also Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, pages 266-267).  Mike Atkinson, the carrier sales representative who booked this load with AKJ and was involved in monitoring the transport of the subject load, testified at his deposition that it was his understanding that Arciszewski and her co-driver, Charles Kevin Morris, were behind schedule at the time the subject accident occurred.   (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, page 120; Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, pages 267-268).

As noted previously, the accident giving rise to the present suit occurred in Wythe County, Virginia, at approximately 8:30 p.m. on September 12, 2004, in the vicinity of Mile Marker 84 on Interstate 81.  Arciszewski and Morris had picked up the load of cable reels at Coleman Cable's North Carolina facility and were in route to East Longmeadow, Massachusetts.   At the time of the accident, Plaintiff was traveling southbound on Interstate 81 in his employer's 2004 Freightliner tractor-trailer to deliver a load destined for Salisbury, North Carolina.  Traveling northbound on Interstate 81 at that same time was the 1997 Freightliner tractor-trailer owned by AKJ, which was being driven by Arciszewski.   Charles Kevin Morris, who was allegedly Arciszewski's boyfriend and co-driver, has previously represented in the context of the Interpleader

action that he was asleep in the sleeper berth of the AKJ vehicle at the time of the accident. (See Exhibit 38, Morris' Answers to Interrogatories, Interrogatory No. 12). As the two tractor-trailers were approaching one another from opposite directions, Arciszewski's tractor trailer suddenly and abruptly left her lane of travel, crossed the median between the northbound and southbound lanes of Interstate 81 and struck Plaintiff's tractor-trailer essentially head-on. (See Exhibits 1 – 5). Susan Cannedy, whose vehicle was traveling for some period of time behind Arciszewski's vehicle, describes in her attached affidavit what she felt was erratic or unsafe behavior on the part of the AKJ tractor-trailer minutes before the subject collision occurred, including what appeared to be an aborted effort by Arciszewski to exit the interstate. (See Exhibit 2, Affidavit of Susan Cannedy). Richard Peele, a professional tractor-trailer driver whose tractor-trailer was passed by the AKJ vehicle shortly before the subject collision, estimates that Arciszewski was speeding as she passed by him. (See Exhibit 3, Affidavit of Richard Peele).

Both tractor trailers were essentially ripped apart in the collision. (See Exhibit 1, Virginia State Police Division Four Crash Team Report). As noted previously, Arciszewski died at the scene, having suffered profound injuries. Her co-driver, Charles Kevin Morris, also suffered injuries. Plaintiff was severely and permanently injured, suffering a concussion, multiple fractures of his right arm and numerous fractures of his left leg, such that essentially every bone in Plaintiff's left leg was broken from just below his hip to his ankle. Plaintiff is permanently disabled and continues to suffer from his emotional and physical injuries arising from this collision.

## III.   <u>PLAINTIFF'S CAUSE OF ACTION</u>

In the present case, Plaintiff currently has three separate and distinct legal theories as to the liability of C. H. Robinson for his severe and disabling physical injuries.  Count I of Plaintiff's Complaint seeks damages against C. H. Robinson for the negligence of AKJ Enterprises, Inc. and Kristina Mae Arciszewski, which led to the subject collision.   Under Counts III and V of his Complaint, Plaintiff seeks damages against C. H. Robinson for its own, separate negligence in (1) selecting and hiring AKJ Enterprises, Inc. and Kristina Mae Arciszewski to haul the subject load and (2) in entrusting responsibility for the safe transport of the subject load to their care.  As Plaintiff believes that each of C. H. Robinson, AKJ Enterprises, Inc., and Kristina Mae Arciszewski were negligent in the course of events leading to the subject collision that has rendered him permanently disabled, Plaintiff respectfully submits that he is entitled to relief under all three pending counts.   However, for purposes of Plaintiff's present motion, Plaintiff only seeks summary judgment against C. H. Robinson in respect of its own negligence and liability for Plaintiff's damages under Counts III and IV of Plaintiff's Complaint.[46]  In addition, Plaintiff also seeks partial summary judgment as to

---

[46] Plaintiff does not seek summary judgment as to Count I of Plaintiff's Complaint, which asserts against Defendant C. H. Robinson a claim for vicarious liability in respect of the negligence of AKJ Enterprises, Inc. and Arciszewski, but Plaintiff does specifically intend to reserve this claim for trial.  By way of explanation, Plaintiff has encountered difficulties in obtaining discovery from C. H. Robinson, including being required to file, and have a hearing on, its first motion to compel.  Plaintiff only just recently received a production of documents asserted to be in compliance with the Order entered by Judge Urbanski on Plaintiff's first motion to compel.   Plaintiff has raised concerns with Defendant's counsel as to those documents so received and, in addition, it came to the attention of Plaintiff's counsel through the recent deposition of Mike Lakotish, a Rule 30(b)(6) corporate representative for C. H. Robinson, on March 13, 2008, that financial information relating to AKJ in C. H. Robinson's possession, which Plaintiff believes would be pertinent to Plaintiff's vicarious liability argument, and which would have been responsive to several different requests for production, was omitted from the discovery materials provided to Plaintiff.  Defendant has agreed to provide the requested information, but clearly it will not be available in time for Plaintiff's use in support of a motion for summary judgment.  As Plaintiff has not yet been able to obtain all of the evidence pertinent to his vicarious liability claim, he would prefer to address this claim later

the negligence of Arciszewski in the operation of the AKJ vehicle.

## **ARGUMENT**

A party moving for summary judgment bears the initial burden of establishing that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See *May v. Dover Elevator Co.*, 845 F. Supp. 377, 379 (E.D. Va. 1994); Fed. R. Civ. P. 56(c). Once this initial showing is made, the burden shifts to the non-moving party to produce, by affidavit or otherwise, specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986) (emphasizing that such dispute must be "genuine"). The non-moving party's burden is not met by expressing "metaphysical doubt" or relying upon such party's "mere allegations or denials in his pleading." *Id.* (citation omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing http://www.lexis.com/research/retrieve?_m=db4af329c7c7dcaf26fd8178e6923c7b&csvc=le&cform=&_fmtstr=FUL L&docnum=1&_startdoc=1&wchp=dGLzVlz-zSkAz&_md5=53272cb0d7e9f1b63658176218c710e7            _-fnote12#fnote12*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-289 (1968)).

Plaintiff respectfully submits that, when the Court reviews the evidence in this case, the Court will find that there really is not a great deal of dispute between the parties as to the facts of this case, whether in terms of the events surrounding the

---

at the jury trial, by which time he will hopefully have been successful in obtaining all of the

subject collision, the information that was available to Defendant C. H. Robinson about AKJ Enterprises, Inc., the circumstances surrounding the relationship between C. H. Robinson and AKJ (however the Court may ultimately decide to characterize this relationship), or what specific actions C. H. Robinson did or did not take. The real dispute between the parties is whether the law requires C. H. Robinson to make any effort to ensure that it is hiring reasonably safe carriers to haul its loads and whether such action as was taken by C. H. Robinson would satisfy any duty that the law would require C. H. Robinson to fulfill.

## I.    KRISTINA MAE ARCISZEWSKI WAS NEGLIGENT IN THE OPERATION OF HER TRACTOR-TRAILER.

As an initial matter, Plaintiff respectfully requests that the Court determine, as a matter of law, that Kristina Mae Arciszewski was negligent in the operation of her tractor-trailer, and that this negligence led to the collision at issue. As noted previously, Plaintiff intends to rely upon the determinations reached by the Virginia State Police in their investigation of the subject collision, as well as Plaintiff's affidavit and the affidavits of eyewitnesses Susan Cannedy, Richard Peele, and Billy Downs. (See Exhibits 1, 2, 3, 4, and 5).

In the present case, Susan Cannedy, who was a passenger in an automobile traveling along Interstate 81 in the northbound direction, in the vicinity of Arciszewski's tractor-trailer, states in her affidavit that, several miles before the accident occurred, she observed Arciszewski's tractor-trailer move onto, and actually begin to ascend, the exit ramp for Exit 77 in the Fort Chiswell, Virginia, area, only to suddenly abort this maneuver and swing back down onto the interstate without signaling any

---

data that he has requested.

intent to do so.  (See Exhibit 2).  Richard Peele, who was operating a tractor-trailer in the same direction of travel at or around the time of the collision, observed Arciszewski's tractor-trailer speeding at it passed his vehicle and then noticed the vehicle move from side to side within its lane before suddenly and sharply veering out of its lane of travel and into the median.  (See Exhibit 3).  All eyewitnesses confirm in their affidavits that Arciszewski's vehicle abruptly and without warning left its lane of travel, crossed the median, and collided head-on with Plaintiff's tractor-trailer, which was approaching in its proper lane of travel.  (See Exhibits 2, 3, 4, and 5).  The Virginia State Police, in their investigation of the subject collision, determined in their investigative report that "[i]t appears that the main causative factor of the crash was error or inattention of [Arciszewski]" and that "inexperience might have also been a contributing factor."  (See Exhibit 1).  The report further provides that "[i]t does not appear that [Plaintiff's vehicle] contributed to the causative factors of the crash in any way."  (See Exhibit 1).  In light of the foregoing facts, Plaintiff submits that he has undisputed evidence of Arciszewski not only negligently causing the subject collision, but of Arciszewski having also been operating her tractor-trailer in a negligent manner many miles before her final act of negligence in veering across the median and striking Plaintiff's tractor-trailer head-on.

In respect of a summary judgment motion, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  See _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  In the present case, Plaintiff is wholly unaware of any shred of evidence whatsoever that would suggest that Arciszewski was anything other than negligent in the operation of her tractor-trailer, or that Plaintiff was operating his vehicle in

anything other than a safe manner. Specifically, Plaintiff is unaware of any contradictory eyewitness reports, either in terms of Arciszewski's negligence or Plaintiff's lack of negligence. Plaintiff is unaware of any conflict in the physical and circumstantial evidence relating to the subject collision. It is undisputed that it was Arciszewski's tractor-trailer that left her lane of travel in the northbound direction of Interstate 81 and crossed the median between the northbound and southbound lanes, striking Plaintiff's tractor-trailer essentially head-on in his lane of travel in the southbound direction. See *Pickett v. Cooper*, 202 Va. 60, 63, 116 S.E.2d 48, 51 (1960) ("It was the defendant's burden to explain the presence of his automobile on the wrong side of the road."). As an additional matter, there is no evidence indicative of any sudden medical emergency or other circumstance that might excuse Arciszewski in the operation of her vehicle, and the affidavits of eyewitnesses Richard Peele and Billy Downs confirm that Arciszewski was alive, conscious, and speaking immediately after the accident. (See Exhibits 3 and 4). Further, there is no evidence that Plaintiff, through any action or inaction, contributed in any way to the collision at issue. (See Exhibits 1, 4, and 5). As such, Plaintiff is entitled to summary judgment as a matter of law on the issue of Kristina Mae Arciszewski's negligence.


II.    **C. H. ROBINSON IS LIABLE FOR ITS OWN NEGLIGENCE IN HIRING AND SELECTING AKJ ENTERPRISES, INC. TO TRANSPORT THE SUBJECT LOAD AND FOR ENTRUSTING RESPONSIBILITY FOR TRANSPORTING THE LOAD TO ITS CARE.**

   A.    **C. H. ROBINSON WAS NEGLIGENT IN HIRING AKJ ENTERPRISES, INC. TO TRANSPORT THE SUBJECT LOAD.**


Plaintiff has asserted under Count III of his Complaint a direct negligence claim

against C. H. Robinson for negligently hiring AKJ to haul the load at issue.[47]  Plaintiff's claim against Defendant C. H. Robinson for negligent hiring may be viewed as either a claim that C. H. Robinson was negligent in hiring AKJ Enterprises, Inc., as its employee, or in hiring AKJ Enterprises, Inc., as an independent contractor.  As Plaintiff argued in his prior brief to the Court, the Virginia Supreme Court has previously recognized a cause of action for the negligent hiring of an independent contractor, as well as for an ordinary employee.  See, for example *Philip Morris, Inc. v. Emerson,* 235 Va. 380, 399, 368 S.E.2d 268, 278 (1988); *J. v. Victory Tabernacle Baptist Church*, 236 Va. 206, 208, 372 S.E.2d 391, 393 (1988).  Plaintiff's understanding from the Court's previous decision is that both theories are still before the Court.  However, for the same reason that Plaintiff chooses not to seek summary judgment on his vicarious liability claim against C. H. Robinson, as set forth in Footnote 42 above, Plaintiff will also reserve for the jury the issue of whether C. H. Robinson was negligent in hiring AKJ Enterprises as an employee, and will limit his argument to the theory that C. H. Robinson negligently

---

[47] The Court noted in footnote 3 of its prior opinion that Plaintiff did not plead a claim for negligent retention.  Plaintiff respectfully directs the Court's attention to Paragraphs 29 and 35 of his Complaint, which were, in fact, intended to also set forth a claim for negligent retention. Unfortunately, due to a typographical error, the caption for this Count did not include the word retention, but the aforesaid paragraphs specifically allege that AKJ was negligently retained. To the extent that the Court may entertain a claim for negligent retention, Plaintiff notes that the *Phillip Morris* decision also recognized a claim for negligent retention of an independent contractor.  In that case, Phillip Morris had not only failed to adequately investigate the fitness of the independent contractor that it employed, but also had actual awareness of circumstances that indicated that the contractor was unsafe in the manner in which it was operating.  In characterizing the appropriate duty of care in the case of a claim of negligent retention, the Virginia Supreme Court chose to rely specifically on a decision from the Court of Appeals of Ohio, in which the court found that "the employer of an independent contractor is . . . independently negligent if he both knew of the dangerous situation created by the contractor's work and acquiesced in its continuance or performance."  *Philip Morris,* 235 Va. at 401, 368 S.E.2d at 279 (citing *Lattea v. Akron,* 9 Ohio App. 3d 118, 124, 458 N.E.2d 868, 874-75 (1982).  In the present case, Plaintiff submits that the evidence in this case would more than sufficient to support summary judgment on a claim of negligent retention of an independent contractor.

hired AKJ, as an independent contractor.


1.      UNDISPUTED FACTS WHICH ARE MOST PERTINENT TO
PLAINTIFF'S CLAIM OF NELIGENT HIRING OF AKJ ENTERPRISES, INC.
AS AN INDEPENDENT CONTRACTOR:

In the present case, it is undisputed that C. H. Robinson failed to make any meaningful investigation into AKJ's safety or fitness as a motor carrier, other than an isolated safety rating update that showed that AKJ had a "conditional" safety rating, which both parties' experts believe should have led C. H. Robinson to make further inquiry into the circumstances of this carrier, including its specific safety practices and procedures.  Furthermore, it is undisputed that C. H. Robinson had actual knowledge of AKJ's "conditional" safety rating prior to assigning the subject load to AKJ, which was in clear violation of AKJ's contractual obligations to C. H. Robinson under their contract carrier agreement, yet C. H. Robinson did not raise this issue with AKJ in any way or seek to enforce its rights under their agreement.  C. H. Robinson knew that there was other publicly available information pertaining to AKJ that it might review if it wished to know more about this carrier, such as that information published by the FMCSA on its website.   Had C. H. Robinson cared to review any of this publicly available information, it would have found that AKJ had an overall SafeStat score that placed it as an "at risk" carrier in the "B" category, with Driver and Vehicle SEAs that placed AKJ within the worst three percent (3%) of motor carriers in the country in terms of safety performance in the areas of driver and vehicle safety, as well as a Safety Management SEA that put AKJ within the worst twenty-three percent (23%) of carriers in the country.  Instead of making even the most minimal of efforts to investigate AKJ's fitness as a carrier, particularly in light of its known "conditional" safety rating,

Defendant chose a path of willful ignorance.

Continuing down such path, it is undisputed that C. H. Robinson also ignored its own history with AKJ. Specifically, it is undisputed that C. H. Robinson's own internal records from its "Express System" reflect numerous incidents of problems associated with AKJ, its vehicles, and its drivers, which evidenced a consistent pattern of unsafe practices, such as numerous incidents of equipment malfunctions; incidents of other AKJ drivers advising C. H. Robinson employees that they had been, or in some instances, were, operating their vehicles in violation of federal safety regulations; incidents of AKJ drivers behaving in abnormal or disturbing ways, such as abandoning loaded tractor-trailers mid-transit, disappearing for days with their tractor-trailers while apparently the target of a multi-state manhunt, and even threatening C. H. Robinson customers with weapons. Further, AKJ's frequent use of C. H. Robinson's QuickPay and T-Chek programs should have put C. H. Robinson on notice that AKJ was struggling financially, which may have been a significant factor in AKJ's poor safety performance. All of these facts, when viewed together, should have alerted C. H. Robinson to the fact that AKJ was not operating safely in respect of its work for C. H. Robinson and that some further investigation into AKJ's particular circumstances and practices was warranted, if Defendant were going to continue to place its loads with this carrier. However, as is also undisputed, C. H. Robinson had no policy or system in place for reviewing this historical data on any sort of routine basis, much less prior to the assignment of any particular load, nor does C. H. Robinson have any such policy or system in place today.

In 2004, reports and studies published by the FMCSA on its website showed a correlation between the type of data concerning AKJ of which C H. Robinson was or

should have been aware, and a propensity to cause crashes. It is undisputed, however, that C. H. Robinson did not consider itself to have any obligation to investigate or consider the above-referenced information, regardless of what any such studies might conclude, and that C. H. Robinson did not take any action in response to the above-referenced information of which it was aware. Indeed, C. H. Robinson's own Rule 30(b)(6) corporate representative, Bruce Johnson, testified that even if C. H. Robinson had been actually, and actively, aware of each and all of the foregoing factors, C. H. Robinson would still have seen no problem with continuing to assign loads to AKJ, including the load at issue in this case.

Further, although AKJ's overall safety practices were clearly deficient, its safety practices in terms of its drivers were particularly lacking. As noted previously, AKJ had a Driver SEA at the time of the accident of 97.8, which placed it among the worst three percent (3%) of motor carriers in the country in terms of driver safety.[48] Additionally, if C. H. Robinson had conducted any investigation into the compliance review for AKJ conducted by the FMCSA in May of 2003, as its own expert witness believes it should have done, Defendant would have found that AKJ was cited for numerous violations pertaining to its hiring and monitoring of its drivers, including (i) using drivers before the motor carrier had received a negative pre-employment controlled substance test result, in violation of 49 CFR 382.301(a) (deemed a "critical" safety violation); (2) failing to maintain a driver's employment application in the driver's qualification file, in violation of 49 CFR 391.51(b)(1); (3) failing to maintain inquiries into drivers' driving records in the drivers' qualification files, in violation of 49 CFR 391.51(b)(2) (deemed a "critical" safety violation); (4) failing to maintain inquiries

---

[48] The bottom two and two/tenths percent (2.2%), to be precise.

into drivers' employment record in such drivers' qualification files, in violation of 49 CFR 391.51(b)(2); (5) failing to maintain a note relating to the annual review of a driver's driving record, in violation of 49 CFR 391.51(b)(2); (6) requiring or permitting drivers to drive more than 10 hours, in violation of 49 CFR 395.3(a)(1); (7) requiring or permitting drivers to drive after having been on duty more than 70 hours in 8 consecutive days, in violation of 49 CFR 395.3(b)(2); (8) failing to require drivers to make a record of duty status, in violation of 49 CFR 395.8(a); and (9) false reports of records for duty status, in violation of 49 CFR 395.8(e), among others.  (See Exhibit 17, which was attached as "Exhibit 3" to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).  Plaintiff finds it noteworthy that, when the FMCSA returned approximately two months later in July of 2003 for a follow up review, it was found that AKJ had violated many of the same provisions during the brief period between the two reviews, including (1) using a driver before the motor carrier had received a negative pre-employment controlled substance test result, in violation of 49 CFR 382.301(a); (2) failing to maintain inquiries into a driver's employment record in the driver's qualification file, in violation of 49 CFR 391.51(b)(2); (3) requiring or permitting drivers to drive more than 10 hours, in violation of 49 CFR 395.3(a)(1); and (4) requiring or permitting drivers to drive after having been on duty more than 70 hours in 8 consecutive days, in violation of 49 CFR 395.3(b)(2).  (See Exhibit 19, which was attached as "Exhibit 4" to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).

In the present case, AKJ hired two drivers, Morris and Arciszewski, and sent them out with the subject load without having conducted a proper investigation of their employment histories or driving records, as it was legally required to do under the

federal safety regulations, in a manner consistent with its past practices, as documented in the aforesaid compliance reviews. Had AKJ investigated the employment and driving records of Morris and Arciszewski, it would have found that Morris had a revoked commercial driver's license, and that Arciszewski had only recently obtained her commercial driver's license. Further, upon information and belief, AKJ would have further found that Arciszewski had never formally accepted employment as a tractor-trailer driver before the trip at issue. Finally, AKJ knew that the subject load had been designated as "hot" by C. H. Robinson, meaning that there was an element of time sensitivity associated with this load. (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, page 69; Exhibit 25, Deposition of Michael T. Atkinson, March 6, 2008, pages 266-269). Compounding this issue, AKJ was apparently late in dispatching Arciszewski and Morris to the pick-up address to begin with. (See Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, pages 143-144). AKJ should never have sent an inexperienced driver such as Arciszewski on a time-sensitive load, particularly where her driving partner could not lawfully provide her any assistance (although he undertook to do so anyway).

### 2. PLAINTIFF'S ARGUMENT FOR SUMMARY JUDGMENT AS A MATTER OF LAW ON HIS CLAIM THAT C. H. ROBINSON NEGLIENTLY HIRED AKJ ENTERPRISES, INC. TO HAUL THE LOAD AT ISSUE.

In its prior decision, the Court determined that Virginia law would recognize a claim of negligent hiring in respect of an independent contractor hired to transport a load of cable reels from Hayesville, North Carolina to East Longmeadow, Massachusetts, in a tractor-trailer weighing in excess of 26,000 pounds, and sharing the public highways with hundreds or thousands of innocent motorists. See *Jones v.*

*D'Souza*, 2007 U.S. Dist. LEXIS 66993, *15 n.4 (citing to *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 399, 368 S.E.2d 268, 278 (1988).

In *Phillip Morris*, the Virginia Supreme Court held that an employer who contracts with an independent contractor can be held directly negligent and liable for selecting and retaining an incompetent independent contractor, based largely upon §411 of the Restatement (Second) of Torts, and applied this rule to the facts of that case. Rule 411 provides that "[a]n employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor . . . to perform work which will involve a risk of physical harm unless it is skillfully and carefully done." <u>See</u> RESTATEMENT (SECOND) OF TORTS § 411 (1965). Plaintiff believes that the facts of his case fit squarely within clause (a) of this rule, as is abundantly clear from the official comments and illustrations relating to this rule. Specifically, the illustration set forth for clause (a) is as follows: "A, a builder, employs B, a teamster, to haul material through the streets from a nearby railway station to the place where A is building a house. A knows that B's trucks are old and in bad condition and that B habitually employs inexperienced and inattentive drivers. C is run over by a truck carrying A's material and driven by one of B's employees. A is subject to liability to C if the accident is due either to the bad condition of the truck or the inexperience or inattention of the driver." <u>See</u> RESTATEMENT (SECOND) OF TORTS §411 cmt. d, illus. 5 (1965). Other than the fact that C. H. Robinson's interest in the subject load was the right to transport the load at issue, or an assumed responsibility to see to its successful transport, rather than actual ownership of the materials comprising the cargo being hauled by AKJ at the time of the subject collision, the facts of this case are virtually indistinguishable from Illustration No. 5.

Specifically, Plaintiff believes that C. H. Robinson intentionally ignored the available safety-related information in respect of its carriers, as a matter of policy, for fear of being deemed to have acknowledged or undertaken a duty to consider it. However, Plaintiff submits that C. H. Robinson cannot divest itself of its legal duties simply by pretending that they do not exist and that no reasonable trier of fact could conclude that C. H. Robinson exercised "reasonable care" in selecting AKJ Enterprises, Inc. to haul the load at issue, or that AKJ would even come close to constituting a "competent and careful contractor." See RESTATEMENT (SECOND) OF TORTS § 411 (1965); see also *Phillip Morris*, 235 Va. at 400, 368 S.E.2d at 278 ("There is no conflict in the evidence of [Phillip Morris's] failure to investigate.").  Further, it goes without question that the operation of a tractor-trailer on a public highway constitutes work which "will involve a risk of physical harm unless it is skillfully and carefully done."   See RESTATEMENT (SECOND) OF TORTS § 411 (1965); *Hodges v. Johnson*, 52 F. Supp. 488, 490 (W.D. Va. 1943) ("It is a matter of common knowledge that the transportation of freight upon the highways, usually by means of huge trucks and trailers, is fraught with great danger to the traveling public."); *Aronovitch v. Ayres*, 169 Va. 308, 318, 193 S.E. 524, 526 (1937) ("These trucks, sometimes inordinate in size, measurably monopolize our highways and add to the peril of their use, and it is in the light of their potential destructiveness that a high degree of care is but ordinary care.").  It is this well known risk of physical harm that leads to the requirement that drivers of commercial vehicles have specialized knowledge and commercial driver's licenses and that motor carriers that own such vehicles and send them out onto the public highways must comply with numerous state and federal safety regulations and must possess valid operating authority granted by the FMCSA.

On a final note, Plaintiff would be remiss if he neglected to note again the opinion of the United States District Court for the District of Maryland in *Schramm v. Foster*, 341 F. Supp. 2d 536 (D. Md. 2004), in which that court considered the duty of C. H. Robinson under very similar circumstances, but much less egregious facts (at least in terms of the carrier's competency and C. H. Robinson's neglect).  As noted previously herein, Judge Motz concluded that C. H. Robinson did have a duty to use reasonable care in the selection of the carriers that it employs,[49] noting that C. H. Robinson had "actively interjected itself into the relationship between shipper and carrier" and had "chosen to do business in a context heavily tinged with the public interest."  *Schramm*, 341 F.Supp.2d at 553.  In light of C. H. Robinson's role in the transportation process, the court found that the common law imposed upon C. H. Robinson a duty "commensurate with its undertakings."  *Id.*

Plaintiff submits that it is clear that C. H. Robinson was negligent in hiring AKJ Enterprises, Inc. to handle transport of the subject load, where this motor carrier had a well-documented and readily discoverable history of abysmally poor safety practices, including particularly its practices and policies pertaining to its drivers.  It was or should have been reasonably foreseeable to C. H. Robinson, had it made reasonable investigation of this carrier, that AKJ would likely continue such unsafe practices in respect of the subject load by hiring unsafe and unfit drivers, such as Morris and Arciszewski, to transport the subject load, and that a likely result of the culmination of so much negligence would be a crash involving the AKJ vehicle, along with C. H.

---

[49] As noted previously, Judge Motz concluded that the exercise of reasonable care would have involved checking "the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMCSA."  *Schramm*, 341 F.Supp.2d at 551.

Robinson's load.  But for the negligence of C. H. Robinson in hiring AKJ to transport the load at issue, in willful ignorance of its poor safety practices, Arciszewski would not have been behind the wheel of the AKJ tractor-trailer on September 12, 2004, at approximately 8:30 p.m., traveling along Interstate 81 in the northbound direction in excess of the posted speed limit and behind schedule to deliver a "hot" load, just as Plaintiff's tractor-trailer came into view.

In light of the foregoing, Plaintiff respectfully requests that the Court make a determination, based upon the deposition testimony of C. H. Robinson's employees and Rule 30(b)(6) corporate representatives; C. H. Robinson's own Express System records documenting the history of its relationship with AKJ; information specifically pertaining to AKJ Enterprises, Inc. then published by the FMCSA on its website, such as safety ratings, SafeStat and individual SEA scores, and insurance information; numerous studies published by the FMCSA showing a correlation between much of the data; the opinions of both parties' experts as to what would have constituted "reasonable care" in selecting a "careful and competent" contractor; and such other evidence as is before the Court, and determine that as a matter of law, (1) C. H. Robinson had a duty to exercise reasonable care in hiring a carrier to transport the subject load; (2) exercise of reasonable care would have, at minimum, required consideration of SafeStat and/or SEA scores, safety ratings, evidence of insurance cancellations and/or financial difficulty that was available to it, as well as its own internal records concerning the particulars of its experiences with such carrier; (3) C. H. Robinson failed to exercise reasonable care in hiring AKJ Enterprises, Inc. to transport the subject load; (4) the subsequent negligence of AKJ and Arciszewski was reasonably foreseeable to C. H. Robinson as a consequence of its breach of its duty of reasonable

care; and (5) that C. H Robinson's negligence was the proximate cause of Plaintiff's severe and debilitating injuries, such that C. H. Robinson is liable for Plaintiff's damages as a matter of law.   See *Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 56 (4th Cir. 1995) (citation omitted) (If, however, 'the evidence is so onesided that one party must prevail as a matter of law,' we must affirm the grant of summary judgment in that party's favor.").

**B.   C. H. ROBINSON WAS NEGLIGENT IN ENTRUSTING RESPONSIBILITY FOR TRANSPORTING THE SUBJECT LOAD TO THE CARE OF AKJ ENTERPRISES, INC. AND ITS DRIVER, KRISTINA MAE ARCISZEWSKI.**

In Count V of Plaintiff's Complaint, Plaintiff has asserted a claim against C. H. Robinson for negligent entrustment to AKJ, not of the tractor-trailer itself, but of the assignment to haul the cargo placed into C. H. Robinson's care by the shipper, Coleman Cable, Inc.  In the Court's prior decision in this case, it held that Virginia law would recognize a negligent entrustment claim consistent with §308 of the Restatement (Second) of Torts, in which it is stated that "[i]t is negligence to permit a third person to use a thing *or to engage in an activity which is under the control of the actor*, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."  See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *15-19; RESTATEMENT (SECOND) OF TORTS § 308 (emphasis added); see also *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 580, n.1 (W.D. Pa. 2004) (finding that a claim for negligent entrustment could be made based upon an "activity"); *Midgette v. Wal-Mart Stores, Inc.*, 317 F. Supp. 2d 550, 568 (W.D. Pa. 2004).

In the official comments to §308, it is explained that the phrase "under the control of the actor" essentially means that the third person had no independent right to engage in the activity, but had authority to do so solely by the consent of the actor, who had reason to believe that withholding such consent would prevent the third party from engaging in the activity.  See RESTATEMENT (SECOND) OF TORTS § 308 cmt. a (1965). In the present case, Max Cortis, the shipper/customer sales representative who accepted from Coleman Cable, Inc. responsibility for transport of the subject load, testified at his deposition that he had already accepted the load on behalf of Defendant C. H. Robinson prior to the assignment of this load to AKJ by C. H. Robinson.  (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, pages 31-33; Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, page 31).  Accordingly, at the time that the subject load was assigned to AKJ by Mike Atkinson, the "activity," or transport of the subject load, was within the control of C. H. Robinson, and any involvement that AKJ might have with such load thereafter came exclusively through the auspices of C. H. Robinson and pursuant to its consent.

The official comments to §308 also provide that, in terms of determining whether the actor should realize that a third person to whom he entrusts the activity is likely to "conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others," one must look to considerations such as whether the third person's known character or competency, or the competency of a group within which the third person belongs, is or should be known to be incompetent or unsafe by the actor, as well as whether the particular circumstances of the case, such as the danger of the work or the qualities or skill level required for safe performance of the work, would give the actor good reason to believe that the third person might conduct himself in an unsafe or

incompetent manner with respect to the activity.  See RESTATEMENT (SECOND) OF TORTS §
308 cmt. c (1965); RESTATEMENT (SECOND) OF TORTS § 307 cmt. a (1965).

In the present case, as has been previously noted, C. H. Robinson was aware of
incidents from its past relationship with AKJ that should have given C. H. Robinson
good reason to believe that AKJ might handle the transport of the subject load in an
unsafe or unfit manner.  C. H. Robinson was also aware that AKJ had a "conditional"
safety rating, in violation of its contractual obligations to C. H. Robinson, which one
must presume were included in the contract carrier agreement for a reason.
Additionally, had C. H. Robinson undertaken any reasonable investigation of AKJ, it
would have quickly and easily located AKJ's overall SafeStat score, which entitled AKJ
to a "B" or "at risk" rating, as well as its Driver, Vehicle, and Safety Management SEA
scores, all of which were deficient, including specifically the Driver and Vehicle SEA
scores, which placed AKJ in the bottom three percent (3%) of motor carriers in the
country in terms of safety in these areas.  C. H. Robinson also knew or should have been
aware that AKJ was struggling financially and that it appeared to be having difficulty
maintaining the insurance coverage that it was required to maintain in order to keep its
federal operating authority.  As has also been previously noted, studies published
through the FMCSA website document a correlation between these various factors and
an increased likelihood that a carrier afflicted with problems in one or more such areas
would be involved in a crash.   All of these factors should have put C. H. Robinson on
notice that AKJ was not fit to transport the subject load in a safe or fit manner.  As such,
C. H. Robinson was clearly negligent, as a matter of law, in entrusting responsibility for
the safe transport of the subject load to AKJ's care.

Further, as has also been previously noted, operation of a tractor-trailer on a

public highway constitutes work which will involve a risk of physical harm unless it is skillfully and carefully done.  See, for example, Hodges, 52 F. Supp. at 490; Aronovitch, 169 Va. at 318, 193 S.E. at 526.  All of the above facts, which were available to C. H. Robinson, had it chosen to consider them, coupled with the danger inherent in the operation of a tractor-trailer if it is not conducted in a competent manner, leads to the conclusion that it was or should have been reasonably foreseeable to C. H. Robinson that AKJ would fail to engage in the activity of transporting the subject load in a safe and competent manner, creating an unreasonable risk of harm to others.  Specifically, C. H. Robinson should have foreseen that AKJ would continue unabated in its practice of employing incompetent and unsafe drivers by hiring an unsafe driver, or drivers, for the subject load and, further, that the incompetence of such drivers would likely lead to a crash and resulting physical harm to one or more innocent motorists sharing the roadways with AKJ's incompetent drivers.

For the foregoing reasons, Plaintiff respectfully requests that the Court make a determination, considering the evidence before it, that, as a matter of law: (1) C. H. Robinson had a duty to exercise reasonable care in entrusting to one of its carriers the responsibility of transporting the subject load; (2) exercise of reasonable care would have, at minimum, required reasonable investigation into AKJ's SafeStat and/or SEA scores, safety ratings, evidence of insurance cancellations and/or financial difficulty that was available to it, as well as consideration of C. H. Robinson's own internal records concerning the particulars of its experiences with such carrier; (3) C. H. Robinson failed to exercise reasonable care in entrusting to AKJ Enterprises, Inc. responsibility for transport of the subject load; (4) the subsequent negligence of, and risk posed by, AKJ and Arciszewski were reasonably foreseeable to C. H. Robinson as a

consequence of its breach of its duty of reasonable care and the nature of the work for which AKJ was employed; and (5) that C. H Robinson's negligence was the proximate cause of Plaintiff's severe and debilitating injuries, such that C. H. Robinson is liable for Plaintiff's damages as a matter of law.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, Plaintiff respectfully requests that the Court grant his Motion for Partial Summary Judgment and find that (1) Kristina Mae Arciszewski was negligent in the operation of the AKJ tractor-trailer and caused the collision at issue; (2) C. H. Robinson had a duty to exercise reasonable care in selecting a motor carrier to transport the load involved in the subject collision; (3) C. H. Robinson breached that duty in assigning the load entrusted to it by Coleman Cable, Inc. to AKJ Enterprises, Inc.; and (4) C. H. Robinson is liable to Plaintiff for his damages arising from the subject collision under one or more of his claims of negligent hiring and negligent entrustment, and/or negligent retention.

Respectfully submitted,

**WINFORD DALLAS JONES**

s/   Gary C. Hancock
Of Counsel

Gary C. Hancock, VSB #16704
Timothy E. Kirtner, VSB #36938

Ann L. Bishop, VSB #43847
GILMER, SADLER, INGRAM, SUTHERLAND & HUTTON
P. O. Box 878, 65 East Main Street
Pulaski, VA  24301
540/980-1360 (telephone)
540/980-5264 (facsimile)

Byron R. Shankman, VSB #13485
P. O. Box 1859
Dublin, VA  24084

Counsel for Plaintiff, Winford Dallas Jones

## CERTIFICATE OF SERVICE

I do hereby certify that I have this 26th day of March 2008 electronically filed the foregoing Brief in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Paul C. Kuhnel, Esquire, Wooten Hart PLC, P.O. Box 12247, Roanoke, Virginia 24024-2247, Counsel for C.H. Robinson Worldwide, Inc.; C. H. Robinson Company; C. H. Robinson Company Inc.; C. H. Robinson Company LP; C. H. Robinson International, Inc.; C. H. Robinson Operating Company LP; and C. H. Robinson Transportation Company Inc.

s/     Gary C. Hancock
Gary C. Hancock
Gilmer, Sadler, Ingram, Sutherland & Hutton
P. O. Box 878, 65 East Main Street
Pulaski, VA  24301
540/980-1360 (telephone)
540/980-5264 (facsimile)
ghancock@gsish.com