## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| **WINFORD DALLAS JONES,** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **C. H. ROBINSON WORLDWIDE, INC.,** *et al.,* | : |
| | : |
| **Defendants/Third Party Plaintiffs** | : |
| | : **Case No. 7:06-cv-00547** |
| **v.** | : |
| | : |
| **AKJ ENTERPRISES, INC., d/b/a** | : |
| **Unlimited Express** | : |
| | : |
| **and** | : |
| | : |
| **ELSON BOLAR** | : |
| | : |
| **and** | : |
| | : |
| **DIONNIE BOLAR,** | : |
| | : |
| **Third Party Defendants.** | : |
| _____ | : |

### BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

**COMES NOW** Plaintiff, Winford Dallas Jones, by counsel, and files this Brief

in Opposition to Defendant's Motion for Summary Judgment.

## INTRODUCTION

In the present case, both Plaintiff and Defendant C. H. Robinson Worldwide, Inc. ("C. H. Robinson") have filed motions for summary judgment.[1]   Given the overlap of issues and arguments set forth in the parties' respective motions and supporting memoranda, Plaintiff asks that the Court deem incorporated into this brief Plaintiff's recitation of facts, exhibits, and legal arguments from his memorandum in support of his own motion for partial summary judgment.[2],[3]

For the Court's convenience, Plaintiff will briefly restate those facts which he believes are most salient in respect of  C. H. Robinson's motion for summary judgment as to Counts III and V of his Complaint, which set forth claims for negligent hiring[4] and negligent entrustment.  In addition, Plaintiff will further set forth those facts in his possession which create a genuine issue of material fact as to whether AKJ Enterprises, Inc., the negligent carrier involved in this case, and/or its driver, Kristina Mae Arciszewski, were employees of Defendant, such that it would be improper for the Court to grant summary judgment to Defendant on this issue as a matter of law or as to the issues of whether C. H. Robinson may be held liable at a matter of law for its negligent hiring of AKJ Enterprises, Inc. ("AKJ"), as an employee, or for the negligence of AKJ and its driver, Kristina Mae Arciszewski,

---

[1] Although the parties have agreed that the proper defendant in this case is C. H. Robinson Worldwide, Inc., Plaintiff does not believe the Court has yet entered an Order approving the stipulation recently filed by Plaintiff to dismiss the other named defendants from this suit.

[2] Plaintiff also requests that the Court deem incorporated herein the facts and arguments set forth in his Brief in Opposition to C. H. Robinson's Motion to Exclude the Testimony of Thomas M. Corsi, Ph.D.

[3] Similarly, Plaintiff requests that the Court consider this brief in further support of his own Motion for Partial Summary Judgment previously filed.

[4] Although Plaintiff respectfully believes that he did plead a claim for negligent retention, he

under a vicarious liability theory.


**MATERIAL FACTS MOST PERTINENT TO PLAINTIFF'S NEGLIGENT HIRING
AND NEGLIGENT ENTRUSTMENT CLAIMS:**

As set forth in some detail in Plaintiff's Brief in Support of his Motion for
Partial Summary Judgment, Defendant C. H. Robinson entered into an agreement
with its customer, Coleman Cable, Inc., to arrange for the safe transport of a load of
cable reels from the customer's facility in Hayesville, North Carolina, to its facility in
East Longmeadow, Massachusetts.   C. H. Robinson, an international "third-party
logistics broker," which claims to have the "largest network of motor carrier capacity
in North America," hired AKJ from among its fleet of contract carriers to transport
the subject load.   As set forth in more detail in Plaintiff's previous brief, AKJ
Enterprises, Inc. was a patently unsafe motor carrier, with particular safety issues in
terms of its hiring practices and oversight of its drivers, and C. H. Robinson had
ready access to a wealth of information, both in its own internal records and in
publicly available data published by the Federal Motor Carrier Safety Administration
("FMCSA"), which should have put C. H. Robinson on notice that AKJ had serious
safety issues and was an unsafe and unfit motor carrier. [5]

Specifically, records of the FMCSA show that AKJ received a proposed
"unsatisfactory" rating on its first compliance review from the FMCSA in May of

---

appreciates the Court's position on this matter.

[5] As a matter of practice and policy, however, C. H. Robinson chose to remain ignorant of
AKJ's incompetence as a motor carrier, and, in fact, C. H. Robinson's own Rule 30(b)(6)
corporate representative, Bruce Johnson, testified that even if C. H. Robinson had been
actively aware of all of the available evidence as to AKJ's incompetence, C. H. Robinson
would still have seen no problem with continuing to assign loads to AKJ, including the load
at issue in this case.  (See Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial
Summary Judgment, Deposition of Bruce W. Johnson, March 13, 2008, pages 166-188).

2003, which was only slightly upgraded to "conditional" in respect of AKJ's follow up compliance review in July of 2003.[6]  This "conditional" safety rating was never upgraded to "satisfactory" by the FMCSA.  Further, AKJ's SafeStat score[7] placed it as an "at risk" carrier in the "B" category for most of 2004, and, in fact, AKJ had grossly

---

[6] As noted in Plaintiff's brief in support of his own motion for partial summary judgment, safety ratings are ratings given to a motor carrier by the FMCSA, based upon safety audits, or "compliance reviews" conducted in respect of a particular motor carrier.  Available ratings are "satisfactory," "conditional," and "unsatisfactory," and such overall ratings are based upon consideration of six individual rating factors – (1) general; (2) driver qualification; (3) operational/driving; (4) vehicle/maintenance; (5) hazardous material; and (6) crash/recordable crash rate.  A motor carrier that receives a "conditional" safety rating is defined by the FMCSA on its website as "a motor carrier [which] does not have adequate safety management controls in place . . ."  (See Exhibit 48, attached hereto, which is available on the website for the Federal Motor Carrier Safety Administration at http://ai.fmcsa.dot.gov/StateProfile/glossary.asp, of which Plaintiff asks that the Court take judicial notice, pursuant to Fed. R. Evid. 201(b).  Plaintiff notes that in C. H. Robinson's recently filed Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendant protests Plaintiff's use of this rule to authenticate certain documents located via the internet in that brief.  Plaintiff respectfully submits to the Court that his intent in seeking judicial notice as to the various documents available through the internet, particularly the FMCSA's website, was simply to validate the source of the information.  Plaintiff does not dispute that the Court will have to determine the value and credibility of such information and its relevancy to the issues at dispute in this case.).

[7] On its website, the FMCSA defines "SafeStat" (Motor Carrier **Safe**ty **Stat**us Measurement System) as "an automated data-driven system that calculates the safety fitness on motor carriers."  The SafeStat methodology involves analytically assessing a motor carrier in four Safety Evaluation Areas (SEAs):  Accident SEA; Driver SEA; Vehicle SEA; and Safety Management SEA.  These scores may potentially incorporate compliance review data, but are largely based upon roadside inspections by state police and any available crash data.  Carriers who have sufficient data in FMCSA's system are assigned values for one or more of the individual SEAs from 0 to 100, with 0 being the best score and 100 being the worst possible score.  A score in any area of 75 or greater is considered deficient, in and of itself.  In addition, an overall SafeStat score is calculated for each carrier who is deficient in two or more SEAs, using a formula that incorporates scores from the four SEAs.  Carriers with overall SafeStat scores between 225 and 350 are given a "B" rating, and carriers with overall SafeStat scores between 350 and 550 are given an "A" rating.  Carriers with "A" and "B" scores are considered by the FMCSA to be "at risk" in terms of the likelihood of such carrier causing a crash.  At the time the subject load was assigned to AKJ, this carrier was deficient in its Driver SEA, Vehicle SEA;, and Safety Management SEA, and had a "B" rating.  (See Exhibit 12 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, which was entered as "Exhibit 5" to the deposition of Defendant's expert, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).

deficient Driver SEA scores continuously from July of 2002 through the date of the accident.   (See Exhibit 12 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).   From July 2003 through the date of the accident, AKJ had no Safety Management SEA score that was not deficient.   (See Exhibit 12 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).   In addition to the foregoing, AKJ apparently experienced great difficulty maintaining any insurance policy for its entire term, and had, in fact, eight separate cancellations of its insurance during the period of a little over three years in which it worked for C. H. Robinson. (See Exhibit 13 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).   All of this information was publicly available.

In addition, C. H. Robinson's own internal records from its "Express System," show that numerous incidents occurred during the period that AKJ hauled loads for C. H. Robinson, which should have put Defendant on notice that it was dealing with an unsafe and unfit motor carrier.   Specifically, there are, among other things, over 22 separate incidents noted of equipment or vehicle breakdowns; two separate instances of AKJ drivers arriving at their destination without proper credentials, one such incident involving Charles Kevin Morris, the co-driver on the subject load;[8] several

_____

[8]  Mike Atkinson, who booked the subject load and was considered the account representative for AKJ, testified at his deposition that he thought Morris had hauled loads for him before and confirmed that Morris had been the driver on another load for AKJ and C. H. Robinson, namely Load No. 20652169, which was a load that experienced problems relating to the driver's credentials.   (See Exhibit 25 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, March 6, 2008, pages 214, 223-235; Exhibit 18, lines 2280-2300).   Plaintiff wishes to note that, although C. H. Robinson takes the position that it has no knowledge of the various drivers hauling its loads, it is clear that this is not entirely true, as C. H. Robinson's records show repeated references to specific drivers who worked for AKJ over the years that it hauled loads for C. H. Robinson.   (See Exhibit 49, Load Confirmation Sheets, Bills of Lading, and Invoices from C. H. Robinson's "scanned images" file pertaining to Load Nos. 13967722, 20355694, 20433146, 21013521, 21030917, 21066309, 21090599, 21312279, 16687219, 19289049, 20652169, wherein

different instances of AKJ drivers notifying C. H. Robinson that either they or their vehicles had been pulled over by police and that they or their vehicles were being taken out of service for violations of federal safety regulations; two separate instances prior to the subject collision where AKJ drivers were involved in crash while hauling C. H. Robinson loads, one instance of an AKJ trailer being rejected by a customer on safety grounds; one instance of an AKJ driver simply walking off and abandoning his tractor-trailer, with keys in the ignition, along with C. H. Robinson's load; one instance of an AKJ driver disappearing with his tractor-trailer and a load worth approximately $150,000.00 for nearly a week, while multiple police departments searched for him, ultimately ending up in jail; and once instance of an AKJ driver threatening employees of one of C. H. Robinson's customers with a knife when they asked him to remove his flip-flops and put on a pair of boots (presumably for safety purposes).  (See Exhibit 18 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment; Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce W. Johnson, March 13, 2008, pages 166-188).   Plaintiff submits that these various incidents, when viewed together, evidence a pattern or unusually high incidence of unsafe and even at times abnormal behavior on behalf of AKJ's drivers, which should have led C. H. Robinson to question what defect or deficiency in AKJ's hiring or safety practices was responsible for so many driver-related problems.

        AKJ, with its well-documented history of not complying with federal safety

_____

reference is made to specific AKJ drivers by C. H. Robinson Employees, which were produced by Defendant during discovery).  Further, Mike Atkinson, the individual who booked the subject load with AKJ, testified at his deposition as to a significant degree of familiarity with AKJ's "regular" drivers.  (See Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, October 8, 2007,

regulations in the hiring of its drivers,[9] as aforesaid, hired Charles Kevin Morris ("Morris") and Kristina Mae Arciszewski ("Arciszewski") to handle the physical transport of the subject load, utilizing one of AKJ's tractor-trailers.  Morris did not have a valid driver's license at the time he and Arciszewski left to pick up the subject load in Hayesville, North Carolina, although it appears that he did much of the driving on the trip.  (See Exhibit 20 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).  Arciszewski, who was reputedly Morris' girlfriend,

_____

page 184).

[9] If C. H. Robinson had conducted any investigation into the compliance review for AKJ conducted by the FMCSA in May of 2003, as its own expert witness believes it should have done, Defendant would have found that AKJ was cited for numerous violations pertaining to its hiring and monitoring of its drivers, including (i) using drivers before the motor carrier had received a negative pre-employment controlled substance test result, in violation of 49 CFR 382.301(a) (deemed a "critical" safety violation); (2) failing to maintain a driver's employment application in the driver's qualification file, in violation of 49 CFR 391.51(b)(1); (3) failing to maintain inquiries into drivers' driving records in the drivers' qualification files, in violation of 49 CFR 391.51(b)(2) (deemed a "critical" safety violation); (4) failing to maintain inquiries into drivers' employment record in such drivers' qualification files, in violation of 49 CFR 391.51(b)(2); (5) failing to maintain a note relating to the annual review of a driver's driving record, in violation of 49 CFR 391.51(b)(2); (6) requiring or permitting drivers to drive more than 10 hours, in violation of 49 CFR 395.3(a)(1); (7) requiring or permitting drivers to drive after having been on duty more than 70 hours in 8 consecutive days, in violation of 49 CFR 395.3(b)(2); (8) failing to require drivers to make a record of duty status, in violation of 49 CFR 395.8(a); and (9) false reports of records for duty status, in violation of 49 CFR 395.8(e), among others.  (See Exhibit 17 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, which was attached as "Exhibit 3" to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).  Plaintiff finds it noteworthy that, when the FMCSA returned approximately two months later in July of 2003 for a follow up review, it was found that AKJ had violated many of the same provisions during the brief period between the two reviews, including (1) using a driver before the motor carrier had received a negative pre-employment controlled substance test result, in violation of 49 CFR 382.301(a); (2) failing to maintain inquiries into a driver's employment record in the driver's qualification file, in violation of 49 CFR 391.51(b)(2); (3) requiring or permitting drivers to drive more than 10 hours, in violation of 49 CFR 395.3(a)(1); and (4) requiring or permitting drivers to drive after having been on duty more than 70 hours in 8 consecutive days, in violation of 49 CFR 395.3(b)(2).  (See Exhibit 19 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, which was attached as "Exhibit 4" to the deposition of Defendant's expert witness, Annette M. Sandberg, taken by Plaintiff's counsel on March 18, 2008).

had only received her commercial driver's license from the State of Utah a little over a month before.   (See Exhibit 21 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).   Further, AKJ would have further found that Arciszewski had never formally accepted employment as a tractor-trailer driver before the trip at issue.  (See Exhibit 50, student driver records from C. R. England, Inc., in Salt Lake City, Utah, in which Arciszewski expressly disavowed having ever worked as a tractor-trailer driver prior to her enrollment in C. R. England, Inc.'s training program on or about July 12, 2004, less than two months prior to the subject collision).

As two sales representatives from C. H. Robinson's Chicago Central branch office testified at their depositions, the subject load had been designated as "hot," meaning that this was a time sensitive load, and this fact was communicated to AKJ and/or the drivers.  (See Exhibit 7 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Maximillian F. Cortis, March 7, 2008, page 67- 70; see also Exhibit 25 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, March 6, 2008, pages 266-267).  Mike Atkinson, who booked the subject load with AKJ and testified as a Rule 30(b)(6) corporate representative for C. H. Robinson, testified specifically that he used the term "hot" to "tell a carrier if there is a deadline that we're trying to face and to make sure that they put a proper driver on the load or drivers that can handle the shipment."  (See Exhibit 25 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, March 6, 2008, page 267).  Despite its awareness of the time-sensitive nature of the subject load, however, AKJ chose to hire Arciszewski and Morris for such load, either in ignorance of the status

and history of Arciszewski and Morris, or despite knowledge of the same.  Further, Mr. Atkinson testified that Morris and Arciszewski were dispatched late to pick up the load.  Atkinson also testified that it was his understanding that Morris and Arciszewski were still behind schedule at the time of the accident which gives rise to the present suit.  (See Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, October 8, 2007, page 120; Exhibit 25 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, March 6, 2008, pages 267-268).

The accident itself occurred at approximately 8:30 p.m. on September 12, 2004, along Interstate 81 in Wythe County, Virginia, between the tractor-trailer then being operated in the southbound direction by Plaintiff on behalf of his employer, Purdy Brothers Trucking Company, Inc., and the AKJ tractor-trailer, traveling in the northbound direction, which appears to have been operated by Arciszewski at the time of the accident.  Plaintiff's evidence is undisputable that Arciszewski was negligent in the operation of her vehicle, and Plaintiff has moved for partial summary judgment as to this issue.  Specifically, eyewitnesses report that the AKJ tractor-trailer appeared to be speeding prior to the accident and that the AKJ tractor-trailer was being driven in what appeared to be an unsafe manner.  (See Exhibits 2 and 3 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).  In or around the vicinity of Exit 84, the AKJ tractor-trailer abruptly veered onto and crossed the median between the northbound and southbound lanes of Interstate 81, ultimately colliding with Plaintiff's tractor-trailer essentially head on.  (See Exhibits 1-5 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).  Arciszewski died at the scene, and both Plaintiff and Morris were seriously injured.

**MATERIAL FACTS MOST PERTINENT TO PLAINTIFF'S CLAIM AGAINST DEFENDANTS FOR THE NEGLIGENCE OF AKJ ENTERPRISES, INC. AND KRISTINA MAE ARCSIZEWSKI:**

In addition to the foregoing, the evidence shows that C. H. Robinson did not act as a traditional broker in respect of the individual loads it assigned to its carriers, and, in fact, used its promise to stay intimately involved in the transport of the load from pick up to delivery as a marketing tool in respect of its shippers/customers. (See Exhibit 46 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment; Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, pages 18-19, 36).[10] Acting as the "one point of contact" for both its shipper/customer and its carrier in respect of a specific load, C. H. Robinson would arrange with the shipper/customer specific dates and times for pick-up and delivery of an individual load; pick-up and delivery addresses; and communicate any specific limitations or directions as to the loading or unloading of the cargo; as well as any time-sensitivity issues associated with the load.  (See Exhibit 7 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Maximillian F. Cortis, March 7, 2008, page 25; Exhibit 9 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).

---

[10] Ms. Sandberg testified in fact, that "[a] broker simply brokers a load from a shipper to a carrier to get to an end source . . . whereas a third-party logistics company typically handles many more issues . . . There are some people that broker a load that never talk to anybody; they just simply put the load up, the company picks the load, and – the carrier would pick the load and then carry the load, and that's about the extent of their involvement."  (See Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, pages 18-19).  Ms. Sandberg testified that she considered Defendant C. H. Robinson to be of the third-party logistics company variety.  (See Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, page 36).

C. H. Robinson would also provide a set of directions for transport of the load to the carrier and its driver(s) intended to ensure that the driver could transport the load within the set time period allowed.  (See Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, October 8, 2007, page 185).

As shown by the load confirmation sheets attached hereto as Exhibit 49, which are expressly described as "amending" C. H. Robinson's Contract Carrier Agreement with AKJ,[11] it is clear that C. H. Robinson attempted to maintain a high degree of control as to the details of the manner in which the AKJ and its drivers conducted themselves during the transport of particular loads.  For example, in respect of Load No. 18890743, the carrier was instructed that the trailer "must be clean, dry, odor-free, and in good condition inside," as well as "without holes or cracks."  In respect of Load No. 8706442, the driver was instructed to call C. H. Robinson before unloading if the cost of having the trailer unloaded exceeded $25.00.  In respect of Load Nos. 20388878 and 20422186, C. H. Robinson instructed that "[i]f the drivers are empty hours ahead of time they need to wait at the truck stop until ½ hour before the [delivery] appt."  With respect to Load No. 21312279, C. H. Robinson instructed that "Driver needs to watch the freight being loaded WH is damaging freight and drivers are signing no damage – If driver does not watch wh load – he needs to sign shipper

---

[11] C. H. Robinson relies heavily upon its initial or "master" Contract Carrier Agreement with AKJ in its brief, but Plaintiff notes that each and every load confirmation sheet that Defendant has produced to Plaintiff contains language expressly amending the initial or "master" contract carrier agreement.  Accordingly, Plaintiff submits that the directions, restrictions, and other information set forth in any and all of the load confirmation sheets for AKJ-transported loads is a part of the agreement between these two companies.  Plaintiff further questions whether he  (or the Court) can be expected to have a true appreciation of the complete agreement between C. H. Robinson and AKJ Enterprises, Inc., where there are literally hundreds of such agreements that Defendant has not produced to Plaintiff.

load and count to clear himself from any unseen damage."  In respect of Load No. 12114698, for some reason, the driver was instructed that, when arriving at the delivery address, "Do not mention CHR."   For Load No. 19181675, AKJ was instructed "Please have your carriers/drivers call Bill Colvin in the Columbia [illegible] office once they are sitting at delivery for 2 hrs and have not been unloaded."  With respect to Load No. 19289049, Mike Atkinson, who also booked the subject load, wrote "make sure Frank [the driver] keeps track of toll money.  I'll help pay for as much as I can."  In the load confirmation sheet for Load No. 20621595, C. H. Robinson instructed "Have trucks park at TA truckstop afterhours."  In respect of Load No. 20804793, drivers were instructed that they "must fuel up before loading;" that no trailers were to be "dropped unless the area is fenced/secure;" and that the only stops to be made were "necessary stops," such as "fuel etc," and if such stops were made, the "ignition key must be removed/tractor locked."  As is clear from the totality of these various orders issued by C. H. Robinson to AKJ and/or its drivers, C. H. Robinson's typical involvement in the transport of any given load was far more extensive than simply matching a shipment with a carrier.[12]   Although C. H. Robinson may have chosen to actively interjected itself into the relationship between shipper and carrier in order to set itself apart from its competitors and to better serve

---

[12] In its brief, C. H. Robinson makes a point of noting that two other courts have granted summary judgment to Defendant on the issue of its asserted employer/independent contractor relationship with its carriers, based on similar contracts.  Plaintiff notes, however, that neither such court appears to have had before them the extensive and detailed facts that Plaintiff has presented, including specifically the load confirmation sheets and extensive Express system records.  As noted previously, the load confirmation sheets expressly amended the "master" contract carrier agreement between C. H. Robinson and AKJ and must be read as a part of their contractual arrangement.  Furthermore, as Plaintiff has previously argued, the terms of any agreement between the parties are irrelevant for purposes of the Court's analysis if Plaintiff can show that the actual dealings between the parties were that of an employer and employee.

its customers, the consequence of this domination of, and exercise of control over, precise details of the transportation process is that for all practical purposes, C. H. Robinson exercises a degree of control over its carriers and, ultimately, their drivers, that far exceeds anything contemplated in the typical employer/independent contractor scenario.

In addition to extensive and detailed instructions that the carriers and/or their drivers are required to follow, C. H. Robinson also dominates the transportation process by requiring a constant flow of communication between the driver and C. H. Robinson, or between the carrier and C. H. Robinson.  For example, Mike Atkinson, testifying as a Rule 30(b)(6) corporate representative for C. H. Robinson, testified that a driver hauling a load for C. H. Robinson would ordinarily be required to call in as many as five or more times during the period between the driver's dispatch to pick up the load and the delivery of the load.  (See Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, October 8, 2007, pages 48-49).  Specifically, the driver (or carrier's dispatcher) is to call C. H. Robinson (1) when dispatched to go pick up the load; (2) when the driver arrives at the pick up address; (3) when the trailer is loaded and the freight checked by the driver; (4) regular status update calls during the actual transport of the load to advise C. H. Robinson of the driver's progress, which would vary in frequency depending upon the time required to make the trip; and (5) when the driver arrives at the delivery address.  In addition, the driver would call C. H. Robinson to report any problems or issues associated with the transport of the load, whether equipment problems, problems experienced at either the pick up or delivery address; problems that are driver-related in nature; traffic or other delays; and/or problems with, or a

need for, advances to the driver via C. H. Robinson's T-Chek System.[13]  (See Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, October 8, 2007, pages 51, 55, 185).   C. H. Robinson's Express System records indicate that Arciszewski's co-driver, Charles Kevin Morris, called in on one or more such occasions, as corroborated in his answers to interrogatories in the underlying Interpleader action, attached as Exhibit 38 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment.  (See also Exhibit 18.1 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, line 3840, showing communications having been received from Morris).[14]

Another aspect of C. H. Robinson's control over the transport of a specific load which should not be overlooked is C. H. Robinson's ability to unilaterally terminate a carrier's right to transport a particular load, even mid-transit, and reassign it to another carrier, or to "bounce" a load, in C. H. Robinson's vernacular.  (See Exhibit 25 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Michael T. Atkinson, March 6, 2008, page 236; Exhibit 22 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce W. Johnson, October 8, 2007, page 45).   Although this process is not expressly

---

[13] T-Chek Systems, Inc., is a wholly owned subsidiary of C.H. Robinson Worldwide, Inc. T-Chek provides a menu of services, including the T-Card, which "enables drivers on the road to pay for fuel, repairs, scales, hotel rooms, receive cash, and other necessities at retail fueling and terminal locations across North America."  (See Exhibit 47 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, from website of T-Chek Systems, Inc.).

[14] As shown by the load confirmation sheets attached hereto as Exhibit 49, C. H. Robinson routinely made very specific demands concerning "check calls" and frequently imposed penalties upon the carrier should the driver fail to comply with those demands.   For example, with respect to Load No. 13340392, drivers were required to make "check calls" between 7 – 7:30 a.m., with monetary fines for failure to do so, as well as increased fines for late delivery coupled with failure to make check calls.

referenced in C. H. Robinson's standard contract carrier agreement that it enters into with essentially any carrier who wants to do business with C. H. Robinson and can complete a minimal amount of paperwork, the practice of "bouncing" appears to be a standard procedure employed by C. H. Robinson when, for one reason or another, it does not believe that a carrier who has already contracted with C. H. Robinson to haul a particular load should be permitted to complete transport of the load.[15]   It is certainly true that, in respect of AKJ, specifically, C. H. Robinson had a history of taking loads away from AKJ that had already been assigned to AKJ, including loads that were in mid-transit when the "bounce" occurred.  (See Exhibit 51, Deposition of Michael T. Atkinson, March 6, 2008, pages 273-275; Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce W. Johnson, March 13, 2008, pages 177-178).   Plaintiff submits that this power to essentially "fire" a carrier in respect of a particular load, including a load that the carrier is actually in the process of transporting, reflects an element of control beyond that of the typical employer/independent contractor relationship.

In addition to the control maintained by C. H. Robinson over the transport of individual loads, Plaintiff submits that there is also an issue of the degree of control that C. H. Robinson was capable of exercising over the carrier itself.  Specifically, C. H. Robinson appears to favor doing business with smaller carriers such as AKJ, which relied upon its QuickPay Program and its T-Chek System to keep their vehicles on the road.  (See Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce W. Johnson, March 13, 2008, pages 127-135; Exhibit 8 to Plaintiff's Brief in Support of his Motion for Partial Summary

---

[15] Presumably C. H. Robinson would also have the right to "bounce" a carrier that cannot

Judgment, Deposition of Michael T. Atkinson, October 8, 2007, page 56, stating that "a big reason why drivers like to use T-Check is because we're able to front them a portion of the load in order to pay for their fuel.").[16],[17]  Plaintiff submits that, AKJ, as a small motor carrier undergoing a day to day struggle to remain financially viable, occupied a special position vis-à-vis Defendant C. H. Robinson.  Specifically, it is clear from the evidence that AKJ took frequent advantage of C. H. Robinson's QuickPay Program and T-Chek Program.  (See Exhibit 18 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, for example, lines 102-105, 204-218, 220-221, 230, 245-251, 319, 360-361, 956, 977, 1126, 1141, 1162-1163, 1224, 2592-2595, among others).  In fact, the spreadsheet data provided to Plaintiff by C. H. Robinson from its Express System shows repeated instances of AKJ drivers notifying C. H. Robinson that they could not drive another mile, or repair damage to their vehicles, without an advance from C. H. Robinson via its T-Chek System. (See Exhibit 18 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, lines 102-105, 319, for example).

In light of the foregoing, the relationship between AKJ and C. H. Robinson is

---

deliver the load in a reasonably safe manner (were it concerned about safety issues).

[16] Seventy-five percent (75%) of C. H. Robinson's current contract carriers are smaller carriers with less than 100 power units (tractors).  (See Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce M. Johnson, March 13, 2008, page 133).

[17] As set forth in Plaintiff's previous brief, there is a demonstrated link between poor financial standing on the part of a carrier and safety performance, in that carriers who are struggling financially appear to be more likely to experience safety issues.  (See Exhibit 33 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, a study conducted on behalf of the FMCSA by the Supply Chain Management Center of the Robert H. Smith School of Business, University of Maryland, which was co-authored by Plaintiff's expert, Dr. Thomas M. Corsi and is now authenticated by his affidavit, attached hereto as Exhibit 52; Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, pages 60-61; 123-124, testifying as to the

not adequately expressed in the initial or "master" contract carrier agreement executed between them, which characterizes the role of AKJ as merely that of an "independent contractor," and upon which C. H. Robinson relies heavily in its brief.[18]  The specific provisions of the initial or "master" agreement that Defendant relies upon, which AKJ did not follow, and which C. H. Robinson clearly chose not to enforce, do not address the financial dependence that AKJ had on C. H. Robinson's willingness to continue to assign loads to it or the degree of control over the details of the work performed that was actually imposed by C. H. Robinson on AKJ and its drivers.  Plaintiff submits that this degree of financial dependence, of which C. H. Robinson was aware and which C. H. Robinson did, in fact, foster, put C. H. Robinson in a position where it did have the power to control AKJ in the conduct of its business affairs, had it wished to do so. [19]

## ARGUMENT

A party moving for summary judgment bears the initial burden of establishing that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See *May v. Dover Elevator Co.*, 845 F. Supp. 377, 379 (E.D. Va. 1994); Fed. R. Civ. P. 56(c).  Once this initial showing is made, the burden of production, but

---

correlation between poor financial performance and poor safety performance).

[18]  See Footnote 11.

[19] Plaintiff notes that the concept of utilizing "economic realities" to determine the existence of an employer/employee relationship has been applied in other types of cases, such as cases relating to social or governmental type benefits.  See, for example, *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006).

not persuasion, shifts to the non-moving party. *Id.; see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986) ("[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor."). The court must view the evidence under consideration in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000).

## I.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS OF NEGLIENT HIRING AND NEGLIGENT ENTRUSTMENT.

With respect to Plaintiff's claims against C. H. Robinson under Count III of his Complaint for negligent hiring of AKJ Enterprises, Inc. (as an independent contractor) and under Count V of his Complaint for negligent entrustment of the transport of the subject load, Plaintiff has sought summary judgment as to these claims in his own right.   Obviously, as a part of Plaintiff's own effort to obtain summary judgment as to the claims in his favor, he has asserted in his motion and brief that there are no issues of material fact which are genuinely in dispute. Accordingly, Plaintiff does not suggest in response to Defendant's motion that any genuine dispute exists in respect of those facts material to these two claims, nor has C. H. Robinson asserted in its brief any *material* facts which Plaintiff does not believe to be true (excluding, of course, Defendant's inferences derived from, or legal conclusions relating to, such facts).   The parties simply disagree as to whether the law requires C. H. Robinson to make any effort to ensure that it is hiring reasonably safe carriers to haul its loads and whether, if it had taken any action in furtherance of

such duty, it would have had reason to suspect that AKJ was an unsafe and unfit

motor carrier.[20]

## A.   C. H. ROBINSON WAS NEGLIGENT IN HIRING AKJ ENTERPRISES, INC., AS AN INDEPENDENT CONTRACTOR:[21]

In its brief in support of its Motion for Summary Judgment, C. H. Robinson

seeks to reopen the issue of whether Virginia law recognizes the tort of negligent

hiring of an independent contractor, a question which the Court has already

answered in its previous ruling on Defendant's Motion to Dismiss,[22] and to paint the

---

[20] In Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Plaintiff predicted that the dispute between the parties might involve discussion as to whether any action taken by C. H. Robinson in furtherance of its duty of reasonable care was sufficient to fulfill that duty.  Plaintiff notes that Defendant has not, in its brief in support of its own motion for summary judgment, addressed in any meaningful way the issue of whether its actions were sufficient, presumably because (i) C. H. Robinson recognizes no duty of reasonable care on its part and (ii) it is undisputable that C. H. Robinson took no meaningful action in terms of evaluating the safety of its network of motor carriers, or AKJ Enterprises, Inc., specifically.  C. H. Robinson's only apparent effort in this regard in its brief is to suggest that what actions Defendant was taking in 2004 were consistent with what "others in the industry" were doing at that time, essentially suggesting an industry-wide standard of care. As an initial matter, Defendant's own expert witness, Annette M. Sandberg, has testified that there was no industry-wide or standard practice in 2004.  (See Exhibit 53, Deposition of Annette M. Sandberg, March 18, 2008, page 99).  Further, as set forth in more detail in Plaintiff's Brief in Opposition to Defendant's Motion to Exclude the Testimony of Plaintiff's expert, Thomas M. Corsi, Virginia law is clear that, even if there were any sort of industry standard, it would not be determinative for purposes of assessing the applicable standard of care.  Additionally, Plaintiff argues in his Brief in Opposition to Defendant's Motion to Exclude the Testimony of Plaintiff's expert, Thomas M. Corsi, that there was essentially no other broker or third-party logistics company in 2004 that was similarly situated, as only C. H. Robinson was then embroiled in a lawsuit involving many of the same issues involved in this case, namely *Schramm, et al v. Foster, et al*, 1:02-cv-03442.

[21] Plaintiff has sought summary judgment as to his claim that C. H. Robinson negligently hired AKJ Enterprises Inc. for the subject load, as an independent contractor.  Plaintiff reserved for trial the issue of whether C. H. Robinson negligently hired AKJ as an employee. For purposes of organization, Plaintiff will address the issue of Defendant's negligent hiring of AKJ, as an employee, in a separate section.  Plaintiff does not concede that AKJ may not qualify as an "employee" of C. H. Robinson.

[22] Plaintiff notes that the Court had information before it on Defendants' Motion to Dismiss

decision of the Virginia Supreme Court in *Philip Morris, Inc. v. Emerson,* 235 Va. 380, 368 S.E.2d 268 (1988) in a light not justified by the text of the opinion itself. Specifically, C. H. Robinson seeks to interpret *Philip Morris* to stand for the proposition that Virginia will only recognize a claim for negligent hiring of an independent contractor where the contractor is performing what may be described as an "ultra-hazardous" activity, even though the Virginia Supreme Court never limited its decision in that manner.  It is true that the independent contractor at issue in the *Philip Morris* case was performing what anyone would agree was an "ultra-hazardous" activity, but the Court never stated that it was limiting its holding to "ultra-hazardous" activities.  In fact, as noted in Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, the *Philip Morris* decision relies upon Rule 411 of the Restatement (Second) of Torts, which clearly was not intended by its drafters to relate exclusively to situations involving "ultra-hazardous" activities. Rather, Rule 411 of the Restatement, specifically clause (a), relates to cases involving "work which will involve a risk of physical harm unless it is skillfully and carefully done."   See RESTATEMENT (SECOND) OF TORTS § 411 (1965).   This language encompasses a broader spectrum of activities than that which would be described as "ultra-hazardous" and arguably creates for plaintiffs a lesser burden than would be the case if the rule required a pure, "ultra-hazardous" activity.[23]  See, for example,

---

as to the nature of the load being transported, the type of equipment being used, the pick-up and delivery points, and the such other pertinent facts as would have been required by the Court to determine at that stage of the proceedings whether an "ultra-hazardous" activity was involved.  Although Plaintiff contends that the size and weight of a tractor-trailer make its operation inherently dangerous, so as to require the application of particular skill, Plaintiff has understood the Court's prior ruling to hold that an "ultra-hazardous" activity is not required, given that there was no significant discussion of this point in the Court's ruling.  See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *15 n.4.

[23] See, for example, Illustration No. 5 for this section, which presents facts very similar to

*Puckrein v. ATI Transport, Inc.*, 186 N.J. 563, 579-581, 897 A.2d 1034, 1044-45(N.J. 2006) (applying Rule 411 in context of a tractor-trailer accident); *Leach v. Newport Yellow Cab, Inc.*, 628 F. Supp. 293, 299 (S.D. Ohio 1985) (applying Rule 411 in the context of a taxi cab accident); *Louie v. Servicelink, Inc.*, 1995 Del. Super. LEXIS 610 (denying the defendant's motion for summary judgment as to negligent hiring of motor carrier under Rule 411).[24]  Plaintiff notes that the Virginia Supreme Court relied upon Rule 411 in the *Philip Morris* decision without limitation or restriction, when the Court could have easily expressed any intent to limit its use of this rule (or its recognition of the tort of negligent hiring of an independent contractor, for that matter).

Defendant C. H. Robinson, concluding in its brief that *Philip Morris* requires an "ultra-hazardous" activity and that the activity involved in the present case was not "ultra-hazardous" in nature, then states that, even if there were potentially a cause of action for the negligent hiring of an independent contractor under the facts of the present case, there is no "credible" evidence that C. H. Robinson knew or should have known that AKJ was "likely to have this type of fatal crash."[25]   As an initial

---

those found in the present case.

[24] Although an unpublished decision, Plaintiff notes that the Superior Court of Delaware in *Louie* denied summary judgment based upon the plaintiff's proffered evidence, which included evidence that driver's license had previously been suspended five times, including once for driving under the influence, and where deposition testimony demonstrated that the employer made no attempt, prior to hiring the carrier, to obtain a driver's list, check accident records, check driving records, make inspections of equipment, or make inquiries as to the carrier's safety record.

[25] In its brief, C. H. Robinson repeatedly references an issue as to whether C. H. Robinson should have known that AKJ would cause a "fatal crash."  With all due consideration to the tragic death of Ms. Arciszewski, Plaintiff's action is for his personal injuries and is obviously not in the nature of a wrongful death action.  To the extent that C. H. Robinson attempts by these repeated references to the fatality involved in the subject collision to create some sort of heightened burden for Plaintiff, Plaintiff submits that he need only show that C. H. Robinson knew or should have known that its negligent hiring of AKJ, a patently unsafe and unfit motor carrier, was likely to lead to an accident involving personal injuries.

matter, and as is set forth in greater detail in Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, C. H. Robinson had ample information available to it which would have, at minimum, put it on notice that further investigation of AKJ's safety practices and policies was warranted.[26]  Both Plaintiff's expert, Dr. Thomas M. Corsi, Ph.D., and Defendant's expert, Annette M. Sandberg, who was Administrator of the FMCSA at the time of the subject collision, agreed that the information available to C. H. Robinson, such as AKJ's "conditional" safety rating, (of which C. H. Robinson admittedly had actual knowledge prior to assigning the subject load to AKJ), should have led Defendant to make further inquiries into the safety and propriety of using AKJ for the subject load, or any load.  (See Exhibit 27 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Affidavit of Dr. Thomas M. Corsi; Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, pages 112-117, 122-123).   Further, Plaintiff believes, as does his expert, Dr. Corsi, that the information available to Defendant, both in terms of public information posted by the FMCSA on its official website and the private, internal records that C. H. Robinson kept of its prior history with AKJ, would have been sufficient to warrant Defendant's cessation of business relations with this carrier altogether.  (See Exhibit 27 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment).

In respect of C. H. Robinson's internal records from its Express system, Defendant asserts in its brief that the multitude of safety related notations contained

---

[26] See *Wasson v. Stracener*, 786 S.W.2d 414, 422 (Tx. Ct. App. 1990) ("One factor that courts have looked to in determining whether an employee was negligent in hiring an independent contractor is whether the employer conducted an inquiry into the contractor's qualifications before hiring the contractor.").

in such records, while "sensational," are "not germane to the issues in the case."[27] Defendant then lists some of the more outrageous incidents referenced in its records and then states that "[n]one of this, of course, would have served to place Robinson on notice 'of the possibility that [AKJ] would create an unreasonable risk of harm or would be unfit for the position." Plaintiff is not surprised by this statement, as C. H. Robinson's Rule 30(b)(6) representative, Bruce Johnson, testified that even if Defendant C. H. Robinson had possessed actual knowledge of (1) AKJ's grossly deficient SEA scores; (2) AKJ's "conditional" safety rating, which was in violation of its contractual obligations to C. H. Robinson; (3) the numerous incidents of driver- and vehicle-related problems with AKJ noted in its own Express System, including notations of AKJ's drivers operating in violation of federal safety regulations, C. H. Robinson still would have refused to do any further investigation into the safety practices of AKJ and further, that C. H. Robinson would have continued to do business with this carrier. (See Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Bruce W. Johnson, March 13, 2008, pages 166-188). Mr. Johnson further testified that he could not recall a single instance in which any information concerning any carrier that had come to his attention had caused him to make inquiry into that carrier's safety practices. (See Exhibit 24 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition

---

[27] C. H. Robinson also implies that the Court should ignore these records as they represent "hearsay within hearsay." As an initial matter, the records are kept in the normal course of business by Defendant and would fall under the "business records" exception. See Fed. R. Evid. 803(6). Further, for purposes of establishing whether C. H. Robinson breached its duty in failing to look at its own records or conduct some investigation into AKJ's safety practices, Plaintiff need not introduce such evidence in order to prove the truth of the matters reported to C. H. Robinson employees and documented in such records, e.g., whether a driver really did threaten warehouse workers with a knife and use it to stab cargo pallets. The point is that these reports, whether true or not, should have prompted C. H. Robinson to make

of Bruce W. Johnson, March 13, 2008, page 187).  As such, Plaintiff questions whether C. H. Robinson could possibly envision any manner of evidence that it would consider "germane to the case."

Certainly, Plaintiff believes that AKJ's safety rating, compliance review records, SafeStat scores, and even the internal records of C. H. Robinson, a sophisticated international third-party logistics company with the largest network of motor carrier capacity in North America and vast resources at its disposal, should have served to place Defendant on notice of the possibility that use of AKJ would create an unreasonable risk of harm or that AKJ would be unfit for the position.  If the extensive information available to C. H. Robinson as to the abysmal safety practices and record of AKJ in the present case would not have been sufficient to put Defendant on notice that it was dealing with an unsafe and unfit motor carrier, then Plaintiff questions whether there is any information that would serve that purpose.

C. H. Robinson also makes the extraordinary suggestion in its brief that it could not have reasonably foreseen that the subject collision in this case would result in personal injuries because AKJ's two previous accidents with C. H. Robinson loads did not result in personal injuries (or at least, none that have come to light during the discovery process).  Plaintiff is uncertain what point C. H. Robinson intends to make – whether it is that perhaps AKJ drivers, although not competent enough to avoid crashes entirely, were nonetheless skillful enough to manage their crashes without injuring others; or that AKJ drivers' incompetence is somehow confined to low-impact situations; or perhaps that C. H. Robinson could have reasonably believed AKJ and its drivers to be perpetually lucky or perhaps the objects of some manner of

---

further inquiry.

divine benevolence. Regardless, it is a matter of common knowledge that massive tractor-trailers, heavy in and of themselves but even more so carrying a full load, will generate great destructive force in any impact that might occur. See *Hodges v. Johnson*, 52 F. Supp. 488, 490 (W.D. Va. 1943) ("It is a matter of common knowledge that the transportation of freight upon the highways, usually by means of huge trucks and trailers, is fraught with great danger to the traveling public."); *Aronovitch v. Ayres*, 169 Va. 308, 318, 193 S.E. 524, 526 (1937) ("These trucks, sometimes inordinate in size, measurably monopolize our highways and add to the peril of their use, and it is in the light of their potential destructiveness that a high degree of care is but ordinary care."). Other than the foregoing, Plaintiff is simply at a loss to figure out how to seriously debate the issue of whether a tractor-trailer crash on a public highway is likely to involve a potential hazard to the traveling public.

Bemoaning Plaintiff's anticipated cluttering of the record with "irrelevant" events, Defendant C. H. Robinson further asserts in its brief that Virginia law "requires a close nexus" in a negligent hiring claim between the employee's past behaviors and the core conduct at issue, or a "near identity of fact patterns between the past events and the current claim." As an initial matter, Plaintiff believes that he has shown that AKJ had well-documented history of poor choices with respect to its drivers and not conducting proper investigation into the backgrounds of its drivers, as required by federal safety regulations. (See Plaintiff's Brief in Support of his Motion for Partial Summary Judgment). AKJ continued this practice of hiring unsafe and unfit driers by hiring Morris, who had no valid driver's license, and Arciszewski, who had only possessed a commercial driver's license for a little over one month and appears to have had no previous experience as a professional tractor-

trailer driver, to handle a "hot" or time-sensitive load with respect to which they were dispatched late to begin with.  Plaintiff submits that Arciszewski was speeding at the time of the accident because she and Morris were behind schedule and that she was simply too inexperienced to handle the speed and pressure without committing a grave error.  More importantly, however, Plaintiff notes that C. H. Robinson does not cite a single Virginia case expressly or impliedly espousing a "close nexus" theory.

Interim Personnel of Central Va., Inc. v. Messer, 263 Va. 435, 559 S.E.2d 704 (2002), the case relied upon by Defendant, involves a worker supplied by a temp agency who, during a period in which his work was being performed at the University of Virginia's Alumni Hall, stole a vehicle belonging to the Alumni Association and, while intoxicated, caused the collision which gave rise to that action.  The plaintiff in that case brought claims of negligent hiring against the temp agency and the Alumni Association, on the grounds that they failed to check into the background of the defendant driver, which check would have shown that he had a suspended driver's license and had been labeled a "habitual offender" as a result of repeated DUI convictions.  The Virginia Supreme Court held essentially that, had the temp agency or the Alumni Association actually checked into the driver's background and found his history of alcohol-related problems, this would not have put them on notice that the driver might steal one of the Association's vehicles and commit a tort.  See Id., 263 Va. at 442-443, 559 S.E.2d at 708.  In other words, the previous DUI convictions and "habitual offender" status would not have put the employers on notice that the defendant driver might commit a theft.  Plaintiff submits that the outcome might have been different had the defendant driver in that

case been hired for the primary purpose of driving one of his employer's vehicles and while, in the course of driving such vehicle (with his employer's permission) negligently caused the accident at issue in that case.  See, for example, *Fulcher v. Va. Elec. & Power Co.*, 60 Va. Cir. 199, 204-5 (Norfolk Cty. 2002) ("Had the Plaintiff merely accidentally severed the line before discovering it, the Defendants' failure to mark would surely be the proximate cause of the Plaintiff's injury, but, in this case, the Plaintiff's intentional severing of the line upon discovery constituted a superseding cause.").  Accordingly, the decision in *Interim Personnel* is inapposite to the facts currently before the Court, as there is nothing unforeseeable about an unsafe motor carrier or its unsafe and unfit driver, transporting freight on a public highway in a tractor-trailer in the course of its and her employment, causing a crash such as the one at issue in the present case.  Certainly, there is nothing stated in the *Interim Personnel* decision that would substantiate C. H. Robinson's claim that Virginia law requires a "near identity of fact patterns between the past events and the current claim." Instead, this case is simply an example of the Virginia Supreme Court evaluating the peculiar facts of that case and determining what would have been foreseeable to the employer.

Plaintiff respectfully submits to the Court that although he believes that he does have a "close nexus" in the present case between AKJ's past safety problems and its actions that led to the crash at issue, he is not required to meet the heightened burden that Defendant is attempting to assign to him.  Plaintiff refers the Court to the Virginia Supreme Court's decision in *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628 (1922), in which the Court found that the plaintiff had proved a claim for negligent hiring where the employee had merely a past history of drunkenness and was known to be

was easily incensed and to fly into a tantrum or become dangerously angry on only slight provocation, and, perhaps as a consequence of these traits, fired a pistol into a vehicle occupied by the plaintiff's decedent following a minor disagreement that arose between the employee and the driver of the decedent's vehicle.  There was no suggestion in this case of any "close nexus" requirement, nor of any prior incidents in which the employee had fired a weapon at anyone, much less in the course of employment.  Rather, mere knowledge of the character trait or propensity of the employee at issue (which would have been discovered had any reasonable investigation been made) was deemed sufficient to have placed the employer on notice that the employee would likely act consistent with that trait and cause harm to a member of the public.  *Id.*, 133 Va. at 80-81, 112 S.E. at 631-32; <u>see</u> <u>also</u> *Southeast Apts. Mgmt., Inc. v. Jackman*, 257 Va. 256, 260, 513 S.E.2d 395, 397 (1999) ("Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position . . .").  Accordingly, Plaintiff believes that Defendant misrepresents the state of Virginia law in this regard.

Plaintiff respectfully submits that, in the end, had C. H. Robinson made any effort to make itself aware of even a fraction of the available information concerning AKJ, it would have, and should have, recognized the clear warning signs that AKJ was not a fit, competent, or safe motor carrier, and should have, at minimum engaged in a more in-depth review of AKJ's safety practices before assigning any loads to AKJ. [28]  Plaintiff submits further that such a review would have confirmed

---

[28] As Plaintiff has noted previously in his Brief in Support of his Motion for Partial Summary Judgment, C. H. Robinson puts millions of loads upon the highways of America each year. It is only by virtue of C. H. Robinson hiring them that many of the carriers employed by C.

that AKJ was not a fit carrier and that it was not reasonably safe to assign any further loads to this carrier unless or until significant safety improvements had been made. As such, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment as to Count III of his Complaint and further, that the Court grant Plaintiff's own motion for summary judgment as to this count.

### B.     C. H. ROBINSON WAS NEGLIGENT IN ENTRUSTING TRANSPORT OF THE SUBJECT LOAD TO AKJ ENTERPRISES, INC.:

In respect of Plaintiff's claim for negligent entrustment, C. H. Robinson argues, quite simply, that the Court wrongly decided the issue of whether Virginia courts would recognize negligent entrustment of an activity under Rule 308 because the Virginia Supreme Court may have, on one or more previous occasions, failed or declined to accept a completely unrelated section of the Restatement (Second) of Torts.[29]   Without undertaking an extensive survey of the fifty states, Plaintiff imagines that there are probably none, or at least exceedingly few, states that have wholeheartedly adopted every single provision of the Restatement (Second) of Torts. Moreover, Plaintiff would anticipate that there are numerous provisions under the

---

H. Robinson are traveling the public highways at all.   How Defendant can deny any responsibility for the duty to select safe carriers is beyond all logic and reason.

[29] Defendant relies upon two unpublished Virginia circuit court cases which do not address or even reference Rule 308.   In *Bridgers v. Doran Corp.*, 1992 WL 884938, the trial court, dealing with a completely unrelated provision of the Restatement, noting simply that a mere reference by the Virginia Supreme Court in a case to a Restatement rule is not necessarily to be viewed as an adoption of that rule unless it is clear from the context that the Court intends to rely upon or adopt the rule.   In *Beasley v. YMCA*, 2003 Va. Cir. LEXIS 367, the trial court makes no discussion of any particular practice or habit of the Virginia Supreme Court in respect of adopting or declining to adopt provisions of the Restatement (Second) of Torts, merely stating that the Virginia Supreme Court had not yet adopted the rule at issue and

Restatement (Second) of Torts that the Virginia Supreme Court has not had occasion to expressly consider. Defendant's argument, which appears to be that, because Virginia has not undertaken a blanket adoption of the entire Restatement, this Court cannot decide what a Virginia court would do in respect of any specific rule section not previously addressed by the Virginia Supreme Court, would appear to be simply a reconstitution of C. H. Robinson's original argument in support of its motion to dismiss. See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *17-18.

In the Court's prior decision on this case, however, it acknowledged and fulfilled its responsibility, as set forth in *Private Mortgage Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002), for example, to predict how the Virginia Supreme Court would rule if presented with an issue that the Court has not had a prior occasion to address. See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *18-19. The Court determined that Virginia courts would recognize a claim for negligent entrustment of an activity in accordance with the provisions of Rule 308 of the Restatement (Second) of Torts and this is now the law of this case. Plaintiff cannot see that Defendant C. H. Robinson has provided any compelling reason or argument as to why the Court should now change its mind.

In its brief, Defendant C. H. Robinson does not discuss Plaintiff's claim for negligent entrustment beyond its "invitation" to the Court to revisit its "prediction" as to whether a Virginia court would rely upon Rule 308. Accordingly, Plaintiff respectfully directs the Court's attention to Section II (B) of his Brief, in which he seeks summary judgment as to Count V of his Complaint. Specifically, in Plaintiff's

---

that the trial did not wish to do so in the absence of such precedent.

brief, he used the official comments to Rule 308 to examine the requirements for a viable claim under this provision and applied those requirements to his evidence. Rule 308 of the Restatement (Second) of Torts provides that "[i]t is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."  See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *15-19; *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 579-80 (W.D. Pa. 2004) ("It is sufficiently alleged that the institutional defendants were aware of Krawczyk's propensity to furnish alcohol to minors in his position as a priest, and knew or should have known that an unreasonable risk of harm to individuals under the age of twenty-one would be created by permitting Krawczyk to retain his position as pastor of the St. Maximilian Kolbe Parish and priest of the St. Anne Catholic Church."); RESTATEMENT (SECOND) OF TORTS § 308 (1965).  Plaintiff noted in his brief that the job of transporting the subject load, Load No. 21422065, was within the control of C. H. Robinson, as Max Cortis, the shipper/customer sales representative who accepted responsibility for transport of the subject load, testified at his deposition that he had already accepted the load on behalf of Defendant C. H. Robinson prior to the assignment of this load to AKJ by C. H. Robinson.  (See Exhibit 7, Deposition of Maximillian F. Cortis, March 7, 2008, pages 31-33; Exhibit 8, Deposition of Michael T. Atkinson, October 8, 2007, page 31).  Furthermore, the "master" Contract Carrier Agreement between C. H. Robinson and AKJ expressly recognizes that transportation of the loads potentially assignable to AKJ was a matter under C. H. Robinson's control.  (See Exhibit 10 to Plaintiff's Brief in Support of his

Motion for Summary Judgment, Contract Carrier Agreement, page 3).  Accordingly, at the time that the subject load was assigned to AKJ by Mike Atkinson, the "activity," or transport of the subject load, was within the control of C. H. Robinson, and any involvement that AKJ might have with such load thereafter was pursuant to the consent of Defendant C. H. Robinson.

The official comments to §308 also provide that, in terms of determining whether the actor should realize that a third person to whom he entrusts the activity is likely to  "conduct himself in the activity in such a manner as to create an unreasonable  risk  of  harm  to  others,"  one  must  look  to  considerations  such  as whether the third person's known character or competency, or the competency of a group  within  which  the  third  person  belongs,  is  or  should  be  known  to  be incompetent or unsafe by the actor, as well as whether the particular circumstances of the case, such as the danger of the work or the qualities or skill level required for safe performance of the work, would give the actor good reason to believe that the third person might conduct himself in an unsafe or incompetent manner with respect to  the  activity.    See RESTATEMENT (SECOND) OF TORTS § 308 cmt. c (1965); RESTATEMENT (SECOND) OF TORTS § 307 cmt. a (1965).  In the present case, as has been previously noted, C. H. Robinson was aware of incidents from its past relationship with AKJ that should have given C. H. Robinson good reason to believe that AKJ might handle the transport of the subject load in an unsafe or unfit manner.  C. H. Robinson was also aware of AKJ's "conditional" safety rating and had access to the publicly available information about AKJ posted on the FMCSA's website, which would have shown that AKJ's overall SafeStat score entitled AKJ to a "B" or "at risk" rating; that AKJ had grossly deficient Driver, Vehicle, and Safety Management SEA

scores; and that AKJ appeared to be having difficulty maintaining the insurance coverage that it was required to maintain in order to keep its federal operating authority.  All of the above facts, which were available to C. H. Robinson, had it chosen to consider them, coupled with the danger inherent in the operation of a tractor-trailer if it is not conducted in a competent manner, leads to the conclusion that it was or should have been reasonably foreseeable to C. H. Robinson that AKJ would fail to engage in the activity of transporting the subject load in a safe and competent manner, creating an unreasonable risk of harm to others.  Specifically, C. H. Robinson should have foreseen that AKJ would continue unabated in its practice of employing incompetent and unsafe drivers by hiring an unsafe driver, or drivers, for the subject load and, further, that the incompetence of such drivers would likely lead to a crash and resulting physical harm to one or more innocent motorists sharing the roadways with AKJ's incompetent drivers.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment as to Count V of his Complaint and further, that the Court grant Plaintiff's own motion for summary judgment as to this count.

**II.   C. H. ROBINSON IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM AGAINST C. H. ROBINSON FOR NEGLIGENT HIRING OF AKJ ENTERPRISES, INC., AS AN EMPLOYEE, OR ON PLAINTIFF'S CLAIM AGAINST C. H. ROBINSON UNDER A VICARIOUS LIABILITY THEORY FOR THE NEGLIGENCE OF AKJ ENTERPRISES, INC. AND/OR ARCISZEWSKI.**

**A.   AKJ ENTERPRISES, INC. WAS AN EMPLOYEE OF DEFENDANT C. H. ROBINSON, AS WERE ITS DRIVERS.**

In its previous decision, the Court set forth the test for whether an

employer/employee relationship exists.  The four factors to consider in evaluating whether an entity is an independent contractor or an employee are  (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power of control.  See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *9 n.1 (citing *Hadeed v. Medic-24, Ltd.*, 237 Va. 277, 288, 377 S.E.2d 589, 594-95 (1989)).  As Plaintiff does not anticipate any dispute among the parties as to the first three factors, he will focus, as did the Court, on the power of control.  As the Court noted, the relevant inquiry is into the existence of a power of control and the exercise or nonexercise of such power is not important. *Id.*

With respect to the power of control, Plaintiff submits that C. H. Robinson's relationship with AKJ, when viewed in its totality, is one where a significant power of control resided in Defendant.  See *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) ("An employer controls the work and its instrumentalities and circumstances to a greater degree than does a hiring party in an independent contractor relationship.").  Notably, C. H. Robinson's involvement in the transport of individual loads is far more extensive than that found with the typical broker.  (See Exhibit 16 to Plaintiff's Brief in Support of his Motion for Partial Summary Judgment, Deposition of Annette M. Sandberg, March 18, 2008, pages 18-19, 36)  In addition to Defendant's standard practice of providing its carriers and their drivers with specific dates and times for pick-up and delivery of individual loads; pick-up and delivery addresses; directions; and specific limitations or directions as to the loading or unloading of the cargo, C. H. Robinson frequently provided very detailed and explicit directions to AKJ and its drivers concerning how the driver was to conduct himself or herself during the transport of the load.  (See Exhibit 49).  These

instructions in the hundreds of load confirmation sheets authored by C. H. Robinson expressly amended Defendant's "master" Contract Carrier Agreement with AKJ and are just as probative of the parties' true relationship as any provision of the initial "master" agreement, perhaps more so, as such instructions were tailored to the individual circumstances of the loads and were not part of a standardized document replete with language clearly intended to insulate Defendant from any and all modes of liability.  (See Exhibit 49).

As an example of these more specific instructions, Plaintiff points to the load confirmation sheet for Load No. 20804793, attached hereto as a part of Exhibit 49, which provides that drivers "must fuel up before loading;" that no trailers were to be "dropped unless the area is fenced/secure;" and that the only stops to be made were "necessary stops," such as "fuel etc," and if such stops were made, the "ignition key must be removed/tractor locked."  Plaintiff submits that these specific directions as to the details of the driver's performance of the work, which direct when and/or under what circumstances the driver may stop, how the driver must leave his vehicle when stopping, and even when and under what circumstances the driver may refuel his tractor-trailer, evidences the degree of control contemplated under Virginia law when determining that an employer/employee relationship exists.  See Phillips v. Brinkley, 194 Va. 62, 66, 72 S.E.2d 339, 341 (1952) (citations omitted) ("If, under the contract, the party for whom the work is being done may prescribe not only what the result may be but may also direct the means and methods by which the other shall do the work, the former is an employer, and the latter an employee.").

In addition to the detailed oversight of the actual performance of the work frequently exercised by Defendant, Plaintiff further notes that C. H. Robinson retains

the power to fire individual carriers from loads that they have already accepted, sometimes even mid-transport, known in C. H. Robinson's vernacular as "bouncing." Plaintiff submits that the power to fire is a key factor for consideration in the employer/employee analysis.  See, for example, *Phillips*, 194 Va. at 67, 72 S.E.2d at 341 (citations omitted) ("One of the tests in determining whether the relationship created is that of master and servant or independent contractor is whether either of the parties possesses the right to terminate the service at will without incurring liability to the other."); *Uninsured Employer's Fund v. Harper*, 26 Va. App. 522, 529, 495 S.E.2d 540, 544 (Va. Ct. App. 1998) (citations omitted).  Plaintiff submits that he has seen no evidence in the records provided to him by Defendant in discovery that would suggest that C. H. Robinson ever experienced negative repercussions from carriers in respect of its decision to "bounce" the carrier, and certainly there is no evidence in the records provided regarding AKJ, specifically, that would indicate that AKJ ever protested a "bounce" or attempted to impose any sort of liability for Defendant's exercise of its right to "bounce."

    As a final matter, Plaintiff submits that the Court must give consideration to the specific industry and type of work performed in the present case, when evaluating the issue of control and applying the facts of this case to the cited authorities.  See *Cilecek*, 115 F.3d at 260 ("[T]he degree of distinction between the two [employee versus independent contractor] is related to the work itself and the industry in which it is performed.").  Inherent in the occupation of truck driver is a certain freedom from overly strict oversight from an employer, even when there is no dispute as to the existence of an employer/employee relationship, which may not be available to a factory or office worker, for example.   A truck driver necessarily

conducts his or her work away from the physical premises of an employer and must exercise considerable discretion in reacting to numerous and constantly changing variables, whether road related, traffic related, vehicle related, etc.  Plaintiff submits that, under these circumstances, an employer would necessarily have somewhat diminished control over the specific details of the driver's work, but would instead posses a broader power of control.

Although in its memorandum C. H. Robinson relies heavily upon certain provisions of its Contract Carrier Agreement with AKJ, which attempts to proactively insulate Defendant from liability by characterizing the relationship between the parties as that of an employer and independent contractor,[30] whether or not AKJ and/or its driver, Arciszewski, were employees of C. H. Robinson is to be determined with reference to the actual relationship and dealings between the employer and the tortfeasor employee and is not dependent upon the terms used by such parties to describe the nature of their relationship.  See, for example, *West v. Costen*, 558 F. Supp. 564, 573 n.2 (W.D. Va. 1983) (citation omitted) ("Although the employment agreement between MSF and the individual collectors refers to the latter as 'independent contractors,' the key consideration in determining the existence of a master-servant relationship is the alleged master's power of control of the alleged servant's actions.").

In light of the totality of the factors set forth above, Plaintiff respectfully submits to the Court that there is a genuine issue of material fact as to whether AKJ Enterprises, Inc. and/or Kristina Mae Arciszewski were employees of Defendant C.

---

[30] As noted previously under Footnote 10 herein, the hundreds of load confirmation sheets prepared by C. H. Robinson and accepted by AKJ must also be deemed incorporated into this initial or "master" Contract Carrier Agreement.

H. Robinson.

**B.    IN LIGHT OF THE EMPLOYER/EMPLOYEE RELATIONSHIP BETWEEN C. H. ROBINSON AND AKJ ENTERPRISES, INC. AND/ OR ARCISZEWSKI, A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER PLAINTIFF IS ENTITLED TO RELIEF UNDER A NEGLIGENT HIRING THEORY.**

In the Court's prior opinion, it relied upon *Interim Personnel of Central Va., Inc. v. Messer*, 263 Va. 435, 559 S.E.2d 704 (2002), to find the proper measure for evaluating a claim of negligent hiring of an employee.  Specifically, the Court held in its prior decision that liability under a claim for negligent hiring is "based upon an employer's failure to exercise reasonable care in placing an individual with known propensities, or propensities that should have been discovered by reasonable investigation, in an employment position in which, due to the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others."  See *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *12 (quoting *Interim Personnel of Central Va., Inc. v. Messer*, 263 Va. 435, 440, 559 S.E.2d 704, 707 (2002)).

Considering those facts and arguments previously set forth herein, Plaintiff submits to the Court that there is no genuine issue as to C. H. Robinson's failure to "exercise reasonable care" in hiring AKJ, which had a propensity to manage its business operations in an unsafe manner, in violation of applicable federal safety regulations, including particularly, regulations pertaining to the hiring and management of its drivers, such propensity being amply evidenced by some facts which were actually known to C. H. Robinson (but ignored) and numerous facts which would most certainly have been discovered by C. H. Robinson had it make

"reasonable investigation," or any investigation, for that matter.  Furthermore, these facts of which C. H. Robinson was aware, or should have been aware, made it readily foreseeable to Defendant that AKJ, through its drivers, posed a threat of injury to others, including Plaintiff.

In light of the foregoing, Plaintiff respectfully submits that there is a genuine issue of material fact as to whether C. H. Robinson exercised reasonable care in hiring AKJ Enterprises, Inc. to transport the subject load and asks that the Court deny Defendant's motion in this regard.

### C.   IN LIGHT OF THE RELATIONSHIP BETWEEN C. H. ROBINSON AND AKJ ENTERPRISES, INC. AND/OR ARCISZEWSKI, A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER PLAINTIFF IS ENTITLED TO RELIEF UNDER A VICARIOUS LIABILITY THEORY.

Plaintiff has asserted a claim against C. H. Robinson under a vicarious liability theory in Count I of his Complaint, in light of the extensive degree of oversight and control that C. H. Robinson exerted over both AKJ and Arciszewski.  Virginia law imposes tort liability on an employer for the negligent acts of its employees under the doctrine of *respondeat superior*.  See *Commercial Business Sys. v. Bellsouth Servs.*, 249 Va. 39, 44, 453 S.E.2d 261, 265 (1995) ("[T]he doctrine of respondeat superior is firmly established in Virginia.").  In applying the doctrine, the primary focus is generally on whether the activity involved was within the employee's scope of employment.  *Id.*; see also *Davis v. Merrill*, 133 Va. 69, 77-78, 112 S.E. 628, 631 (1922)("[T]he test of the liability of the master for the tortious act of the servant,  is not whether the tortious act itself is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether the service itself, in which

the tortious act was done, was within the ordinary course of such business or within the scope of such authority.").

In the present case, Plaintiff submits that there is no question that AKJ and Arciszewski were acting within the scope of their employment with C. H. Robinson when the act of negligence occurred, nor does C. H. Robinson attempt to dispute this point in its brief in support of its motion for summary judgment. AKJ was a motor carrier engaged in interstate transportation services and was engaged by C. H. Robinson to transport the subject load. Arciszewski and Morris, Arciszewski's co-driver, were engaged by AKJ to drive its tractor-trailer and physically move the load at issue. Arciszewski and Morris were driving AKJ's tractor-trailer, with C. H. Robinson's brokered freight inside, in route to deliver the subject load, when the collision occurred. Furthermore, Plaintiff further submits that there is no dispute in the evidence as to the negligence of Arciszewski and Plaintiff has, in fact, moved for partial summary judgment on this issue.

Plaintiff submits that, in light of the employer/employee relationship between Defendant C. H. Robinson and AKJ/Arciszewski, and the fact that the negligence involved in the present case occurred while Arciszewski, and AKJ through Arciszewski, were acting within the scope of their employment. As such, Plaintiff respectfully submits that there is a genuine issue of material fact as to whether C. H. Robinson may be held vicariously liable for the negligence of AKJ and Arciszewski in the transport the subject load, under a *respondeat superior* theory, and asks that the Court deny Defendant's motion in this regard.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, Plaintiff respectfully requests that the Court overrule Defendants' Motion for Summary Judgment for the reasons asserted herein.

Respectfully submitted,

**WINFORD DALLAS JONES**


s/        Gary C. Hancock
Of Counsel


Gary C. Hancock, VSB #16704
Timothy E. Kirtner, VSB #36938
Ann L. Bishop, VSB #43847
GILMER, SADLER, INGRAM, SUTHERLAND & HUTTON
P. O. Box 878, 65 East Main Street
Pulaski, VA  24301
540/980-1360 (telephone)
540/980-5264 (facsimile)

Byron R. Shankman, VSB #13485
P. O. Box 1859
Dublin, VA  24084

Counsel for Plaintiff, Winford Dallas Jones


## CERTIFICATE OF SERVICE

I do hereby certify that I have this 9th day of April 2008 electronically filed the foregoing Brief in Opposition to Defendant's Motion for Summary Judgment with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Paul C. Kuhnel, Esquire, Wooten Hart PLC, P.O. Box 12247, Roanoke,

Virginia 24024-2247, Counsel for C.H. Robinson Worldwide, Inc.; C. H. Robinson

Company; C. H. Robinson Company Inc.; C. H. Robinson Company LP; C. H.

Robinson International, Inc.; C. H. Robinson Operating Company LP; and C. H.

Robinson Transportation Company Inc.

<u>s/     Gary C. Hancock    </u>
Gary C. Hancock
Gilmer, Sadler, Ingram, Sutherland & Hutton
P. O. Box 878, 65 East Main Street
Pulaski, VA  24301
540/980-1360 (telephone)
540/980-5264 (facsimile)
ghancock@gsish.com