UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


```
* * * * * * * * * * * * * *
WINFORD DALLAS JONES,          * CIVIL ACTION 7:06-CV-00547
                               * MAY 5, 2008    9:28 A.M.
               Plaintiff,      * JURY TRIAL EXCERPT
                               * TESTIMONY OF KENNETH CLARK
vs.                            * AND MICHAEL ATKINSON
                               *
C.H. ROBINSON WORLDWIDE,       *
INC., et al.,                  * Before:
                               * HONORABLE GLEN E. CONRAD
             Defendants.       * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * *    * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        TIMOTHY E. KIRTNER, ESQUIRE
                          GARY CLAY HANCOCK, ESQUIRE
                          ANN BISHOP, ESQUIRE
                          Gilmer, Sadler, Ingram, Sutherland
                          & Hutton
                          P.O. Box 878
                          Pulaski, VA 24301


For the Defendant:        PAUL C. KUHNEL, ESQUIRE
                          ROBERT MICHAEL DOHERTY, ESQUIRE
                          Wooten Hart, PLC
                          P.O. Box 12247
                          Roanoke, VA 24024




Court Reporter:           Judy K. Webb, RPR
                          P.O. Box 1234
                          Roanoke, Virginia 24006
                          (540)857-5100 Ext. 5333

          Proceedings recorded by mechanical stenography,
transcript produced by computer.

Jones v. C.H. Robinson Worldwide – 5/5/08

1                           I N D E X
                                                        Further
2                   Direct   Cross   Redirect   Recross   Redirect

3  WITNESSES FOR THE
    PLAINTIFF:
4  Kenneth Clark          3       4        5

5  Michael Atkinson       7      44       57        59

6

7

8

9

10

11

12
   EXHIBITS:                      MARKED              RECEIVED
13 Joint Exhibit 1                 30

14 Plaintiff's Exhibit 5          39                   39

15

16

17

18

19

20

21

22

23

24

25

1       (Court convened at 9:28 a.m.)

2           THE COURT:  Good morning.  I'll ask Ms. Bright to

3   announce the style of today's first case.

4           THE CLERK:  *Winford Dallas Jones v. C.H. Robinson*

5   *Worldwide*, Civil Action 7:06-CV-547 for motions.

6       (Proceedings were had but not transcribed at this time.)

7       KENNETH SCOTT CLARK, PLAINTIFF'S WITNESS, SWORN

8                   DIRECT EXAMINATION

9   BY MR. HANCOCK:

10  Q    Would you tell us your name, please.

11  A    Kenneth Scott Clark.

12  Q    And, Trooper Clark, how long have you been with the

13  Virginia State Police?

14  A    A little over 18 years.

15  Q    And tell us what your primary job is with the state

16  police.

17  A    Currently?

18  Q    Yes.

19  A    Currently I'm assigned to the Safety Division of the

20  Motor Carrier Unit for Wytheville Division State Police.

21  Q    And you're one of the local state representatives of the

22  Federal Motor Carrier Safety Administration, who is actually

23  on the road reviewing trucks and other commercial vehicles; is

24  that correct?

25  A    Through the State of Virginia, the state police.

1    Q    Yes.  You're at the local enforcement arm of the Federal

2    Motor Carrier Safety Administration; is that correct?

3    A    Yes, sir.  We're a state partner.

4    Q    And I believe you're also on the reconstruction team with

5    the state police; is that right?

6    A    Yes, sir, I am.

7    Q    And that was the reason you were at the accident that

8    we're here to talk about; is that correct?

9    A    Yes, sir, that's correct.

10   Q    And you have seen the report that's come in by

11   stipulation, and that's a report that you were at least partly

12   responsible for as the state reconstructionist; is that right?

13   A    Yes, sir, that's correct.

14   Q    We've agreed we're going to limit your testimony today,

15   and the main thing I wanted to ask you today was, did you have

16   an understanding as to whether or not Charles Morris, who was

17   the passenger in the AKJ vehicle, whether or not he was a

18   codriver?

19   A    That was our belief at the time, based on the results of

20   the investigation.

21   Q    All right.

22            MR. HANCOCK:  I believe that's all I have, Your

23   Honor.

24            THE COURT:  All right.

25                         CROSS-EXAMINATION

1  BY MR. DOHERTY:

2  Q    Good afternoon, Trooper Clark.

3  A    Good afternoon.

4  Q    Nice to see you again.  Just a couple of questions to

5  clarify.

6       When you say it was the result of your investigation

7  regarding Morris's status as a codriver, first of all, were

8  you the one who conducted that investigation, or was it

9  another member of your team?

10 A    What?  Which investigation?

11 Q    The investigation into whether --

12 A    He was the co- --

13 Q    To establish that he was the codriver.

14 A    That would have been another investigating officer of the

15 team.

16 Q    Okay.  So you didn't personally?

17 A    No, sir, I did not.

18         MR. DOHERTY:  Okay.  Thank you.

19         MR. HANCOCK:  Just a couple of follow-up questions.

20                    REDIRECT EXAMINATION

21 BY MR. HANCOCK:

22 Q    Trooper, how many troopers exactly were involved in the

23 investigation of this accident?

24 A    There was the initial investigating trooper out of

25 Wytheville; I believe there were two accident reconstruction

1  troopers; there was a supervisor for the accident

2  reconstruction team; and a motor carrier trooper, I believe.

3  There may have been more local troopers there that may have

4  handled other aspects that I don't know about.

5  Q    And was this investigation conducted by the Virginia

6  State Police as a part of the ordinary course of business of

7  the Virginia State Police?

8  A    Yes, sir.

9  Q    And you divided up responsibilities among several

10 troopers; is that correct?

11 A    Yes, sir.

12 Q    You all relied on each other to do certain things, and

13 then incorporated the results of your individual

14 investigations into your report and your total investigation;

15 is that correct?

16 A    Yes, sir.

17 Q    So when you say that you believe that he was a codriver,

18 you may have relied on someone else for that, but that was a

19 part of the official investigation of the Virginia State

20 Police; is that right?

21 A    Yes, sir.

22 Q    All right.

23         MR. HANCOCK:  That's all, Your Honor.

24         THE COURT:  Let me ask you a question.  When the

25 tractor-trailers drive down the highways, can they carry

Michael Atkinson – Direct

1  passengers?

2          THE WITNESS:  They can carry authorized passengers.

3  The company has to have the authorization on file at the

4  company.

5          THE COURT:  Does the law make a provision about

6  passengers, or is that some regulation that supplements the

7  statute?

8          THE WITNESS:  Title 49 -- I'm not sure of the exact

9  code section -- prohibits unauthorized passengers in the cab

10 of commercial motor vehicles.  I believe there's an

11 interpretation that says they can have passengers as long as

12 the company keeps a record that they're authorized to be on

13 the vehicle.

14         THE COURT:  Any other questions of this witness?

15         MR. HANCOCK:  No, Your Honor.

16         THE COURT:  May the trooper be excused?

17         MR. DOHERTY:  Yes, sir.  Thank you.

18         THE COURT:  You may stand down.  You're excused.  You

19 may leave or remain in the courtroom.  Thank you for your

20 attendance this afternoon.

21         THE WITNESS:  Thank you, Your Honor.

22      (Further proceedings were had but not transcribed at this

23 time.)

24      MICHAEL THOMAS ATKINSON, PLAINTIFF'S WITNESS, SWORN

25                    DIRECT EXAMINATION

1  BY MR. KIRTNER:

2  Q    Good afternoon, Mr. Atkinson.

3  A    Good afternoon.

4  Q    We've met on a couple of occasions.  How are you today?

5  A    Doing well.  Thank you.

6  Q    Can you tell us your full name, please, first.

7  A    Michael Thomas Atkinson.

8  Q    Where do you live, Mr. Atkinson?

9  A    Glen Ellyn, Illinois.

10  Q    And who do you work for?

11  A    C.H. Robinson.

12  Q    That's the defendant in this case; is that correct?

13  A    Correct.

14  Q    And how long have you worked for C.H. Robinson?

15  A    Eleven years.

16  Q    And you told us, I think, already that you live in

17  Illinois, close to Chicago, correct?

18  A    Correct.

19  Q    And you work in Chicago as well, correct?

20  A    Yes, sir.

21  Q    For C.H. Robinson?

22  A    Correct.

23  Q    What is the name, if it has a name, of the particular

24  office of C.H. Robinson that you work in in Chicago?

25  A    We're known as the Chicago Central Branch.

Michael Atkinson - Direct

1  Q    And you've worked in that office the entire time that you

2  have worked for C.H. Robinson; is that correct?

3  A    Yes, sir.

4  Q    And you were working there in September of 2004?

5  A    Yes.

6  Q    Now, what's your job title?

7  A    I'm a carrier salesperson.  I work on the carrier side of

8  the business that turns around and sells the freight to the

9  trucking companies.

10 Q    I want to make sure that we're clear on terms, and we've

11 described some of this to the jury already.  When you talk

12 about carriers, carriers are the people or companies who have

13 the trucks that haul C.H. Robinson's loads; is that correct?

14 A    Correct.

15 Q    And AKJ Enterprises was a carrier?

16 A    Yes.

17 Q    And they worked for C.H. Robinson, correct?

18 A    Yeah, we would hire them.

19 Q    And there is -- at least in the Chicago central office at

20 C.H. Robinson, there is another sales side, isn't there?

21 A    Correct.

22 Q    And could you describe to us what that other sales side

23 in that Chicago central office is.

24 A    The other sales side of the business would be the

25 customer sales side, the people that are responsible for going

1 out and getting a customer, like Coleman Cable, and

2 negotiating the rates with Coleman, and bringing the freight

3 into our company, and then me turning around and selling that

4 freight back to the trucking company.

5 Q    And customers -- you refer to them in your business as

6 "customers."  They're shippers too, correct?

7 A    Correct.

8 Q    They're people who have or entities who have product or

9 freight that they need moved, correct?

10 A    Yes.

11 Q    And the shipper -- the customer-side salespeople market

12 C.H. Robinson's service to those folks; is that correct?

13 A    Yes.

14 Q    As a carrier sales rep, you have relationships with

15 carriers who have trucks; is that correct?

16 A    Yes.

17 Q    And the customer sales representatives have relationships

18 with the customers or the shippers who need the freight moved;

19 is that correct?

20 A    Yes.

21 Q    Can you tell us when you generally become involved in the

22 process and how you become involved in the process of getting

23 a load placed with a particular carrier.

24 A    I guess part of my job is, you know, gathering

25 information, calling carriers, trying to find out where they

1  have available equipment, entering that information in the

2  computer, and using the computer system to generate a match.

3  A match being matching a customer load to a carrier, an

4  available carrier.

5      So, you know, my sales calls, you know, on a day-to-day

6  basis revolve around me trying to locate equipment, finding

7  equipment, entering that into the computer, and then calling

8  those carriers and offering them the available freight.

9  Q    You're referring to the computer system.  We're going to

10 get into some detail about that in a few minutes, and I

11 understand you're not an IT person, but we're going to talk

12 about that.

13     The information that you see on the computer system, that

14 you're trying to match a carrier with, those are loads for

15 customers or shippers who have already agreed for

16 C.H. Robinson to move the freight for them, correct?

17 A    Yes.

18 Q    So C.H. Robinson already has the right to move that

19 particular load that you're looking for a carrier to match; is

20 that correct?

21 A    Correct.

22 Q    Do the carriers that you work with come from some list

23 that's kept within some database at C.H. Robinson?

24 A    Yeah.  There's a large database of carriers in our

25 computer system that we're able to load, and that's -- you

Michael Atkinson - Direct

1  know, that's how we find them.  They're entered in the

2  computer.  And so I'm not -- each time I book a load, I'm not

3  entering a new carrier into the computer; it's already

4  existing.

5  Q    There's a list of carriers that someone at C.H. Robinson

6  compiles that are carriers that you can use; is that correct?

7  A    Yes.

8  Q    And you work from that list?

9  A    Uh-huh.

10  Q    Do you know how many, approximately, carriers are on that

11  list right now?

12  A    30-some thousand, maybe.

13  Q    And in 2004, a similar number?

14  A    I don't know.

15  Q    Has there been any dramatic increase in the number of

16  carriers on that list in the past three years?

17  A    I don't know.

18  Q    Whoever else may have been on that list in 2004,

19  AKJ Enterprises was in fact on that list in 2004; is that

20  correct?

21  A    List of available carriers?

22  Q    Yes.

23  A    Yes.

24  Q    List of carriers that you could hire to pull a load for

25  C.H. Robinson, correct?

1   A    Correct.

2   Q    And you are the person ultimately who connects carriers

3   with loads that C.H. Robinson has been hired to transport,

4   correct?

5   A    Yes.

6   Q    And I think you've already described a load gets posted,

7   and you see it and you connect it with a carrier; is that

8   correct?

9   A    Correct.

10  Q    And it's the efforts of you or some other carrier-side

11  salesperson, at least in the Chicago central office, that

12  ultimately determines which carrier pulls a C.H. Robinson

13  load; is that correct?

14  A    Correct.

15  Q    It is not a part of your job to consider the safety

16  practices of a carrier before you book a load with them; is

17  that correct?

18  A    No.

19  Q    It's correct that it is not part of your job?

20  A    It is not part of my job to determine the safety of a

21  carrier.

22  Q    The safety practices of carriers is not something that

23  C.H. Robinson asks you particularly to be concerned with in

24  your day-to-day job, correct?

25  A    Umm, no.

1   Q    I'm asking questions and saying "correct" at the end, and

2   you're saying "no."  I understand, when you say that, you're

3   saying no, it is not part of your day-to-day responsibility

4   to --

5   A    No, it's not part of my day-to-day job description to

6   verify the safety of a carrier.

7   Q    And looking into the safety practices of AKJ in this

8   particular instance was not something you did before you

9   placed this load with them; is that correct?

10  A    Correct.

11  Q    One of the things that you're concerned with on the

12  shipper -- excuse me, on carrier sales side, is the difference

13  between the price that the customer sales rep has agreed with

14  the shipper to be paid and the amount that you can get a

15  carrier to move a load for, correct?

16  A    Yes.

17  Q    That's a very big part of the way you're compensated; is

18  that correct?

19  A    Yes, absolutely.

20  Q    The difference between those two numbers, the number that

21  C.H. Robinson is being paid to move the load and the amount

22  that C.H. Robinson is going to have to pay a carrier to

23  actually move the load, is the basis for your commission; is

24  that correct?

25  A    Correct.

1  Q    And that's also true of the shipper -- or customer sales

2  representatives as well?  Their commission is based on that

3  difference also, correct?

4  A    Yes.

5  Q    You've indicated that there is a list that's available

6  through C.H. Robinson of carriers that you can place loads

7  with; is that correct?

8  A    Correct.

9  Q    Is there another division or is there a department or

10 division of C.H. Robinson whose role you understand to be to

11 compile that list of carriers that you can work with?

12 A    The carrier services department would, you know, be in

13 charge of compiling a database of the carriers.

14 Q    As you understand it, the carrier services department

15 decides which carriers you, as a sales representative, can

16 place loads with, correct?

17 A    Yeah.

18 Q    And do you know who the head of that department is at

19 this point in time?

20 A    Bruce Johnson.

21 Q    Is it also your understanding of the carrier services

22 department that they are the folks who determine whether the

23 safety practices of the various carriers are acceptable?

24 A    Yes.

25 Q    That's their responsibility, as you understand it?

1  A    Yes.

2  Q    Would it also be your understanding that the folks in the

3  carrier services department are the only people at

4  C.H. Robinson who are charged with ensuring that the carriers

5  you deal with have safety practices, good safety practices?

6  A    Yes.

7  Q    Nobody else is concerned with that?

8  A    Correct.

9  Q    And it's your understanding that once carrier services

10  says it's okay and puts a carrier on the list, you're free to

11  use them?

12  A    Yes.

13       THE COURT:  Are there any designations on the list

14  about the type of load that a carrier is qualified to carry,

15  for example, a refrigerated load or especially heavy load?  Is

16  it broken down in some additional way?

17       THE WITNESS:  No.  Let's say, for example, there's a

18  shipment that requires a carrier has, you know, over $100,000

19  in cargo insurance; if you tried to book a carrier on that

20  load that didn't have that much cargo insurance, the system

21  wouldn't let you book it.

22       And, yes, there are, you know, ways that you can query

23  certain carriers, depending on certain characteristics of the

24  load.  So, for example, you mentioned refrigerated.  If you're

25  looking for a refrigerated carrier, you would query the

1  computer to only look up refrigerated carriers, and then you

2  would only be looking at those particular carriers.  Or if you

3  wanted a flatbed load, you would query for flatbeds.

4          THE COURT:  Do any of those characteristics turn on

5  the experience of the carrier, like this carrier can only take

6  a load that it would take someone who had a long steel --

7  steel that's long and requires a special type of bed?

8          THE WITNESS:  Yeah, you could enter different

9  qualifications, like, let's say the customer needed a

10 53-foot-long trailer, you could look up carriers that just had

11 those particular trailers, or -- so there's different ways

12 that you can look up those carriers in the computer system,

13 depending on what the customer is asking you to look for.

14         THE COURT:  So it's based on what the customer is

15 looking for as opposed to Robinson as an entity?

16         THE WITNESS:  Right.  Yeah.

17 BY MR. KIRTNER:

18 Q    Let me follow up just on those issues.

19      So the computer system at C.H. Robinson that you deal

20 with every day --

21 A    Uh-huh.

22 Q    -- has the ability to alert you and other salespeople to

23 distinctions between the capabilities of carriers, correct?

24 A    Yeah, like modes of transportation, you know, whether

25 you're looking for a van or a flatbed, or, you know, if it's a

1  container movement or if it's intermodal movement.  It's modal

2  based, that's basically how you're looking up the different

3  carriers.

4  Q    And it has the ability to -- I'm talking about the

5  computer system now.

6  A    Uh-huh.

7  Q    It has the ability to flag a carrier who doesn't have

8  enough insurance for a particular load; is that correct?

9  A    Correct.

10  Q    But none of the things that you see as a salesperson on a

11  day-to-day basis flag or delineate between carriers in terms

12  of their safety practices; is that fair to say?

13  A    Yes, that's right.

14  Q    Now, there is, isn't there, a rating system that

15  C.H. Robinson uses internally to assign numbers and ratings to

16  carriers it deals with, correct?

17  A    That's correct.

18  Q    What is that called?

19  A    It's called Logipoints.

20  Q    And can you describe briefly for the jury what the

21  Logipoint system is and how that works?

22  A    Mainly it's a -- it's an indicator of service.  So if a

23  carrier -- if you sell a load for a carrier and they accept

24  the tender and they call back later and say they can't do it,

25  the system logs that as a bounce, meaning that the carrier

 1  accepts loads and then gives them back for whatever reason.
 2  Sometimes they give them back for no reason at all, and
 3  sometimes they have very good reasons why they give them back,
 4  you know, their driver wasn't empty from a previous load, he
 5  is running late for whatever reason, weather, you name it.
 6       Also, if a driver -- if a customer has a pickup
 7  appointment set and we book a carrier on the load, and they
 8  end up missing the appointment either at the pickup end or the
 9  delivery end, they'll get -- they can be flagged for, you
10  know, missing that appointment, and that would indicate --
11  that would correlate to their Logipoints rating system.
12  Q    You mentioned the term "bounced."
13  A    Uh-huh.
14  Q    And you mentioned that in the context of a carrier giving
15  back a load.  Do sometimes you have to bounce carriers
16  yourself, in the sense that they're not giving it back, you're
17  taking the load from them?
18  A    Yeah, you can take a load back from a carrier.
19  Q    You have that ability, correct?
20  A    Correct.
21  Q    Because the load is C.H. Robinson's to haul, correct?
22  A    Excuse me?
23  Q    You have the ability to take that load back from the
24  carrier, because that load is actually C.H. Robinson's load to
25  haul, correct?

1   A      True, you can take a load back.

2   Q      Now, let's get back to the Logipoints.  Are you aware of

3   whether there's any safety component to the Logipoints score?

4   A      Not to my knowledge.

5   Q      So the Logipoints is just rating carriers who work with

6   C.H. Robinson in terms of their ability to provide good

7   service to the customers, correct?

8   A      Correct.

9   Q      But safety practices are not a part of that calculation?

10  A      No, sir.

11  Q      You're not familiar with safety ratings, are you, in the

12  day-to-day course of your work?

13  A      No.

14  Q      SafeStat scores, is that something you deal with?

15  A      No.

16  Q      Are you aware of whether C.H. Robinson keeps track of

17  safety ratings of their carriers?

18  A      They must.  I mean, they must keep track because, you

19  know -- you know, carriers who don't have proper information

20  or authority or insurance, you know, they'll turn off the

21  account so you can't use them.

22  Q      But that safety rating is not something that you see,

23  correct?

24  A      No.

25  Q      Is that correct?

1   A    Correct.

2   Q    You've developed relationships with the carriers that you

3   work with; is that correct?

4   A    Yes.

5   Q    Do you have a certain group of carriers that list you as

6   their sales representative at C.H. Robinson?

7   A    Yes.

8   Q    And was AKJ Enterprises among those carriers who listed

9   you -- or I guess a better way to put it would be, within

10  C.H. Robinson, listed you as the sales rep for

11  AKJ Enterprises?

12  A    For my Chicago central branch, yes.

13  Q    There are other branches that AKJ Enterprises shipped for

14  or transported freight for, for C.H. Robinson, correct?

15  A    Correct.

16  Q    But in the Chicago central office, you were the point

17  person for AKJ Enterprises; is that correct?

18  A    Yes.

19  Q    And you're encouraged to develop relationships and to get

20  to know those carriers that you work with; is that correct?

21  A    Yes.

22  Q    And you knew the names of the owners of AKJ Enterprises;

23  is that correct?

24  A    Yes.

25  Q    And who were they?

1  A    Elson Bolar.

2  Q    You knew Elson.  Did you ever hear the name Dionnie

3  Bolar?

4  A    I occasionally talked to Dionnie, but she wasn't the main

5  person I talked to.  Elson Bolar was the main person that I

6  would speak with.

7  Q    Because of that relationship that you had with

8  AKJ Enterprises, you felt a certain sense of responsibility to

9  them, to keep their trucks moving and making money; is that

10 correct?

11 A    Yes.

12 Q    And in addition to becoming familiar with the principals

13 or the owners of AKJ Enterprises, you also became familiar

14 with some of the drivers; is that correct?

15 A    Yes.

16 Q    And you had dealings with many of those drivers on a

17 day-to-day basis; is that correct?

18 A    Yes.

19 Q    One of the drivers that you had dealt with even prior to

20 this load was a Charles Kevin Morris; is that correct?

21 A    Yes.

22 Q    You knew of Mr. Morris; he had pulled loads for

23 C.H. Robinson, correct?

24 A    Yes.

25 Q    Based upon your personal observations and your dealings

1  with the drivers now specifically at AKJ Enterprises, would it

2  be fair to say that you had some misgivings about some of

3  those drivers?

4  A    There were some drivers that were better than others.

5  Nothing really -- not one of them really sticks out in my head

6  as being, you know, better or worse than any one of them.  But

7  with any carrier, there's a pretty wide swath of the quality

8  of drivers.  Not every driver is the same.

9  Q    We're talking specifically about AKJ Enterprises now.

10  A    Uh-huh.

11  Q    And I'm understanding your testimony to be that in fact

12  there were some drivers with AKJ Enterprises that you had some

13  misgivings about, correct?

14  A    Misgivings?  There's no one that really sticks out in my

15  head that I can remember.  But, you know, there were, you

16  know, just a lot of different drivers, and I wouldn't really

17  say misgivings.

18  Q    Let me ask you this question:  If somebody were to ask

19  you right now could you vouch for all the drivers who pulled

20  loads for C.H. Robinson, what would your response be?

21        MR. DOHERTY:  Objection, Your Honor.  I think that's

22  a misleading question.  What's he vouching for, with respect

23  to safety, with respect to honesty, with respect to height,

24  what?

25        THE COURT:  I agree, it's too vague.  Sustained.

1  BY MR. KIRTNER:

2  Q   Let's just ask it this way:  Would you be able to vouch

3  for all of them in terms of their abilities as drivers?

4  A   Vouch for every driver for C.H. Robinson?

5  Q   No, AKJ Enterprises.  I'm talking about AKJ Enterprises.

6  A   Yes.

7  Q   Let me show you, Mr. Atkinson --

8       MR. KIRTNER:  I'm trying to find an extra copy for

9  counsel, Your Honor.  I apologize.

10      THE COURT:  I've seen it.  I don't need a copy.

11      MR. KIRTNER:  Right.  I was going to provide it to

12 the witness, Your Honor.  I have one for me and one for the

13 witness.

14      THE COURT:  Are you familiar with the content of this

15 document, gentlemen?

16      MR. DOHERTY:  Yes, Your Honor.

17      THE COURT:  They've seen it.

18      MR. KIRTNER:  Can I provide it to the witness, Your

19 Honor?

20      THE COURT:  You may.

21 BY MR. KIRTNER:

22 Q   Let me let you look at that document.  Specifically, I

23 would ask you to take a look at an e-mail from you to an Otto

24 Simmering, Rob Pearson, Doug Lage, dated April 27, 2003.  Do

25 you see that e-mail?

1   A     Yes.

2   Q     And I don't intend to try to ask you about any of the

3   stuff other than the one particular phrase that I'm going to

4   ask you about, Mr. Atkinson.

5   A     Okay.

6   Q     You can see in that e-mail that you say, in reference to

7   AKJ Enterprises and Elson Bolar, that you can't vouch for all

8   of his drivers.

9         Now, my question to you is:  What did you mean when you

10  said in that e-mail that you could not vouch for all of AKJ's

11  drivers?

12  A     I don't know.  I didn't read through this whole thing.

13            THE COURT:  Take a minute and read it and let us know

14  when you're ready to answer.

15            THE WITNESS:  Okay.  In reference to the e-mail, you

16  know, some trucking companies lose drivers, they quit or, you

17  know, for whatever reason they're no longer with the company.

18  So in regards to that paragraph, to me it looks like someone

19  was calling C.H. Robinson and impersonating someone from

20  Elson's company and trying to get money for a T-Chek.  And to

21  me, it looks like it didn't look right, for whatever reason.

22  BY MR. KIRTNER:

23  Q     I'm not trying to put words in your mouth.  I'll just see

24  if we can move on with this.

25  A     Uh-huh.

1  Q    So the "vouching for" there refers to the honesty of the

2  drivers?  Is that what you're telling us now?

3  A    It sounds to me like an ex-driver that was no longer with

4  AKJ was calling in and trying to get money from us, advanced

5  money for whatever reason.

6  Q    So you're not sure what you were specifically saying you

7  couldn't -- what quality you couldn't vouch for?  I guess that

8  what I'm trying to ask you, is there a particular quality, if

9  you know, based on that e-mail, that you're saying you could

10 not vouch for concerning AKJ drivers?

11 A    I'm sorry.  Can you repeat your question?

12 Q    Probably not, but I will certainly try.

13     The question is this:  Is there a particular quality,

14 character trait or quality about AKJ drivers that you're

15 talking about in that e-mail being unable to vouch for?

16 A    I don't know.  I guess I'm just stating that I'm not --

17 it sounds to me that I said that Elson was an honest man;

18 however, I can't vouch for all his drivers.  I have a feeling

19 that the person scamming is an ex-AKJ driver, so . . . (pause)

20 Q    You're not necessarily able to identify the quality that

21 you're referring to here; is that correct?

22 A    Yeah.  I mean I'm not -- right.

23         MR. KIRTNER:  We probably need to get to -- get that

24 to the bailiff, it's not going to be marked as an exhibit, so

25 it doesn't get mixed up with something.

1  BY MR. KIRTNER:

2  Q    In addition to whatever personal recollections and

3  personal dealings that you had with AKJ Enterprises and its

4  drivers, there was a lot of information in C.H. Robinson's

5  computer database about AKJ Enterprises, because they had

6  pulled for several years for C.H. Robinson; is that

7  correct?

8  A    Yes.

9  Q    Understanding you're not an IT person, but can you tell

10 us in your own terms, and based on how you deal with it every

11 day, what the Express System is at C.H. Robinson?

12 A    It's the main computer system that we use to enter loads

13 and -- how we get the loads entered, and then, on the other

14 side of it, how we have the available trucks and how we're

15 able to post equipment, and then put the two parts together.

16 And, you know, it also runs accounting, payments to the

17 carriers, payments from the customers to us, so it's sort of

18 all-encompassing.  It's our operating system.

19 Q    In addition to being an exchange -- talking about the

20 Express System now.  In addition to being an exchange where

21 you can find loads and kind of connect shippers and carriers,

22 does the Express System -- or is the Express System also used

23 to keep track of where loads are and their status?

24 A    Yes.

25 Q    And that's a service that's provided to the customer or

1 the shipper, correct?

2 A    Correct.

3 Q    C.H. Robinson is tracking that load for them, correct?

4 A    Correct.

5 Q    And so when drivers call in either with a problem or to

6 say where they are, they call in C.H. Robinson, and

7 information is put into this Express System as to the status

8 of the driver and the load; is that correct?

9 A    Yes.

10 Q    And that's something that is done with regard to every

11 single load that C.H. Robinson moves; is that correct?

12 A    We try to do it for every load.  You know, there are some

13 loads where there's very little information, you know,

14 something that would pick up in the morning and deliver in the

15 afternoon, there might not be a whole detailed list of records

16 about that load.

17 Q    And you and the other sales representatives understand,

18 when you put information into that system, that it needs to be

19 put in in such a way that somebody else can read it too,

20 correct?

21 A    Correct.

22 Q    I mean, you don't just put in the information for you to

23 look at; you put in the information for the other sales reps

24 and employees of C.H. Robinson to look at so they know what's

25 going on with the load, correct?

1  A    Yes.

2  Q    Within that system, that Express System, is there what's

3  called a problem log?

4  A    Yes.

5  Q    Can you tell us what the problem log is?

6  A    A problem log could be a wide range of things.  For

7  example, if I book AKJ Enterprises on a load and there's no

8  appointment set for the driver, we're not sure what time the

9  shipper is open or what time the receiver is open, we're not

10 sure what their hours are, I'll open up a problem log to

11 signify someone on the customer side that some attention needs

12 to be brought to this load, and you need to call your people

13 and let them know a truck is coming.  Or it could be a log of

14 problems related to carriers.  Say they break down during

15 transit, it signifies to the customer rep, again, that their

16 load isn't moving and we might need to change some

17 appointments.  It could be any number of factors that you

18 might enter a problem log.  And, basically, it's just raising

19 awareness to issues about the load.

20 Q    The problem log also could include crashes, correct?

21 A    It could.

22 Q    It could include information about drivers being pulled

23 out of service if they're over hours, correct?

24 A    Correct.

25 Q    The carrier's trucks being shut down by the Department of

1  Transportation, that information would be in there as well,

2  correct?

3  A    It could.

4        MR. KIRTNER:  Let me provide this.  Your Honor, this

5  is a five-page spreadsheet that I believe the defendants

6  propose to mark as a joint exhibit.

7        MR. DOHERTY:  That's correct, Your Honor.

8        THE MARSHAL:  Do you want it marked or given to the

9  witness?

10       MR. KIRTNER:  I would like to have it marked if I

11 could, Your Honor.  I also have separate copies to publish to

12 the jurors once that has been marked.

13       THE COURT:  Call it Joint Exhibit Number 1.

14    (Joint Exhibit Number 1 was marked for identification.)

15       THE BAILIFF:  Okay, Your Honor?

16       THE COURT:  Yes.

17    Can you tell us what that is, Mr. Atkinson?

18       THE WITNESS:  It looks like a paper copy of the

19 problem logs that get opened up in the Express System, with

20 subsequent follow-up entries by various persons.

21 BY MR. KIRTNER:

22 Q    Don't worry, I'm not going to ask you about every entry.

23 The Court will be reassured by that too.

24    But I want to ask you about a couple of things

25 specifically.  First of all, there are a number of columns

1  here.  The information in Column F --

2  A    Uh-huh.

3  Q    -- generally, can you tell us what that information

4  consists of?

5  A    It looks like that is the opening of the log and -- the

6  initial opening of the problem log.

7  Q    The problems identified, it shows up initially in

8  Column F; does that seem to be the case?

9  A    Yeah, it looks that way.

10  Q    What about Column K, what is that?

11  A    That looks like some subsequent notes that are entered

12  after the original one is opened.

13  Q    And all of this information, at least in Column F and

14  Column K, is information that you enter into this system in

15  the day-to-day course; is that correct?

16  A    Yes.

17  Q    And, in fact, there are some columns here: "entered by,

18  closed by, log entered by, log follow-up by."  And there seem

19  to be some initials or acronyms in those specific columns.

20  Are those the names of sales representatives or other

21  C.H. Robinson employees who are dealing with those particular

22  problems?

23  A    Yes.  Each employee has a seven-letter code.

24  Q    And is your seven-letter code ATKIMIK?

25  A    Yes.

Michael Atkinson - Direct

1  Q    So anytime we see that in the problem log, that's

2  information that you entered, correct?

3  A    Me or someone sitting at my computer typing in

4  information.

5  Q    Well, let me ask you about other sorts of abbreviations.

6  There's a problem code column here, E.  And let me just ask

7  you, EQBAD, is that equipment bad?

8  A    Yes.

9  Q    And "crash" I assume means there was a crash.

10 "Breakdown" just means that the truck that was moving the load

11 broke down?

12 A    Uh-huh, yes.

13 Q    "D late," what does that mean?

14 A    Driver late.

15 Q    And what sorts of things would be in the "other"

16 category?

17 A    It could be just miscellaneous.  Could be any number of

18 things.  It could be weather.  It could be -- I don't know.

19 Q    Okay.

20       MR. KIRTNER:  Before I forget, did we not provide

21 Your Honor with this?

22       THE COURT:  I don't have it, unless it's in one of

23 the books.

24       MR. KIRTNER:  May I provide that?

25       THE COURT:  Sure.

Michael Atkinson - Direct

1  BY MR. KIRTNER:

2  Q    Well, let me just ask you about a few things.

3  A    Uh-huh.

4  Q    I promise, a few.

5        Well, first of all, you understand this to be a problem

6  log or problem log data associated with AKJ Enterprises?

7  A    Yes.

8  Q    Your understanding is that T code number there, T216991,

9  that's a number assigned to AKJ Enterprises internally at

10 C.H. Robinson; is that correct?

11 A    Correct.

12 Q    There are a couple of places here where there's a

13 reference to the term "tracking." For instance, looks like

14 line 54, it says, "Driver is tracking Roanoke and had a

15 blowout -- or tire blowout." Does that mean in Roanoke or on

16 the route to Roanoke? Do you know? It's 54, column --

17 A    That would probably mean they're in Roanoke.

18 Q    And if it says somewhere "tracking to," does that mean

19 they're on their way to that place but haven't arrived?

20 A    I think it would mean where they currently are.

21 Q    Okay. So anytime you see tracking, that's where the load

22 is?

23 A    Yes.

24 Q    But other than some of these abbreviations that we've

25 talked about, there's no particular reason that someone even

1  outside of C.H. Robinson shouldn't be able to look at these

2  entries and understand what's going on?  I mean, they mean

3  what they say, correct?

4  A    Yes.

5  Q    Let me direct your attention to line 61 and 67 there on

6  page 4.  61 through 67, I should say.

7  A    Okay.

8  Q    What is the problem that's been identified there with the

9  AKJ truck or driver?

10  A    The driver was, looks like, over his log hours on his

11  logbook.  And then the follow-up is trying to get the

12  appointment rescheduled for him.

13  Q    That indicates that the driver has actually been shut

14  down by the Department of Transportation, correct?  That's

15  over in Column K, line 66?

16  A    Yes.

17  Q    And your understanding would be that means that the

18  driver has been told not to drive anymore for a certain period

19  of time, correct?

20  A    Correct.

21  Q    And whoever made that entry suggests "bounce" it,

22  correct?

23  A    Yes.

24  Q    You're going to get another carrier to move that load or

25  another truck; is that correct?

1   A    That's what it looks like, yes.

2   Q    Now, you ask -- the entries over in Column F.  Are you

3   asking for an opportunity to let this driver update his

4   progress before anything changes, correct?

5   A    Yes.

6   Q    And you say, "I have a feeling he will make Thursday

7   appointment."  What does that mean?

8   A    Just that it looks like I thought he would make the

9   appointment time.

10  Q    That did not reflect a belief on your behalf that the

11  driver was going to hit the road again, even though he

12  apparently had been shut down?

13  A    Well, that would be up to the DOT.

14  Q    But I'm asking you what your belief or understanding was

15  when you made that entry, that was the basis of making that

16  entry.

17  A    Yeah, it looks like I thought he would make the

18  appointment.

19  Q    You thought he would go ahead and get back on the road

20  even though he had been shut down, correct?

21  A    I don't know about that, but -- and it doesn't say, you

22  know, about the DOT and what they were making him do.  I only

23  know that the DOT said they were going to pull him over.

24  Q    Let me ask you about one of the services that

25  C.H. Robinson provides for carriers.

1   A    Uh-huh.

2   Q    You provide a T-Chek service; is that correct?

3   A    Uh-huh, yes.

4   Q    And AKJ Enterprises was a T-Chek customer, correct?

5   A    Correct.

6   Q    Can you tell us just in summary form what T-Chek is and

7   what it does for carriers.

8   A    T-Chek is a C.H. Robinson subsidiary, and they're able to

9   extend the carrier's credit.  When they have expenses out on

10  the road, a lot of times they'll call T-Chek and get an

11  advance to pay for fuel, for unloading or loading services.

12  They can use it basically for whatever purpose they want.

13  They can usually get up to a 50-percent advance.  And then

14  when they go ahead and bill us, when they've completed the

15  load, then we'll, you know, pay them the rest of their money.

16       A lot of small carriers use it to, you know, just pay for

17  things out on the road for their drivers, and that's really

18  about it.

19  Q    It's a way for C.H. Robinson to advance money to the

20  carriers for things that they need while they're transporting

21  loads for C.H. Robinson; is that correct?

22  A    Correct.

23  Q    You're the person who specifically obtained the services

24  of AKJ Enterprises to pull the load that was involved in this

25  accident, correct?

1  A    Yes.

2  Q    In fact, you understood when you booked the load that

3  Kevin Morris was going to be the driver; is that correct?

4  A    Yes.

5  Q    Before you booked that load with AKJ Enterprises, that

6  specific load that ended in this accident, did you consider

7  any of this spreadsheet information, this problem log data, as

8  to whether you ought to book the load with them?

9  A    No.

10 Q    At any time prior to booking this particular load, did

11 anyone else at C.H. Robinson speak with you about how or if

12 any of this problem log information that we're looking at

13 reflected on AKJ's safety practices?

14 A    No.

15 Q    You're not aware that anyone at C.H. Robinson considered

16 this problem data before that load was booked with

17 AKJ Enterprises; is that correct?

18 A    No, it wasn't reviewed.

19 Q    If they did, you don't know about it?

20 A    Excuse me?

21 Q    If anybody else did that, you don't know about it?

22 A    Correct.

23 Q    So now the load that's at issue here is going to be --

24 let me just ask you to confirm this.  The load number is in

25 Column C, correct?

Michael Atkinson - Direct

1   A     Yes.

2   Q     And let's look down to column -- looks like beginning

3   Column 79 -- or line 79.  Excuse me.

4         Can you confirm for me that the load that's at issue in

5   this case is load number T -- or, excuse me, 21422065?

6   A     Yes.

7   Q     Now, after Mr. Cortis arranged for C.H. Robinson to move

8   this load for Coleman Cable, then you confirmed with

9   AKJ Enterprises for them to pull this load, correct?

10  A     Correct.

11  Q     And you issued -- or there was issued, wasn't there, a

12  load confirmation sheet?

13  A     Yes.

14  Q     Yes?

15  A     Yes.

16  Q     Is there a notebook there that says "Exhibit Notebook" in

17  front of you somewhere?

18  A     No.

19  Q     No.

20        MR. KIRTNER:  This is the exhibit book, Your Honor,

21  we provided to defense counsel and Your Honor.

22        MR. DOHERTY:  Your Honor, if it will speed things

23  along, we will stipulate that the load was assigned to AKJ.

24        MR. KIRTNER:  I think we would like to get in this

25  load confirmation sheet that documents --

1        MR. KUHNEL:  Number 6?

2        MR. KIRTNER:  Yes.

3  BY MR. KIRTNER:

4  Q    It's behind Tab 6, Mr. Atkinson, if you could look behind

5  Tab 6.  Does that appear to be the load confirmation sheet

6  that was issued with regard to this particular load?

7  A    Yes.

8        MR. KIRTNER:  I would like to have that admitted into

9  evidence, Your Honor, and here's a clean copy.

10        MR. DOHERTY:  No objection.

11        THE COURT:  We'll receive that document as

12  Plaintiff's Exhibit 5.

13     (Plaintiff's Exhibit Number 5 marked and received.)

14  BY MR. KIRTNER:

15  Q    And these sorts of load confirmation sheets are issued

16  whenever C.H. Robinson agrees with the carrier to pull a

17  particular load; is that correct?

18  A    Correct.

19  Q    This particular load needed to be at its delivery point

20  at a certain date and time; is that correct?

21  A    Yes.

22  Q    It was designated, was it not, as a "hot load"?

23  A    I can't remember if it was or not.

24        MR. KIRTNER:  Can we get -- I'm not sure which

25  exhibit it was.  It was another spreadsheet that was marked,

1  Your Honor.

2          MR. HANCOCK:  4.

3          MR. KIRTNER:  4?

4          MR. HANCOCK:  I believe.

5          MR. KIRTNER:  Exhibit 4.  There's one right there.

6  Could I proffer that?

7          THE COURT:  Here's Exhibit 4.

8  BY MR. KIRTNER:

9  Q    I'm looking at a document that's been marked as

10 Exhibit 4, Mr. Atkinson.  I'm going to let you look at line 3,

11 Column E.

12 A    Uh-huh.

13 Q    It says "hot."  That's referring to this load, correct?

14 A    Yes, that's the right load number.

15 Q    And "hot" indicates some time sensitivity, correct?

16 A    Yes.

17 Q    Does it also indicate to your understanding that a team

18 driver situation is going to be needed?

19 A    In regards to this particular load, I don't think there

20 was really anything hot about the transit time.  It picked up

21 on a Friday, and it was supposed to deliver on a Monday.  So,

22 you know, that to me doesn't indicate that it would be a hot

23 shipment.

24 Q    Well, but this information that we're looking at in

25 Exhibit 4, this is the information that was in the Express

Michael Atkinson - Direct

1  System, and the driver log date, correct?

2  A    Uh-huh.

3  Q    Somebody put in there "hot"?

4  A    That could mean that, you know, there was a time

5  constraint at the shipper, to make it to the shipper by a

6  certain time, or, you know, that it was conveying information

7  to the driver that there was some sensitive nature about that.

8  Q    In your understanding, it indicates there's a time

9  sensitivity somewhere along the way, correct?

10 A    Yeah, and relaying that information to the driver, making

11 sure he was aware of it.

12 Q    And if it's designated "hot" in here, in this driver log

13 data, that information would be communicated to the carrier

14 and to the driver so they know it's hot, correct?

15 A    Sure.  Right.

16 Q    Was it your understanding that the drivers for AKJ who

17 were hauling this load were actually running late at some

18 point during this transit?

19 A    They were.  They were running late for the pickup time.

20         MR. KIRTNER:  Give me just one moment, Your Honor.

21         THE COURT:  Sure.

22     (Discussion off the record between plaintiff's counsel.)

23         MR. KIRTNER:  Your Honor, can I have about two

24 minutes to consult with co-counsel?

25         THE COURT:  Are you asking just to consult here in

Michael Atkinson - Direct

1    open court?

2            MR. KIRTNER:  Sure.

3            THE COURT:  Go ahead.

4        (Discussion off the record between plaintiff's counsel.)

5            MR. KIRTNER:  A few more questions, Mr. Atkinson.

6        Thank you, Your Honor.

7            THE COURT:  Sure.

8    BY MR. KIRTNER:

9    Q    Let me have you look at the load confirmation sheet again

10   that's been marked as an exhibit.  Do you have that still in

11   front of you, Mr. Atkinson?

12   A    Yes.

13   Q    That load confirmation sheet shows the estimated weight

14   of the cable reels that are going to be hauled, doesn't it?

15   A    Yes.

16   Q    And what does it indicate that weight was to be?

17   A    40,000.

18   Q    Do you know what the weight of a tractor-trailer is?

19   A    I believe about 35,000 pounds, give or take, depending on

20   the age of the equipment.

21   Q    Do you know from any of the documents that you have in

22   front of you, or that you are able to recall, what the

23   delivery time was for these cables to be in East Longmeadow,

24   Massachusetts?

25   A    The time looks like between 0900 and 1400, which would be

1  2:00 p.m.  So between 9:00 and 2:00 p.m.; there was a window.

2  Q    A window between 9:00 a.m. and 2:00 p.m.?

3  A    Right.

4  Q    And that would have been on September 13, 2004?

5  A    Correct.

6  Q    Do you know, Mr. Atkinson, how long per government

7  regulation a driver is allowed to drive without stopping?

8  A    I'm not exactly sure of the law, but I think currently a

9  driver can drive ten hours.

10 Q    And do you know how far this truck was that was involved

11 in this accident from East Longmeadow, Massachusetts, in terms

12 of driving time when this accident occurred?

13 A    I don't know exactly.

14 Q    Mr. Atkinson, do you know where this truck actually

15 embarked from on the date this accident occurred?

16 A    I think it was somewhere in Georgia.

17 Q    Is it where they started from on the date the accident

18 occurred, is that your understanding?

19 A    I'm not sure on the date of the accident.

20 Q    Let me ask you this:  Is there some indication in the

21 problem log data that the driver who was pulling this load was

22 lost at some point?  Look on line 79 and 80.

23 A    Yes.  There's a note about a driver being lost.

24 Q    So your understanding is that they had been lost and they

25 were running behind at the time, correct?

1  A    On the day they picked up, yes.

2         MR. KIRTNER:  Your Honor, I think those are all the

3  questions I have at this time.

4      Thank you, Mr. Atkinson.

5         THE WITNESS:  Okay.

6                        CROSS-EXAMINATION

7  BY MR. DOHERTY:

8  Q    Good afternoon, Mr. Atkinson.

9  A    Good afternoon.

10 Q    I will try to be brief.

11 A    Okay.

12 Q    I think there are only a finite number of questions left

13 in the English language I could ask you now.

14     Let's touch on a couple of things real quick.  First of

15 all, do you remember Mr. Kirtner asked you questions about

16 T-Chek?

17 A    Yes.

18 Q    And you testified that's a subsidiary of C.H. Robinson?

19 A    Yes.

20 Q    That T-Chek has its own customers?

21 A    Yes.

22 Q    Isn't it true that T-Chek has customers who don't haul

23 loads for C.H. Robinson?

24 A    Yes.

25 Q    So there are trucking companies that get T-Cheks that are

1  not contract carriers for Robinson?

2  A    Correct.

3  Q    Do you know whether or not AKJ Enterprises hauled loads

4  for people besides C.H. Robinson?

5  A    They must have.

6  Q    Why do you say that?

7  A    Well, I know that they hauled freight for other brokers

8  and customers.

9  Q    Let me ask you this way:  Do you know how many loads they

10  hauled for C.H. Robinson total?

11  A    I think the figure was 850.

12  Q    Could it be 844?

13  A    844.

14  Q    And do you know how many loads are on the problem log?

15  A    20-something.

16  Q    If I told you 23, would you argue with me?

17  A    No.

18  Q    Okay.  So that's about 2.6 percent of the total loads?

19  A    Yes.

20  Q    Okay.  Moving back over to that e-mail, you know, where

21  you talked about vouching --

22  A    Yeah.

23  Q    -- is it possible what you were saying there was that you

24  know Elson Bolar but you don't know all of his drivers and,

25  therefore, can't vouch for whether or not the person calling

1  in about the T-Chek was still a driver?

2  A    Correct.

3           MR. KIRTNER:  Your Honor, I object to the leading.

4  We treated this person as an adverse witness.  I don't believe

5  he is entitled at this point to treat him --

6           THE COURT:  I don't know that I ruled upon it one way

7  or the other, but he's testified as to his recollection

8  concerning the e-mail.

9           MR. DOHERTY:  Okay.  Well, then I will move on and

10  put that to rest.

11  BY MR. DOHERTY:

12  Q    Let me ask you this:  If you knew that a driver for AKJ

13  did not have a valid driver's license, would you book the

14  load?

15  A    No.

16  Q    Did you know when you booked this load whether or not

17  Kevin Morris had a valid driver's license?

18  A    No.

19  Q    Why not?

20  A    That's not anything that Robinson is privy to.  That's

21  between the driver and his employer, the trucking company.

22  Q    So you rely on the carrier to make sure that their

23  drivers are properly licensed?

24  A    Correct.

25  Q    Okay.  Let me shift gears a little bit.  Do you remember

1  Judge Conrad asked you a few questions about criteria that you

2  might use to select the carriers, like the type of equipment

3  or whether there was information that you could use about the

4  capacity of certain carriers to haul certain types of loads?

5  A    Uh-huh.

6  Q    Do you remember that?

7  A    Yes.

8  Q    Let me ask you a question.  Are there other factors you

9  might use, like geography or proximity of a truck to a

10 particular location, when assigning loads?

11 A    Yeah.  We usually look for the trucks that are closest to

12 the shipper because that saves money.  We're not going to hire

13 a carrier that's 500 miles away from a shipper, because

14 generally we wouldn't be able to afford that.  That would chew

15 up all the money that's in the load.

16 Q    So there are factors besides money that go into who gets

17 a load?

18 A    Right.

19 Q    And I believe you were asked some questions about whether

20 you verify the qualifications of the carriers yourself, their

21 federal operating authority, insurance, safety rating, all

22 that?

23 A    That's all through Minnesota, the corporate office.

24 Q    Okay.

25 A    Carrier services.

Michael Atkinson - Cross

1  Q    And is it someone in carrier services who is responsible

2  for signing up new contract carriers and putting them in the

3  system?

4  A    Correct.

5  Q    And that's just not part of your job?

6  A    No.

7  Q    Well, let me turn back to the question of money.  How are

8  you compensated?  Not to put you on the spot or anything.

9  A    I make a commission based on each load that I move.

10 Q    Okay.  And what would your commission have been for this

11 load?

12 A    I don't remember the exact figure, but I want to say -- I

13 think it was $20.

14 Q    Is that a pretty typical commission?

15 A    Yes.

16 Q    So you made $20 on this load?

17 A    Correct.

18 Q    We're not talking about a massive financial incentive to

19 shift the load to an unsafe carrier versus some other carrier?

20 A    Correct.

21 Q    It wouldn't be worth your while?

22 A    No.

23 Q    When you assigned this load to AKJ, was it because you

24 were trying to maximize your commission?

25 A    No.

Michael Atkinson - Cross

1 Q    Let's turn, if we could, to the problem log, which I

2 think is Joint Exhibit 1.  I'll try really hard to be brief.

3 You were asked about this earlier.

4      What is a "problem," in the parlance of the Express

5 System, in the problem log?

6 A    It's just a way to log information into the Express

7 System and bring attention to that information so all parties

8 involved with the load are aware of what's going on with the

9 shipment.

10 Q    And so the word "problem" doesn't necessarily mean dire

11 emergent safety issue?

12 A    No.

13 Q    It could just somebody is running late?

14 A    Correct.

15 Q    Or any of a host of things?

16 A    Correct.

17 Q    Looking at the log as you sit here today -- let me ask

18 you this first:  You've booked loads for other carriers; is

19 that right?

20 A    Yes.

21 Q    You were the account rep for AKJ, I believe there was

22 some testimony?

23 A    Yes.

24 Q    But you also book loads on other carriers?

25 A    Correct.

1  Q    As you sit here today looking at this, does this problem

2  log look pretty typical for a carrier the size of AKJ?

3  A    Yes.

4  Q    Does a log like this tell you a lot about the safety of

5  the carrier?

6  A    No.

7  Q    Why not?

8  A    We don't have that safety information at our disposal.

9  Q    Let me ask it this way:  If it has been suggested that

10 you should have used information like this to make judgments

11 about the overall safety of these carriers, is that practical?

12 A    No.

13       MR. KIRTNER:  Judge, I object, because he has said

14 very clearly he doesn't make those judgments, and now we're

15 going back and asking him, "Well, if you did make those

16 judgments, what would it say about the carrier?"  And I don't

17 think he's qualified to answer that question.  His answer has

18 been he doesn't make those judgments.

19       THE COURT:  I think he answered that's not the

20 purpose of that problem log.

21     Safety considerations are not part and parcel of the key

22 to the problem log; is that correct?

23       THE WITNESS:  I'm sorry?

24       THE COURT:  You're not concerned with the safety

25 issues in compiling the problem log, if I understand your

1  testimony correctly?

2          THE WITNESS:  Correct.

3  BY MR. DOHERTY:

4  Q    Okay.  Let's look at a couple of specific entries.  If

5  you would turn to line 12 on the first page.  Let's see, the

6  first question I have is, if you look at Column F, it says,

7  "Trailer was rejected twice; holes in the roof; driver tried

8  to repair; shipper says still a safety issue; rejected;

9  carrier" -- does that mean will call back in a.m.? -- "7:00.

10 They might have gotten another trailer in the area in a few

11 hours."

12          Did I read that correctly?

13 A    Correct.

14 Q    When you read this -- because I see that you had some

15 input into this log, if you look at Column I on the same line?

16 A    Yes.

17 Q    ATKIMIK, is that your seven-letter --

18 A    Correct.

19 Q    How would you interpret this entry, the one that says

20 "safety issue," holes in the roof of the trailer?

21 A    At that particular shipper, they load paper and so

22 they -- they'll come through a trailer with a magnifying

23 glass, looking for holes.  And they didn't like the equipment.

24 And it looks like the carrier was going to call back in the

25 morning, and maybe they have another trailer or another driver

1  in the area that can pick up the load.

2  Q    Okay.  But your understanding of this is that it was

3  really safety as it related to the cargo --

4  A    No.

5  Q    -- as opposed to safety of the truck?

6  A    Correct, safety of the truck.

7  Q    You're saying their concern is that the truck was unsafe

8  to go out on the road, or the holes of the trailer may damage

9  the paper?

10  A    The holes would damage the paper.

11  Q    Moving on to line Number 30; I think that's on page 2.

12  You recall Mr. Kirtner asked you a number of questions about

13  entries on this log that involved police or Department of

14  Transportation pulling over trucks and stopping them for

15  various things, they're over their hours, shutting them down

16  for a while, things like that?

17      There were a number of entries like that on here; this is

18  one.  Can you tell me why when a carrier calls in with

19  information like this it doesn't prompt you to be concerned

20  about their safety?

21  A    A DOT inspection is something that happens frequently.

22  And, I mean, all the drivers have to pass through certain

23  checks on a daily basis to make sure that they're being

24  inspected.  And occasionally, you know, a driver will get

25  pulled over and, you know, the DOT will inspect the truck or

1   inspect their logbooks, and it's something that happens on a

2   daily basis.

3   Q    So you-all have to rely on the Department of

4   Transportation and the state police to regulate these

5   carriers?

6   A    Correct.

7   Q    Because they're the ones that are out there with the

8   scales and the inspectors?

9   A    Correct.

10  Q    Let me ask you -- let me just jump ahead.  Taking a look

11  at this problem log in its entirety as you sit here today, if

12  you were going to book that load today, do you see anything on

13  here that would suggest to you that AKJ couldn't handle it?

14  A    No.

15  Q    Let me ask you just one small other series of questions.

16  Does C.H. Robinson have the legal authority to keep a carrier

17  off the road?

18  A    No.

19  Q    Okay.  Federal operating authority, you can't revoke

20  somebody's operating authority?

21  A    No.

22  Q    Who can do that?

23  A    The government.

24  Q    Okay.  Can Robinson reject a carrier's operating

25  authority and shut them down?

1  A    No.

2  Q    So only the FMTSA can do that?  I believe that's what you

3  were saying.

4  A    Yes.

5  Q    Did you, when you booked this load, have any reason to

6  believe that it was going to end up being involved in a fatal

7  crash?

8  A    No.

9        MR. DOHERTY:  That's all I have.  Thank you.

10        THE COURT:  Let me ask him one or two questions,

11  Mr. Kirtner, just out of general interest.

12     You answered, in responding to one of Mr. Kirtner's

13  questions, that sometimes you get to know the drivers

14  themselves.

15        THE WITNESS:  Yes.

16        THE COURT:  How do you get to know the drivers?

17        THE WITNESS:  They call us for dispatch information,

18  and, you know, we encourage carriers to call us for the

19  dispatch info.  Some carriers --

20        THE COURT:  Would -- the drivers as opposed to the

21  carriers, or the men and women actually out on the road?

22        THE WITNESS:  The drivers themselves.  So I'll take

23  calls from drivers frequently, and so that's how you get to

24  know them.

25        THE COURT:  Now, in booking a carrier for a

1    particular delivery, are you ever able to choose the driver

2    that you're going to be able to get assigned to a particular

3    load?

4           THE WITNESS:  It depends how many drivers they have

5    available.  I mean, there's some times where the carrier only

6    has one driver available in the area to get it, so you don't

7    really pick and choose.  The carrier will tell you, "I have a

8    driver available, you know, get him a load or get her a load."

9    And then I'll search for a load and try and sell something

10   that matches the parameters that they're after in terms of

11   money and geography and, you know, the time constraints.

12          THE COURT:  What about the circumstances where there

13   are other drivers available?  Does Robinson, you acting on

14   behalf of Robinson, have some ability to say, "I would prefer

15   that this driver took the load"?

16          THE WITNESS:  I mean, I could request that, but the

17   carrier could say, "No, that driver is not available" or turn

18   me down for some reason, if I know that there's, you know, two

19   available drivers.

20          THE COURT:  Well, let's look on the opposite side --

21   well, let me ask this question about the drivers:  You said

22   that in Minnesota, I believe it is, they make some evaluation

23   as to the safety of particular carriers, and it's by that

24   means that they find themselves in the computer, someone that

25   Robinson uses, someone that Robinson procures loads for.  Is

1  there any similar compilation of information or any similar

2  effort made to evaluate drivers?

3           THE WITNESS:  No.

4           THE COURT:  But you say you know some of the drivers?

5           THE WITNESS:  (Nods head up and down.)

6           THE COURT:  Are there circumstances in which you

7  might choose another carrier based on the driver that's

8  available, say, on behalf of AKJ or some other company that

9  you represent, based on the identity of the driver that's

10 available?

11          THE WITNESS:  You could make that distinction,

12 knowing that, you know, the driver might not be able to handle

13 some of the appointments on the load.

14          THE COURT:  Is that something you would do, or is

15 that handled by someone else?

16          THE WITNESS:  Picking and choosing between the two

17 different carriers?

18          THE COURT:  Based on the driver available.

19          THE WITNESS:  I would decide if I'm going to use that

20 particular carrier or driver or another one.

21          THE COURT:  Based on the qualities and

22 characteristics of the driver?

23          THE WITNESS:  Yeah.  I mean, it's more what the

24 dispatcher is telling me that the drivers can handle, you

25 know.

1       THE COURT:  And not your own information or

2  perception of the driver's abilities?

3       THE WITNESS:  If I know the driver really well, you

4  know, then I would -- then I can make that differentiation.

5       THE COURT:  Fair enough.

6     Mr. Kirtner.

7       MR. KIRTNER:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9  BY MR. KIRTNER:

10 Q    C.H. Robinson has a do-not-use list for carriers,

11 correct?

12 A    Correct.

13 Q    AKJ was not on that list?

14 A    No.

15 Q    Was there a do-not-use list for drivers?

16 A    No.

17 Q    You were asked by Mr. Doherty whether you could take a

18 carrier off the road, and you said "no."  And I think you said

19 that the government could do that?

20 A    Correct.

21 Q    But once C.H. Robinson acquired from Coleman Cable the

22 right to move this load, you had the right to decide who was

23 going to haul this load, correct?

24 A    Correct.

25 Q    And if you had decided that wasn't going to be

1  AKJ Enterprises, they would not have been on Interstate 81

2  with this load of cable reels on September 12, 2004, around

3  8:30, correct?

4  A    Correct.

5  Q    Mr. Doherty asked you whether you compromised safety for

6  the sake of a commission when you booked this load.  Do you

7  remember him asking you that?

8  A    Yes.

9  Q    You said "no," correct?

10 A    Uh-huh, yes.

11 Q    The reality is that you didn't think about safety at all

12 when you booked this load, correct?  It was not a

13 consideration?

14 A    Correct.

15 Q    Because it's not your job?

16 A    Right.

17 Q    Similarly, it's not your job to worry, in your view,

18 about whether AKJ's drivers have driver's licenses, correct?

19 A    Correct.

20 Q    It's not C.H. Robinson's problems to worry about that; is

21 that correct?

22 A    That's between the driver and their employer, the

23 trucking company.

24 Q    Which is to say, in your view, it's not C.H. Robinson's

25 problem whether the drivers who are pulling loads for

1  C.H. Robinson, through their representative employers, have a

2  license, correct?

3  A    Correct.

4         MR. KIRTNER:  Those are all the questions I have,

5  Your Honor.

6         MR. DOHERTY:  Just one follow-up question.

7                        RECROSS-EXAMINATION

8  BY MR. DOHERTY:

9  Q    Mr. Atkinson, if you had not given that load to AKJ on

10  September 10th, 2004, would you have been able to prevent AKJ

11  from going and getting a load from somebody else?

12  A    No.

13  Q    Wasn't it your prior testimony that they undoubtedly get

14  loads from other people?

15  A    Correct.

16  Q    So if Robinson refuses to load them, that doesn't mean

17  they wouldn't have other sources of loads and wouldn't be out

18  hauling on that day?

19  A    Correct.

20         MR. DOHERTY:  Thank you.

21         THE COURT:  Any other questions of Mr. Atkinson?

22         MR. KIRTNER:  No, Your Honor.

23         THE COURT:  You may stand down.

24     May the witness be excused?

25         MR. DOHERTY:  Yes, Your Honor.

1          THE COURT:  You may leave or remain in the courtroom,

2    whichever you prefer.

3          (Further proceedings were had but not transcribed at this

4    time.)

5          (Court recessed at 4:27 p.m.)

6

7                        CERTIFICATE

8    I,  Judy K. Webb, certify that the foregoing is a

9    correct transcript from the record of proceedings in

10   the above-entitled matter.

11

12   /s/  Judy K. Webb             Date:  5/30/08

13

14

15

16

17

18

19

20

21

22

23

24

25