CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

**JUN 1 0 2008**

JOHN F. CORCORAN, CLERK
BY: _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

WINFORD DALLAS JONES, )
)
      Plaintiff, )    Civil Action No. 7:06CV00547
)
v. )    **MEMORANDUM OPINION**
)
C.H. ROBINSON WORLDWIDE, INC., )    By: Hon. Glen E. Conrad
)    United States District Judge
      Defendant. )

      This personal injury action arose out of a serious accident involving two tractor-trailers. This matter is before the court on the plaintiff's motion for partial summary judgment, the defendant's motion for summary judgment, the plaintiff's motion in limine, the defendant's motion in limine, the defendant's motion to exclude the testimony of Thomas M. Corsi, Ph.D., the defendant's motion in limine to permit evidence regarding plaintiff's settlement with AKJ, and the defendant's motion in limine to exclude evidence regarding proposed safety ratings for AKJ. Although the court announced its findings in open court in order to permit the parties to prepare for the imminent trial date, the court announced that it would file a memorandum opinion in support of its oral findings and conclusions. The parties' motions will be addressed in turn.

## FACTUAL BACKGROUND

      On the night of September 12, 2004, the plaintiff, Winford Dallas Jones, a West Virginia resident, was traveling southbound on I-81 in Wythe County in a tractor-trailer owned by his employer. Traveling northbound was a tractor-trailer owned by AKJ Enterprises, Inc. ("AKJ"), which was driven by Kristina Arciszewski. As the two tractor-trailers approached one another from opposite directions, Arciszewski's tractor-trailer abruptly crossed the median and struck

Jones's tractor-trailer head-on. Arciszewski died at the scene, and Jones suffered serious injuries, including a concussion and multiple fractures in his right arm and left leg.

Jones filed this diversity action on September 11, 2006. The following individuals and/or entities were named as defendants: Loretta D'Souza, a Florida resident and the personal representative of Arciszewski's estate; AKJ, the Georgia trucking company which owned the tractor–trailer that Arciszewski was driving; Elson and Dionnie Bolar, the owners of AKJ; and C.H. Robinson Worldwide, Inc., a Minnesota motor carrier broker with whom AKJ had a contractual relationship and which has offices in Norfolk, Richmond, and Roanoke, Virginia. The complaint included the following claims: negligence, negligent hiring and supervision, negligent entrustment, violations of the Federal Motor Carrier Act, and violations of the Federal Motor Carrier Regulations.

None of the parties save C.H. Robinson Worldwide, Inc. ("Robinson") were served. Ultimately, the plaintiff voluntarily dismissed defendants Loretta D'Souza, AKJ, and Elson and Dionnie Bolar. Robinson then filed a motion to dismiss all the claims against it. The court granted the motion with regard to the plaintiff's claims under the Federal Motor Carrier Act and the Federal Motor Carrier Regulations. The remaining claims (negligence under a theory of respondeat superior, negligent hiring and supervision, and negligent entrustment of an activity) survived the motion to dismiss. Robinson has also filed a third party complaint against AKJ and Elson and Dionnie Bolar in which it requests indemnification under the Contract Carrier Agreement signed by the parties.

After conducting extensive discovery, Robinson filed a motion for summary judgment with regard to all the remaining claims, Jones filed a motion for partial summary judgment with

2

regard to the claims of negligent hiring and supervision and negligent entrustment assuming that the court determines that AKJ and Arciszewski were independent contractors of Robinson, Robinson filed several motions in limine with regard to the exclusion of evidence at trial, and the plaintiff filed a motion in limine with regard to the exclusion of evidence at trial. Jones also requested the court to find as a matter of law that Arciszewski was negligent in causing the accident. The parties appeared before the court at a hearing on all of these motions.

## DISCUSSION

### I.    Motions for Summary Judgment

### A.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985). When a motion for summary judgment is supported by affidavits or other evidence as provided for in Rule 56, the opposing party may not rest upon the allegations in the pleadings and must, instead, present evidence showing that there is a genuine issue for trial. If the adverse party fails to present such evidence, summary judgment, if appropriate, should be entered. Fed. R. Civ. P. 56(e); Atkinson v. Bass, 579 F.2d 865, 866 (4th Cir.), cert. denied, 439 U.S. 1003 (1978).

3

**B.      Negligence of Kristina Arciszewski**

As previously stated, Kristina Arciszewski was the driver of the AKJ tractor trailer which struck the plaintiff's vehicle when the AKJ vehicle crossed over the median on I-81. Jones asks the court to find that Arciszewski was negligent in the operation of the tractor-trailer involved in this accident and that her negligence was a proximate cause of the collision. The plaintiff contends that, because there is no evidence to indicate that he was negligent or that there was any cause for the crash other than the negligence of Arciszewski, the court should find as a matter of law that Arciszewski negligently caused the accident in which he was injured. Robinson has noted no opposition to the plaintiff's motion.

Eyewitness accounts indicate that Arciszewski's tractor-trailer suddenly left its lane of travel and crossed the median, striking the tractor-trailer driven by Jones head-on. See Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exhibits 2-4. In fact, one witness stated that she observed Arciszewski attempt to exit the interstate prior to the collision and abruptly re-enter the highway from the exit ramp without signaling. See Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exhibit 2. The Police Crash Report for this incident also indicates that "[i]t appears that the main causative factor of the crash was error or inattention of the driver of Vehicle # 1," and that Arciszewski was a new driver for the company, thus "inexperience might have also been a contributing factor." See Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exhibit 1.

The court concludes that the evidence clearly establishes that Arciszewski was at fault in causing the accident that resulted in the plaintiff's injuries. The eyewitnesses all indicated in their affidavits that the tractor trailer driven by Arciszewski abruptly crossed over the median

4

without warning and struck the tractor trailer being driven by Jones. There is no evidence to indicate that the plaintiff, or any person or instrumentality other than Arciszewski, was at fault in any way. Therefore, the court concludes as a matter of law that Arciszewski was negligent and that her negligence was a proximate cause of the accident.

## C.     Negligence/Respondeat Superior

Jones has alleged that AKJ and Arciszewski were agents, servants or employees of Robinson, that Arciszewski was negligent in operating the tractor-trailer which was involved in the accident, and that Robinson is, therefore, subject to vicarious liability for that negligence. The defendant contends, however, that it is not subject to vicarious liability in this instance because AKJ and Arciszewski were independent contractors, not employees, of Robinson.

The April 19, 2001 Contract Carrier Agreement between Robinson and AKJ contains the following relevant provisions:

1.     SERIES OF SHIPMENTS AND ROBINSON'S DISTINCT NEEDS

. . . Carrier agrees to provide service designed to meet the unique, distinct and continuing transportation service needs of Robinson and its Customers, which include but are not limited to the following: providing flexible contract freight rates which may be amended through a simplified notice provision; providing Certificate of Insurance to Robinson; Carrier's agreement to issue invoices to and to accept payment from Robinson, rather than from the shipper or receiver; participating with Robinson to use various means of communications and transmitting information to permit the tracking and tracing of shipments accepted by Carrier; and the occasional granting of other business considerations.

. . .

4.     CARRIER'S SERVICE WARRANTIES

. . . Carrier agrees that neither Robinson nor its Customer is responsible for paying the involved driver's salary, wages, compensation or charges, nor are either responsible for Workmen's Compensation coverage or any taxes based on salary, wages or

5

compensation. Carrier agrees to provide and maintain the necessary equipment and to provide all fuel and pay all expenses necessary to operate the equipment, and Carrier agrees that in no instance shall Robinson or its Customer be responsible for any of the expenses. Carrier represents that the transportation will be performed without violating local, state or federal laws or regulations, and that Carrier has complied and will comply with all laws and regulations of local, state and federal authorities and regulatory bodies having jurisdiction over the operation of its vehicles.

. . .

6.      INDEPENDENT CONTRACTOR

The Parties understand and agree that the relationship of Carrier to Robinson hereunder is solely that of an independent contractor, and that Carrier shall and does employ, retain, or lease on its own behalf all persons operating motor vehicles transporting commodities under this Contract, and such persons are not employees or agents of Robinson or its Customers. It is further understood and agreed that all drivers of motor vehicles and persons employed in connection with the transportation of commodities under this Contract are subject to the direction, control and supervision of Carrier, and not of Robinson or its Customers. Carrier represents and agrees that such employees are and will at all times be covered by adequate workmen's compensation insurance as provided by law.

The plaintiff does not now dispute the authenticity of this agreement. The court had previously indicated that, if the agreement proved to be authentic, it had doubts as to whether the plaintiff's claim for negligence could go forward. See Memorandum Opinion dated Sept. 11, 2007 at 7 n. 2.

Robinson contends that, based on the Contract Carrier Agreement, AKJ was an independent contractor and also maintains that Robinson had no control over AKJ or its drivers' driving times, compensation, routes, discipline issues, or any other aspects of hauling a load. Robinson also notes that it had no power to fire any driver hired by AKJ, including Arciszewski. Therefore, Robinson concludes that, because it had no control over the details of AKJ's business or its drivers, AKJ was an independent contractor of Robinson, and Robinson cannot be held

6

vicariously liable for the negligence of AKJ or its drivers.

Jones responds that Robinson is not simply a freight broker, but acts as a third party logistics company. At her deposition, Annette Sandberg, the defendant's expert, explained the distinction as follows:

Q.   Do you draw a distinction between third-party logistics providers and brokers?

A.   Yes, I do.

Q.   Tell me what the distinction is in your mind.

A.   The distinction in my mind is a broker has a much narrower focus than a third-party logistics provider. A broker simply brokers a load from a shipper to a carrier to get to an end source, so they're just that – that pass off; whereas a third-party logistics company typically handles many more issues, so they will handle more than just the brokering of the load. They may handle some customer relations to make sure that if the shipper has a customer that needs material at a certain point in time, they try to coordinate those two points and make sure that the customer, the end customer, is happy, so that the shipper doesn't have to do a lot of that interaction with the end customer. So they are a much broader based focus and service entity than just simply a broker. . . .

Q.   So the third-party logistics provider is more involved in the actual process of making sure the load gets where it needs to be on time; is that fair to say?

A.   If that's what they've offered. It depends on the specific contract that the logistics provider has with a shipper as to the services that they've asked for.

. . .

Q.   Something you sort of implied but I don't think I've asked you very directly. Do you consider C.H. Robinson to be a third-party logistics provider?

A.   Yes, I do.

See Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exhibit 16 at 18-19, 36. Jones notes that Robinson would typically arrange the dates and times for pickup and delivery, obtain the pickup and delivery addresses, communicate any specific limitations or

7

directions as to the loading or unloading of cargo, communicate any time sensitivity issues for the load, and provide directions for transport of the load to the carrier and its drivers. Such communications were included on the Carrier Load Confirmation form that was sent from Robinson to the carrier for each load. These confirmation forms specifically state that they amend the Contract Carrier Agreement with that particular carrier with regard to the rates charged for each shipment as well as directions and any special warehouse notes. The plaintiff contends that these requirements and communications indicate a high level of control by Robinson over AKJ and its drivers, including Arciszewski.

Jones also notes that Robinson required all drivers to call in to Robinson (1) when dispatched to pick up a load; (2) when the driver arrived at the pick up address; (3) when the trailer was loaded and the freight checked by the driver; (4) during the actual transport of the load for status updates; and (5) when the driver arrived at the delivery address. Drivers also called in to report any problems or issues that arose during the transport of the load, including equipment problems, traffic or delays, or needs for advances through Robinson's T-Chek System.[1] In addition, Robinson had the ability to terminate a carrier's right to transport a load, or "bounce" the load. Finally, Jones contends that Robinson exercised control over small carriers like AKJ because they were more financially dependent on Robinson through the T-Chek System, as well as its Quick Pay plan, than larger carriers would have been.[2] Therefore, based upon all of the

---

[1] The T-Chek System allows carriers and/or their drivers to obtain advances from Robinson for the cost of fuel or other necessities. Such advances are deducted from the total owed to the carrier by Robinson.

[2] The Quick Pay plan allows carriers who signed up with Robinson to obtain a very quick turnaround on payment for transporting loads in exchange for a percentage of the total. AKJ apparently participated in both the T-Chek System and the Quick Pay plan.

foregoing factors, Jones concludes that, notwithstanding the provisions of the Contract Carrier Agreement, AKJ and its drivers were employees, not independent contractors, of Robinson because of the level of control Robinson was able to exercise over AKJ's activities.

On the other hand, Robinson contends that it did not exercise significant control over the operations of AKJ. Robinson claims that requesting status updates for shipments and communicating pickup and delivery instructions from its shipping customers to its carrier simply does not indicate that it was taking control of AKJ's operations. Robinson also notes that the funds received by AKJ or its drivers under the T-Chek system were simply advances on their fee for a particular load to cover expenses incurred while transporting that load.[3] Robinson next asserts that when it "bounces" a load, it is simply transferring that load to a carrier who can complete a delivery from one who cannot. Robinson further contends that there is no evidence that it acted in the capacity of a third-party logistics company with respect to the particular load at issue in this case, and notes that Ms. Sandberg also testified that the services offered to a particular shipper could vary depending upon that shipper's needs.

In determining whether an entity is an independent contractor or employer of another, a court must examine the following factors: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power of control. See Hadeed v. Medic-24, Ltd., 237 Va. 277, 377 S.E.2d 589, 594-95 (Va. 1989). The fourth factor, power of control, is determinative. Id. However, the employer need not actually exercise this control; the test is whether the employer has the power to exercise such control. McDonald v. Hampton Training

---

[3] The T-Chek system is also administered by a separate corporation, a wholly-owned subsidiary of Robinson, and counts as its customers carriers that may not haul loads for Robinson but desire access to cash advances during the transport of a load for another shipper or broker.

9

Sch. for Nurses, 254 Va. 79, 486 S.E.2d 299, 301 (Va. 1997).

In this case, the court finds that, regardless of whether Robinson was acting as a third party logistics company or solely as a freight broker with regard to the subject load, Robinson did not exercise a sufficient degree of control over AKJ so as to convert their contractual relationship to one of employer-employee. The Contract Carrier Agreement plainly states that AKJ was acting as an independent contractor of Robinson. A similar agreement was construed in the case of Schramm v. Foster, 341 F. Supp. 2d 536 (D. Md. 2004). As in the instant action, Robinson had acted as the broker of the load at issue in Schramm and was likewise a defendant in that case. Specifically, Robinson brokered a load with carrier Groff Brothers who used driver Foster to transport the load. 341 F. Supp. 2d at 540. En route, Foster failed to yield the right of way at a stop sign and caused a collision with another vehicle. Id. at 541. The injured driver of the other vehicle filed an action against the driver, Groff Brothers, and Robinson for negligence, negligent entrustment, negligent hiring and supervision, and violations of the Federal Motor Carrier Act and Federal Motor Carrier Safety Regulations. Id. at 540-41.

In Schramm, Robinson admitted that it was a third-party logistics company which provided one point of contact service to shippers. Id. at 541-42. Groff Brothers had also entered into a Contract Carrier Agreement with Robinson which was in effect at the time of the accident. Id. at 542. The plaintiff in Schramm argued that Robinson exercised a significant degree of control over Groff Brothers by directing its driver to pick up and deliver the load at particular times, giving him directions from the pickup to the delivery destination, giving him instructions regarding the load, requiring him to use load locks on the trailer, and requiring him to call when he picked up the load as well as during the trip. The Court found that "both the written

10

agreement and the conduct of the parties belie plaintiff's arguments." Id. at 543. The agreement

contained an independent contractor provision which appears to be substantially identical to that

included in the agreement between Robinson and AKJ. Ultimately the court granted summary

judgment to Robinson on the negligence claim holding as follows:

> Robinson did not have the power to fire Foster or to control his activities in transit. The
> only thing Robinson had a right to control was the ultimate result - the delivery of the
> load to its final destination in New Jersey. The fact that Robinson instructed Foster on
> incidental details necessary to accomplish that goal is not enough to subject Robinson to
> liability for Foster's negligent acts during the course of the shipment when Robinson had
> no control over Foster's movements.

Id. at 546.

Similarly, here Robinson did arrange pickup dates and times, provided pickup and

delivery addresses to the carrier, communicated information from the shipper regarding the

loading and unloading of cargo, provided other directions regarding the transportation of the

load, and required drivers to call in to report the status of shipments. However, all of these

activities were directed toward the incidental details required to accomplish the ultimate purpose

for which Robinson had been hired by its shippers - the delivery of a load to its proper

destination in a timely fashion. Although Robinson could "bounce" a load from a particular

carrier, it did so primarily when that carrier could not complete a delivery for whatever reason.

There is no evidence to indicate that Robinson could terminate a particular driver, or that it asked

carriers to do so, or that Robinson controlled the details of the carrier's operations, such as its

drivers' schedules during a trip, particular routes, or compensation plans. Furthermore, although

AKJ may have received funds through Robinson's T-Chek system, the court finds that such

advance payments on the carrier's fee do not indicate that Robinson exercised any heightened

11

level of control over AKJ or its operations. Therefore, the court concludes that AKJ was an

independent contractor of Robinson and that, as a result, Robinson cannot be held liable for the

negligence of AKJ or its driver, Arciszewski, under a theory of respondeat superior.

**D.    Negligent Hiring of an Independent Contractor**

1.    The Applicability of a Claim for Negligent Hiring of an Independent Contractor to the
      Hiring of a Carrier by a Freight Broker

Virginia law recognizes a claim for the negligent hiring of either an employee or an

independent contractor. The plaintiff has asserted a claim for negligent hiring of an employee,

or, in the alternative, negligent hiring of an independent contractor. Because the court has now

found that AKJ was an independent contractor, not an employee, of Robinson, the court will

address only the latter claim.

The general rule is that "one who employs an independent contractor is not liable for

injuries to third parties resulting from the contractor's negligence." MacCoy v. Colony House

Builders, Inc., 239 Va. 64, 69, 387 S.E.2d 760, 762 (1990). However, the Virginia Supreme

Court has recognized an exception to this rule for the negligent hiring of an independent

contractor. 239 Va. at 69; Philip Morris v. Emerson, 235 Va. 380, 368 S.E.2d 268 (1988). In the

latter case, Philip Morris had engaged a contractor to dispose of the unknown contents of several

cylinders which it had discovered buried on its property. 235 Va. at 390. The contractor had

developed a device to use in opening and sampling the contents of such cylinders before

neutralizing and disposing of the substance inside. Id. Philip Morris hired the contractor on the

basis of his representations regarding the device and a brochure describing the contractor's

experience. Id. However, the Philip Morris employee who hired and supervised the contractor

12

failed to make any investigation into the contractor's reputation or experience and did not ascertain whether he had ever used the device successfully. Id. at 392. When the contractor employed his device, the highly toxic chemical contained in the cylinders escaped from the device, resulting in the death of the contractor and serious injuries to the plaintiffs. Id. at 393.

The Court noted that it had previously alluded to a "rule of liability for negligent hiring of an incompetent independent contractor" and explicitly adopted the principles set forth in the Restatement (Second) of Torts § 411 which recognize a defendant's:

> liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor ... to do work which will involve a risk of physical harm unless it is skillfully and carefully done.

235 Va. at 399. The Court noted that Philip Morris had failed to undertake any investigation into the contractor's "competence to perform an admittedly dangerous task." Id. Specifically, the Court found that

> The slightest inquiry would have revealed A-Line's inexperience. A perusal of a contractor's self-serving brochure is not sufficient to discharge an employer's duty of reasonable care to employ a contractor who is competent to perform a dangerous task. There can be no doubt that [the contractor's] incompetence was the ultimate cause of the losses claimed in this case. There is no conflict in the evidence of Saddington's failure to investigate.

Id. at 400. Therefore, the Court held that "Philip Morris is liable as a matter of law because of its own negligence in selecting and retaining A-Line as an independent contractor under the facts and circumstances of this case." Id. at 399.

Robinson first contends that the holding in Philip Morris should be limited only to the type of dangerous or ultra-hazardous activity described in that case and not to a more routine

13

situation, such as the transport of a load of cable reels which is at issue here.[4] The plaintiff

responds that the Court in Philip Morris did not limit its holding to ultra-hazardous activities, but

noted that it could apply to any "work which will involve a risk of physical harm unless it is

skillfully and carefully done." Id. at 399. Illustration 5 to the Restatement (Second) of Torts §

411, the section adopted by the Virginia Supreme Court in Philip Morris, describes a situation

involving an activity which is not ultra-hazardous but which would nevertheless involve a risk of

physical harm unless skillfully and carefully done as follows:

> A, a builder, employs B, a teamster, to haul material through the streets from a nearby
> railway station to the place where A is building a house. A knows that B's trucks are old
> and in bad condition and that B habitually employs inexperienced and inattentive drivers.
> C is run over by a truck carrying A's material and driven by one of B's employees. A is
> subject to liability to C if the accident is due either to the bad condition of the truck or the
> inexperience or inattention of the driver.

The plaintiff points to this illustration, which is factually similar to the instant case, as an

example of an activity that is not ultra-hazardous, but nevertheless involves a risk of physical

harm as described in the Restatement. The plaintiff also asserts that it is well known that the

operation of a tractor-trailer on a public highway involves just such a risk of harm, as evidenced

by requirements that drivers of tractor-trailers must possess special commercial driver's licenses

and specialized knowledge and that carriers must comply with numerous federal and state

regulations and possess valid operating authority from the Federal Motor Carrier Safety

Administration ("FMCSA"). See also, Schramm, supra, 341 F. Supp. 2d at 553 (noting that the

---

[4] Robinson also points out that the defendant in Philip Morris was on-site and closely monitoring the
disposal firm while it engaged in its activities. Robinson contends that it did not directly supervise or control AKJ's
operations. The court finds, however, that such an argument would be more properly directed to a claim of negligent
retention of an independent contractor, which was specifically discussed in Philip Morris, rather than to a negligent
hiring claim. The court previously found that the plaintiff's complaint does not properly assert a claim for negligent
retention. See Memorandum Opinion dated Sept. 11, 2007 at 7 n. 3. Therefore, the court does not find Robinson's
assertions with regard to its lack of direct supervision of AKJ to be relevant to an analysis of the claim at hand.

transportation business is "heavily tinged with the public interest").

Although the court has not identified any Virginia cases discussing a claim for negligent hiring of an independent contractor in the context of the selection of a carrier by a broker or a shipper, there have been several cases in other jurisdictions which have found that § 411 of the Restatement does apply to such situations. Applying Washington state law, the Court in L. B. Foster Co. v. Hurnblad, 418 F.2d 727 (9th Cir. 1969) considered § 411 in the context of a case where the plaintiffs' automobile was struck by a tractor-trailer. The plaintiffs ultimately filed suit against the driver and the owner of the tractor-trailer, as well as the company which arranged the shipment and the shipper itself. After a jury found for the plaintiffs, the shipper alone appealed the judgment. 418 F.2d at 728. The Court found that the shipper could be liable if its "negligent selection of an incompetent independent contractor to do work which involves a risk of physical harm to others unless skillfully and carefully done was a proximate cause of the accident." Id. at 729 (citing § 411 of the Restatement). Without specifically citing § 411, the Supreme Court of Oklahoma has likewise held that:

> Where there is foreseeable [sic] risk of harm to others unless precautions are taken, it is the duty of one who is regularly engaged in a commercial enterprise which involves selection of motor carriers as an integral part of the business, to exercise reasonable care to select a competent carrier. Failure to exercise such care may create liability on the part of the employer for the negligence of that carrier.

Hudgens v. Cook Indus., Inc., 521 P.2d 813, 816 (Okl. 1973).

The Supreme Court of New Jersey has also applied § 411 to a case involving the selection of a carrier by a shipper. In Puckrein v. ATI Transport, Inc., 186 N.J. 563, 897 A.2d 1034 (N.J. 2006), the Court first noted that there are "three exceptions to the general rule that principals are not liable for the actions of independent contractors: (1) where the principal retains control of the

15

manner and means of doing the work subject to the contract; (2) where the principal engages an incompetent contractor; or (3) where the activity constitutes a nuisance per se." 186 N.J. at 574. Finding that the second exception applied, the Court pointed to the language of § 411 and noted that "[t]he notion of liability for hiring an incompetent contractor is derived from basic negligence principles." Id. at 575.

The court agrees that the Virginia Supreme Court would extend the cause of action of negligent hiring of an independent contractor to this situation involving the selection of a carrier by a freight broker or third party logistics company such as Robinson. It is true that the activity for which the contractor was engaged in Philip Morris involved a dangerous toxic chemical. Yet, the Court adopted the language in § 411 of the Restatement without specifically limiting its application to ultra-hazardous activities. The hiring of an independent contractor to perform an ultra-hazardous activity more closely falls within the third exception to the general rule for a nuisance per se, as noted in Puckrein, supra, rather than the exception for the hiring of an incompetent independent contractor. In fact, such inherently dangerous activities were discussed elsewhere in the Court's opinion in Philip Morris, where it set forth a separate and distinct basis for liability for the employer of an independent contractor in a situation where the work involved "a peculiar, unreasonable risk of physical harm to others unless special precautions were taken." Philip Morris, supra, 235 Va. at 401. Therefore, the court believes that the Virginia Supreme Court would apply § 411 of the Restatement to any situation involving the hiring of an independent contractor where the work will involve a risk of physical harm unless it is skillfully and carefully done.

The court also agrees that the operation of a tractor-trailer upon the public highways does

16

involve such a risk of physical harm. The likelihood of this risk is reflected in the federal government's licensing requirements to ensure that commercial truck drivers have the necessary skills to operate a tractor-trailer. Other courts applying § 411 have easily extended this cause of action to the hiring of a carrier by a shipper, the situation described in Illustration 5 to § 411 as previously set forth. Therefore, the court concludes that the plaintiff's claim for negligent hiring of an independent contractor is viable under the facts of this case.

2.      The Defendant's Duty of Inquiry in Selecting a Competent Carrier

The court's conclusion with regard to the viability of this cause of action does not end the necessary inquiry with regard to the parties' motions for summary judgment on this claim, however. In order to succeed on a claim for negligent hiring of an independent contractor, the plaintiff must also be able to prove that "the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence." Puckrein, 186 N.J. at 576. Section 411 of the Restatement defines a competent and careful contractor as one "who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." Restatement (Second) of Torts § 411 comment (a). Furthermore, the harm that resulted to the plaintiff must have arisen out of the particular quality of the independent contractor which made it negligent for the employer to select that contractor to perform the work. Restatement (Second) of Torts § 411 comment (b). Finally, in determining the appropriate amount of care that a defendant must

17

exercise in selecting an independent contractor, the finder of fact should consider "that which a reasonable man would exercise under the circumstances." Restatement (Second) of Torts § 411 comment (c).

In their motions for summary judgment, the parties do not appear to specifically dispute that AKJ was an incompetent carrier or that Arcisziewski was an incompetent driver. The parties also agree that Robinson did not conduct any investigation into AKJ's safety and fitness as a carrier beyond ascertaining that it was insured, that it had a conditional safety rating, and that it had valid operating authority from the FMCSA. Instead, the dispute between the parties focuses upon the appropriate duty of inquiry that was required of Robinson under the facts of this case. Robinson contends that there is no evidence to demonstrate that it either knew or should have known that AKJ would be likely to be involved in a collision such as that involved in this case. Instead, Robinson alleges that it made all appropriate inquiries prior to hiring AKJ to carry the subject load by determining that AKJ was properly insured and had valid operating authority from the FMCSA. On the other hand, Jones argues that Robinson should have conducted an investigation into AKJ's safety program and its safety ratings which would have disclosed that AKJ was an at risk carrier and was likely to be involved an accident.

Robinson was aware that AKJ had received a "conditional" rating from the FMCSA prior to assigning the subject load to AKJ. A carrier can be rated satisfactory, conditional, or unsatisfactory. A conditional rating indicates that the FMCSA considers that the carrier does not have adequate safety management controls in place. The Contract Carrier Agreement required AKJ to maintain a rating of "satisfactory."

The FMCSA maintains a public website which includes several different categories of

18

safety information. The information available includes the SafeStat database which reports scores for carriers across different Safety Evaluation Areas ("SEAs"). The SEAs are broken down into the following categories: Accident SEA, Driver SEA, Vehicle SEA, and Safety Management SEA. Carriers may receive a score from 0 to 100, with 0 being the best and 100 being the worst. Carriers are scored on a bell curve such that there will always be carriers at either end of the curve regardless of their level of safety. A score greater than 75 is considered deficient. If a carrier receives a cumulative score of 225 to 350, it receives a "B" rating which is considered "at risk" by the FMCSA. AKJ possessed a "B" rating (overall score of 322.32) and was in the bottom 3% of the motor carriers in the country with regard to its Driver SEA (97.8) and Vehicle SEA (97.09) scores. The plaintiff notes that studies published on the FMCSA website indicate that there is a correlation between deficient SEAs and crash rates. Information retained on the FMCSA website also indicated that AKJ's insurance coverage had been cancelled eight times from 2001 to 2004 and that AKJ had previously been cited by the FMCSA for numerous violations of federal safety regulations.

In addition to AKJ's deficient safety rating and SafeStat scores, the plaintiff notes that Robinson's internal Express system contained information regarding problems with its various loads, including those carried by AKJ. Spreadsheets including this data for AKJ indicate specific problems over the three years Robinson did business with the carrier, including incidents of equipment or vehicle breakdowns of varying degrees of severity, incidents where drivers were pulled over or vehicles were taken out of service for regulatory violations, and two different tractor trailer accidents (including one roll over). In many cases, however, these spreadsheets do not describe the causes of the equipment or vehicle breakdowns or of the two accidents.

19

The plaintiff's argument in support of its motion for summary judgment on the negligent hiring claim is that Robinson was under a duty to ensure that it used reasonable care in selecting carriers; that it should have been alerted to safety problems with AKJ because of the carrier's conditional rating and the various incidents reported in the Express system; that in fulfilling its duty it should have checked the SEA scores that were publicly available on the FMCSA website; that those scores would have demonstrated that AKJ was a safety risk and would have resulted in Robinson's refusal to hire AKJ for the subject load; and, finally, that Robinson's failure to properly investigate AKJ's poor safety record was the proximate cause of the accident in that its record would have indicated a high likelihood of a tractor-trailer crash such as the one that caused the plaintiff's injuries. In further support of his argument, Jones asserts that AKJ acted negligently in hiring Arciszewski, a novice tractor-trailer driver who had received her commercial driver's license only two months prior to the accident, for this load, which had been designated as "hot," or in need of urgent delivery. The plaintiff contends that this negligence in hiring, of which Robinson could have been aware generally based on AKJ's SEA scores, resulted in the collision in which he was injured.

In Schramm v. Foster, 341 F. Supp. 2d 536 (D. Md. 2004), the Court permitted a claim for negligent hiring of an independent contractor to go to the jury. The plaintiffs were injured in a collision between their pick-up truck and a tractor trailer driven by Foster. As noted, supra, the plaintiffs then filed an action against the driver and his employer, Groff Brothers Trucking, LLC, as well as Robinson, which had hired Groff Brothers to transport the load for Robinson's shipper customer. In describing the duty of care required in selecting such a carrier, the Court held that:

I believe that [Robinson's] self-proclaimed status as a 'third party logistics company'

Case 7:06-cv-00547-GEC-mfu   Document 147   Filed 06/10/08   Page 20 of 39   Pageid#: 2053

providing 'one point of contact' service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers. This duty to use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMCSA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings.

Id. at 551. The Court based the "common law duty upon third party logistics companies to use reasonable care in selecting carriers" upon the "critical federal interest in protecting drivers and passengers on the nation's highways," Robinson's recognition of the importance of a good safety record by requiring a rating of "satisfactory" in the Contract Carrier Agreement (a contract provision that was breached by the carrier in Schramm because it was a new company that did not yet have a rating), and Robinson's active interjection of itself into the relationship between shipper and carrier. Id. at 552-53. Another important factor to the Court was that Robinson had advertised to its shipping customers that it maintained a liability insurance policy to pay any damages that exceeded the carrier's own insurance coverage. Id. at 552.[5]

The plaintiff's expert, Thomas M. Corsi, Ph.D., has also opined that Robinson should have reviewed the publicly available SafeStat data in deciding whether to hire AKJ.[6] Dr. Corsi has also stated that the Driver SEA and Vehicle SEA scores are "accurate measures of both a carrier's driver and vehicle performance," and that if Robinson had reviewed this data, it would

---

[5] The plaintiff also refers to this advertisement in his motion for partial summary judgment. Robinson has responded that the statement was included in a 2002 brochure, was inelegantly worded even at that time, and is irrelevant in this case because there is no evidence that Robinson used the brochure after 2002 or that the shipper of the subject load relied upon such statements when contracting with Robinson. This factual dispute with regard to one of the key factors to the Schramm court, which this court also finds relevant, supports the notion that the parties' motions for summary judgment should be denied.

[6] Robinson has filed a motion to exclude all of Dr. Corsi's testimony and his report which will be discussed, infra.

have determined that "hiring this carrier compromised safe operating practices." The plaintiff contends that this public data has been available since 1999, is heavily relied upon by the FMCSA to target unsafe motor carriers for investigation, and, according to Dr. Corsi, is the most reliable, up to date means of evaluating the safety performance of a particular carrier. Jones further contends that even the defendant's expert, Annette Sandberg, Esq., the head of the FMCSA at the time of the accident, testified at her deposition that if a third party logistics provider became aware that a carrier had received a conditional rating, it should inquire with regard to the information gathered during the FMCSA compliance review and the carrier's plan for improvement. <u>See</u> Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, Exhibit 16 at 112-17, 122-23.

With regard to the alleged duty to consult the SafeStat data available on the FMCSA website, Robinson contends that there was no such common law duty, notwithstanding the Court's holding in <u>Schramm</u>. At the time of the instant collision, according to Robinson, the FMCSA had posted the following warning on the front page of its website with regard to the SEAs:

> Because of State data variations, FMCSA cautions those who seek to use the SafeStat data analysis system in ways not intended by FMCSA. Please be aware that use of SafeStat for purposes other than identifying and prioritizing carriers for FMCSA and state safety improvement and enforcement programs may produce unintended results and not be suitable for certain uses.

At her deposition, Ms. Sandberg testified that this warning came about because the FMCSA became aware that businesses were using the SEAs for commercial or business purposes and should not have been doing so. Instead, according to Ms. Sandberg, the SEAs were primarily intended to be an enforcement tool.

The Court in Schramm had also noted that the FMCSA website containing the SafeStat information contained this disclaimer but nevertheless held that "[w]here, as here, one party (Robinson) knows from information provided to it by the other (Groff Brothers) that the latter is in breach of a contractual provision whose very purpose is to protect the safety of innocent third parties, a duty of inquiry necessarily is implied." 341 F. Supp. 2d at 552. Furthermore, a duty of further inquiry was implied where the carrier's SafeStat scores were marginal, even though not unsatisfactory. Id. In the case at hand, AKJ was also in breach of the contractual provision requiring it to maintain a satisfactory rating.

Robinson acknowledges that the Court in Schramm recognized that the warning was posted on the website and nevertheless found a common law duty to check the SafeStat scores during the carrier selection process. Robinson claims that the crucial difference between this case and Schramm, however, is that Robinson now has an expert in the person of Ms. Sandberg, whose testimony was not available in Schramm, who has offered an explanation of the agency's policy behind the warning, as stated previously, and who will make clear that the FMCSA was expressly warning companies against the very use recommended in Schramm and by the plaintiff here. Thus, Robinson contends that it should not be held to a higher standard than other freight brokers in the industry and should not be required to ignore the very warning placed upon the FMCSA website regarding the use of the SafeStat scores.

The court believes that Robinson did hold itself out as a third party logistics provider in general and with regard to the subject load. Ms. Sandberg, the defendant's own expert, testified at her deposition that she considers Robinson to be a third party logistics provider. With regard to the subject load, the evidence indicates that the AKJ drivers, including Arciszewski's driving

23

partner, called in to report on the progress of the load and that Robinson had provided detailed instructions regarding the delivery. Furthermore, the court agrees with the reasoning set forth by the Court in <u>Schramm</u> regarding Robinson's active interjection of itself into the relationship between shipper and carrier, and its choice "to do business in a context heavily tinged with the public interest." <u>Id.</u> at 553. Therefore, the court finds that Robinson did have a duty to investigate the fitness of AKJ prior to hiring it to carry the subject load on the public highways.

Nevertheless, the court finds that there is a conflict in the evidence regarding the appropriate inquiry Robinson should have undertaken in this case. Although there were some indications of safety problems in the data available to Robinson on its Express system, it is not clear whether these problems were unusual in comparison to those experienced by other carriers used by Robinson. It is also true that AKJ had a conditional safety rating, and as a result, was in breach of the Contract Carrier Agreement. Ms. Sandberg appeared to indicate in her deposition testimony that such a rating should have prompted some form of additional inquiry on the part of Robinson. The defendant asserts, however, that Ms. Sandberg's comments were made in response to certain hypothetical questions and should not be taken to necessarily apply to a proper evaluation of AKJ. Therefore, there remains a dispute regarding the true import of Ms. Sandberg's comments.

With regard to the SafeStat scores, Dr. Corsi has testified that Robinson should have looked into AKJ's scores and other information available on the FMCSA website. However, there remains the issue of the warning on the website, as well as Ms. Sandberg's comments regarding the reason for that warning. The court also notes that the evidence indicates that the FMCSA website included information about the removal from public view of the Accident SEA

24

and the overall SafeStat score based upon their lack of reliability. As the plaintiff points out, this section of the website states that the Driver SEA, Vehicle SEA and Safety Management SEA scores would remain publicly available and "will continue to provide valuable help to carriers measuring their own safety performance, *shippers determining a carrier's reliability*, and insurance underwriters assessing a carrier's risk level." (Emphasis supplied). Furthermore, Ms. Sandberg also stated in her deposition that the SafeStat scores could be helpful to those in private industry, such as Robinson, given that they understood that the data were not perfect.

Given these discrepancies in Ms. Sandberg's testimony, the disagreement between the experts with regard to the effect of the warning page on the FMCSA website, and the inconclusive nature of the data available in the Express system, the court concludes that the question of whether Robinson breached the appropriate duty of inquiry in selecting a competent carrier must be submitted to the jury. See also, Hudgens v. Cook Indus., Inc., 521 P.2d 813, 816 (Okl. 1973) (holding that where "there is competent evidence tending to show that such employer knew, or in the exercise of reasonable care should have known, that the independent contractor was not such a [competent] driver, and reasonable men might draw conflicting conclusions on the matter, then whether or not the employer was negligent in the discharge of his duty to select a competent contractor becomes a question to be determined by the trier of fact").

3.     The Causation Element of a Claim for Negligent Hiring of an Incompetent Carrier

Regardless of whether Robinson knew or should have known that AKJ was an incompetent carrier, the defendant next asserts that there is simply no evidence to indicate that Robinson knew or should have known that the subject crash could result from that incompetence. As previously stated, before a plaintiff can succeed on a claim of negligent hiring of an

incompetent independent contractor, he must prove not only that the contractor was incompetent and that the employer knew or should have known of that incompetence, but that the contractor's incompetence was a proximate cause of his injuries.

With regard to the incidents noted in the Express system, Robinson contends that many of them were totally unrelated to AKJ's propensity to be involved in a crash. Of all the problems reported, only two involved crashes, neither involving injuries, which took place approximately two years prior to the instant collision. Neither of them involved circumstances similar to those involved in the instant collision. Jones responds that based upon AKJ's poor overall safety record, it would have been foreseeable that a tractor trailer driven by an AKJ driver would be involved in a crash.

Robinson argues that, in order to show causation, there must be some close nexus between the past incidents and the present claim. In support of this argument, Robinson cites Interim Personnel of Central Virginia, Inc. v. Messer, 263 Va. 435, 559 S.E.2d 704 (2002) which involved a claim for negligent hiring of an employee, not an independent contractor, and examined whether the trial court properly submitted the issue of foreseeability to the jury. The Court noted that "the precise injury need not be foreseen by a defendant. It is sufficient that an ordinary, prudent person ought, under the circumstances, to have foreseen that an injury might probably (not possibly) result from the negligent act." 263 Va. at 442. The Court then went on to hold that:

> In the present case, the mere fact that East had been convicted twice of DUI, had failed to pay fines or attend counseling, and had been declared an habitual offender, would not place a reasonable employer on notice or make it foreseeable that East would steal a truck, operate the stolen vehicle during non-business hours for his own frolic, and cause an accident on the open highway distant from the environs of his job.

26

Id.

The court agrees that Jones must demonstrate the necessary causal connection between the particular quality or qualities of AKJ that made it an incompetent carrier and the crash in which plaintiff was injured. While the court believes that the causation element is not particularly strong in this case, the court does find that the plaintiff has proffered evidence sufficient to withstand summary judgment. The evidence demonstrates that AKJ received its conditional safety rating from the FMCSA based, in part, upon driver hiring issues. The reasons behind the rating, including the particular violations, were available on the FMCSA website. Robinson does not dispute that it was aware of AKJ's conditional rating and yet did no further investigation into AKJ's safety practices. In addition, AKJ's Driver SEA and Vehicle SEA scores, also publicly available on the website, indicated that it was at the low end of the curve in terms of driver and vehicle safety issues. The evidence also shows that Arciszewski was an inexperienced driver who had just obtained her commercial driver's license, that AKJ paired her for the trip with a driver whose commercial driver's license had been recently suspended, and that the crash report indicated that inexperience could have been a factor in the accident. It is possible that the finder of fact could determine that AKJ's negligent driver hiring and safety procedures, of which Robinson should have been aware, were a proximate cause of the crash which is the subject of this case. On the other hand, the evidence regarding the actual cause of the crash is sparse, and it is also possible that the finder of fact could determine that, regardless of AKJ's incompetence, the subject crash was not the result of that incompetence. Therefore, the court will deny both parties' motions for summary judgment with regard to the plaintiff's claim for negligent hiring of an independent contractor and will submit these issues to the jury at trial.

27

## E.    Negligent Entrustment

In its previous Memorandum Opinion, the court noted that the Virginia Supreme Court

had not addressed a claim for negligent entrustment of an activity, but found that Virginia would

adopt § 308 of the Restatement (Second) of Torts which states as follows:

> It is negligent to permit a third person to use a thing *or to engage in an activity* which is
> under the control of the actor, if the actor knows or should know that such person intends
> or is likely to use the thing or to conduct himself in the activity in such a manner as to
> create an unreasonable risk of harm to others.

See Memorandum Opinion dated Sept. 11, 2007 at 11 n. 5 (emphasis added).  At the previous

hearing on the defendant's motion to dismiss, the plaintiff had indicated that there was a

possibility that the rolls of wire that were being carried by AKJ could have been more dangerous

than the average load because of their propensity to shift during travel.  The court made its prior

ruling that Virginia would recognize a cause of action for the negligent entrustment of an activity

based upon the understanding that it would apply only to an activity that would require the

handling of a thing that was somehow dangerous in and of itself, in light of the language in the

Restatement.  At this point in the proceedings, the plaintiff is no longer making the argument that

the subject load was inherently dangerous, and there is no evidence in the record to indicate that

the load of rolls of wire was more dangerous than the average load.  As a result, the defendant's

motion for summary judgment has been granted with regard to the plaintiff's claim for negligent

entrustment.[7]

---

[7] Robinson has also asked the court to revisit its previous finding that negligent entrustment applies to an
activity.  In light of the court's ruling on this claim, the court does not find it necessary to address the parties'
arguments on this issue, but notes again that at least one Virginia court has cited § 308 with approval.  See Stanley v.
Williams, 42 Va. Cir. 400, 401 (Va. Cir. Ct. 1997).

28

## II.    Defendant's First Motion in Limine

The defendant asks the court to exclude the following evidence at trial:

1.    Any evidence relating to predecessor entities and/or successor entities to AKJ;
2.    Any evidence of prior problems or conduct by AKJ other than evidence of crashes and/or personal injuries;
3.    Any evidence or testimony by Virginia State Trooper K. Scott Clark regarding the cause of the crash; and
4.    Any reference and/or evidence as to Robinson's overall revenue, monetary allocation, or profit per load.

These issues will be discussed in turn.

## A.    Evidence Relating to Predecessor and/or Successor Entities

Bolar Trucking Express, Inc. was a predecessor corporation to AKJ that did business with Robinson until April 2001.  AKJ Logistics, LLC was a successor corporation to AKJ that did business with Robinson for a short time period beginning in June, 2005, well after the date of the subject accident.  Robinson contends that any evidence related to driver or safety incidents for these entities should be excluded because they are not parties to this matter, that it would have no bearing on whether Robinson was negligent in assigning the subject load to AKJ in 2004, that evidence related to Bolar Enterprises is too remote in time to be relevant, and that the entities are not fungible with AKJ simply because they were operated by the same people.

The plaintiff responds that Robinson knew that Bolar Enterprises and AKJ were directly related and that any actual knowledge Robinson had with regard to the safety practices of Bolar Enterprises should also apply to those of AKJ.  The plaintiff also contends that Bolar Enterprises, like AKJ, had "severe" safety issues.  With regard to AKJ Logistics, the plaintiff argues that its failure after Robinson removed it from Robinson's contract carrier program indicates the extent to which these reformulations of the same trucking company were dependent upon Robinson

29

and, therefore, the level of control Robinson could exercise over carriers like AKJ. The plaintiff also asserts that he has no intention of offering any evidence regarding AKJ Logistics to show that AKJ itself was incompetent.

With regard to AKJ Logistics, based upon the court's ruling that AKJ was an independent contractor, not an employee, of Robinson, there would be no need for the plaintiff to present evidence going to the level of control Robinson exercised over AKJ. Therefore, the defendant's motion has been granted to the extent that the plaintiff will not be permitted to offer evidence related to any successor entity of AKJ.

The court agrees that Robinson's knowledge of the safety practices of Bolar Enterprises could be relevant to demonstrate its knowledge of AKJ's safety practices in that Robinson was aware that the same principals were involved in both entities. Therefore, the defendant's motion has been denied in that the plaintiff may introduce evidence relating to Bolar Enterprises insofar as that evidence pertains to safety on the public highways. General evidence regarding other driver or vehicle issues experienced by Bolar Enterprises will not be permitted, however.

**B.    Evidence of Problems or Conduct by AKJ Other Than Evidence of Crashes and/or Personal Injuries**

The defendant asserts that, for evidence of prior incidents and problems noted in its Express system to be admissible, they should have occurred under substantially the same or similar circumstances, including resulting personal injury, as the subject accident. In support of this proposition, Robinson cites Roll 'R' Way Rinks v. Smith, 218 Va. 321, 237 S.E.2d 157 (1977), a premises liability case, in which the Court held that a party may introduce evidence of other similar accidents to demonstrate notice or actual knowledge of a defective condition

30

provided that "the plaintiff shows that those prior accidents or occurrences happened at substantially the same place and under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue, or by the acts of the same person." 218 Va. at 325. See also, Jones v. Ford Motor Co., 263 Va. 237, 255, 559 S.E.2d 592, 601 (2002) (holding that evidence of similar accidents may be admissible to prove notice or knowledge if "the prior incident occurred under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue") (internal citations omitted).

The plaintiff contends that the cases cited by the defendant address notice of a static or physical defect, whereas he intends to offer evidence of prior conduct or problems to demonstrate notice of, or the existence of, "a propensity, pattern, or characteristic of a person or entity." The plaintiff asserts that he does not intend to introduce this evidence to demonstrate negligence on the part of AKJ, but to prove a propensity on the part of AKJ with regard to its poor hiring and safety record and to show that Robinson should have been on notice of this propensity, which should then have prompted further inquiry by Robinson.

The court agrees that this case is not precisely akin to a premises liability action, as in Roll 'R' Way Rinks, or an automobile products liability action, as in Jones, in that the plaintiff need not be limited to presenting evidence of prior incidents which are precisely identical to the collision at issue here. Nevertheless, the plaintiff is limited to presenting evidence of AKJ's incompetence only insofar as it relies upon that particular form of incompetence to demonstrate that Robinson was negligent in hiring AKJ to carry the subject load or that this particular quality of which Robinson knew or should have known resulted in the subject crash. Therefore, the

31

plaintiff may introduce evidence of prior conduct or problems of AKJ only insofar as they relate to the ability of AKJ's drivers to carry their loads safely upon the public highways.

**C.      Evidence or Testimony by Trooper Clark Regarding the Cause of the Accident**

Robinson next contends that Trooper Clark, the officer who investigated the accident, should not be permitted to testify regarding the cause of the accident because he has not been designated as an expert and he previously stated that he had no opinion regarding the cause of the crash. The defendant does not object to the trooper's testimony with regard to his observations of the scene of the accident. The plaintiff responds that he is content to rely upon the Police Crash Report, as well as Trooper Clark's testimony with regard to his investigation and findings. Given these representations, the court will take the defendant's motion regarding testimony by Trooper Clark under advisement pending his appearance as a witness at trial.

**D.      References and/or Evidence Regarding Robinson's Finances**

Robinson asserts that, because the plaintiff does not seek punitive damages in this case, evidence regarding its net worth is not permissible. Furthermore, the defendant asserts that testimony regarding its overall revenues, its allocation of spending to its various divisions, and its profits per load would be unduly prejudicial.

The plaintiff responds that he intends to introduce evidence regarding Robinson's size and the number of loads it transports in a given year to demonstrate to the jury the importance for such a third party logistics company to exercise reasonable care in the selection of carriers. Jones also asserts that he intends to introduce evidence of the small amount of Robinson's resources that are allocated to the department responsible for safety monitoring compared with its overall resources to demonstrate its general disregard for carrier safety issues.

32

The court agrees that evidence related to the defendants' overall revenues, monetary allocation, and profit per load would be unduly prejudicial and that such evidence will generally not be permitted. If, however, the defendant relies at trial upon financial constraints to justify its decision not to engage in a more thorough review of AKJ's safety record, the plaintiff would be permitted to introduce such financial evidence in rebuttal.

### III. Defendant's Motion in Limine to Permit Evidence Regarding Plaintiff's Settlement with AKJ

Robinson requests the court to take judicial notice of the fact that AKJ had a $1,000,000 insurance policy in effect at the time of the crash and that the plaintiff received a settlement of $756,231.10 in the related interpleader action filed in this court. See Canal Ins. Co. v. AKJ Enters., No. 7:05CV00312. The information regarding the settlement is available in the Final Order entered in the interpleader action on August 6, 2007.

Robinson contends that the evidence regarding AKJ's insurance policy directly relates to the plaintiff's claims that AKJ was having financial difficulties in that AKJ had actually purchased insurance in an amount 25% higher than the minimum required under federal guidelines. The defendant also states that evidence of this insurance policy goes to one of Robinson's self-identified criteria in approving a carrier for its contract carrier program. With regard to the existence of the insurance policy, the plaintiff contends that this fact would not speak to whether AKJ was in financial difficulties because federal law required AKJ to maintain insurance. The plaintiff also notes that the policy could have been cancelled at any time after the accident. Nevertheless, the plaintiff does not object to the introduction of this evidence if relevant at trial. The court finds that information concerning the insurance carried by AKJ at the

33

time of the accident could be relevant if the plaintiff raises the issue of AKJ's financial viability. Therefore, if the plaintiff does introduce evidence on that subject, the defendant would be permitted to introduce evidence regarding AKJ's insurance policy.

With regard to the plaintiff's settlement from AKJ, Robinson claims that, because AKJ would be considered a joint tortfeasor, Robinson would be entitled to a setoff for any damages awarded to the plaintiff in the amount of the plaintiff's settlement with AKJ. The plaintiff does not dispute that this evidence would be admissible in the damage phase, but he contends that it should not be permitted at the liability phase because it has no bearing on Robinson's negligence in hiring AKJ. The court notes that the trial of this matter has been bifurcated with the jury to decide the issue of negligence, and the court to determine the amount of damages to which the plaintiff is entitled, if any. Therefore, the court finds that Robinson may not present evidence regarding the earlier settlement during the liability phase of the trial, but may present that evidence during the damage phase should the case proceed to that point.

## IV.    Defendant's Motion in Limine to Exclude Evidence Regarding Proposed Safety Ratings for AKJ

Robinson requests the court to prohibit the plaintiff from introducing any evidence regarding a proposed "unsatisfactory" rating for AKJ. In May 2003, the FMCSA proposed a rating of "unsatisfactory" after performing a compliance review of AKJ. After AKJ apparently addressed some of FMCSA's concerns, AKJ later received a "conditional" safety rating. Robinson notes that the plaintiff has referred to this lower rating as further evidence of Robinson's negligence in hiring AKJ for the subject load. However, Robinson contends that there was no evidence that it was, or should have been, aware of the proposed rating. According

34

to Ms. Sandberg, the defendant's expert, only the final rating has any regulatory significance. Therefore, Robinson concludes that it was under no duty to consider a proposed rating until and unless it became final.

The plaintiff contends that evidence of the earlier compliance review, which was based upon violations of various safety regulations by AKJ, would support its position that AKJ possessed numerous documented safety deficiencies, was charged with violations of many of the same regulations in the follow-up review, and had a propensity to operate its business in an unsafe manner. The plaintiff also asserts that Ms. Sandberg's opinion that a proposed rating has no significance is based upon her short three year period as head of the FMCSA and should not be determinative.

The court finds that evidence of violations in the earlier compliance review would be relevant in evaluating AKJ's competence as a carrier. Furthermore, although Robinson may not have immediately been aware of the prior rating, once it learned of the conditional rating AKJ received, Robinson could have discovered information relating to violations from the earlier evaluation based upon a review of the information on the FMCSA website as it related to AKJ. Therefore, the plaintiff will be permitted to adduce evidence regarding the proposed safety ratings for AKJ.

## V.     **Plaintiff's Motion in Limine**

The plaintiff initially contended that Robinson should not be permitted to introduce into evidence the warning page from the FMCSA website because it seemingly was a copy of what appeared on the website in 2008, not in 2004. The plaintiff asserts that Robinson should only be permitted to introduce an authenticated copy of any warning that actually did appear on the

35

website at the time of the subject collision. At the hearing on this matter, Robinson introduced the correct page from 2004 which contained the proper warning language. That language was identical to that on the website in 2008. As a result, the plaintiff's motion in limine is rendered moot.

## VI.    Defendant's Motion to Exclude the Testimony of Thomas M. Corsi, Ph.D.

The plaintiff has indicated that he intends to introduce at trial the testimony and expert report of Thomas M. Corsi, Ph.D. Dr. Corsi is a Professor of Logistics and Co-Director of the Supply Chain Management Center at the Robert H. Smith School of Business at the University of Maryland where he has worked since 1976. The plaintiff intends to present Dr. Corsi as an expert witness to testify regarding the carrier selection standards a broker should have applied in this case.

Robinson asks the court to exclude Dr. Corsi's testimony in its entirety. In support of this request, Robinson first contends that Dr. Corsi is an academic with no real experience in the freight broker industry or the regulatory aspects of the trucking industry. The court notes, however, that Dr. Corsi was educated and currently teaches in the field of logistics, has authored over 100 articles and three books on logistics and transportation, has worked as a consultant with the Department of Transportation since 1980 where he has evaluated safety regulations and safety performance of carriers, has worked with the Volpe National Transportation Center to implement the SafeStat methodology for the evaluation of the safety performance of carriers, and has participated in a task force to evaluate compliance reviews for the FMCSA. As a result, the court finds the defendant's arguments with regard to Dr. Corsi's credentials to be without merit.

Robinson next argues that Dr. Corsi has based his opinion that a broker should not select

36

any carrier in the bottom 25th percentile on any SEA score upon the program of the Department of Energy for selecting carriers for materials such as hazardous nuclear waste. Robinson also notes that Dr. Corsi testified at his deposition that he had conducted informal internet searches over the weekend prior to his deposition and found several websites of freight brokers who advertise their use of the FMCSA statistics in selecting carriers. Dr. Corsi also testified that not all the brokers whose websites he visited included descriptions of their carrier selection standards. Dr. Corsi admitted that none of these websites described a program as rigorous as that followed by the Department of Energy, which he apparently considers a model for the industry. Therefore, Robinson concludes that Dr. Corsi "employed no substantive data or methodology at all in forming his opinion" as required by Federal Rule of Evidence 702, and failed to demonstrate that he relied upon the information of a kind reasonably relied upon by experts in this field as required by Federal Rule of Evidence 703. Finally, Robinson asserts that Dr. Corsi has offered no evidence regarding the standard of care for carrier selection in 2004.

According to the plaintiff, however, Dr. Corsi will not be offered to testify regarding an industry wide custom or practice in place in 2004. Instead, Dr. Corsi will present his opinions regarding the reliability of the SafeStat methodology, the SEA scores, and the reliability of the FMCSA safety ratings given to carriers and, based upon this information, will present his opinion regarding the type of data that would be of most assistance to a company in evaluating a carrier for fitness, *i.e.*, the SafeStat data publicly available on the FMCSA website, along with insurance data, financial issues, and any actual knowledge possessed by a broker. The plaintiff notes that the federal court in Schramm required the consideration of such data, thus providing authority for Dr. Corsi's opinions.

The court is compelled to agree that Dr. Corsi should not be permitted to specifically quantify the group of carriers that should have been considered acceptable or unacceptable based upon their SEA scores or any other measure. In addition, Dr. Corsi will not be permitted to testify with regard to any opinion he has formed with regard to carrier selection practices based upon the rather informal internet survey he performed immediately prior to his deposition testimony. Nevertheless, Dr. Corsi has extensive experience with the SafeStat methodology, the information available on the FMCSA website, and the relationship of this data to tractor-trailer accidents. Therefore, he will be permitted to testify regarding the safety related information that was available to freight brokers in 2004 as well as its meaning and reliability.

The defendant has also argued that Dr. Corsi's testimony cannot overcome the FMCSA's own warning on its website that the SafeStat data should not, in fact, be used for commercial purposes. Robinson notes that the court in Schramm did not have the benefit of Ms. Sandberg's testimony regarding the nature of this warning and may have decided the case differently otherwise. The court finds, however, that these points simply highlight the differences of opinion between the two experts involved in this case that must be resolved by the finder of fact. Certain SafeStat data does remain available on the FMCSA website, regardless of the warning, and these statistics must have some meaning to the industry. The plaintiff is entitled to present qualified expert testimony so as to communicate its version of these issues to the jury. Except as otherwise noted, Dr. Corsi will be permitted to be qualified and testify as an expert in this case.

38

## CONCLUSION

For the foregoing reasons, and as stated in an order entered following the hearing and oral rulings on these motions, the plaintiff's motion for summary judgment has been granted with regard to the negligence of Kristina Arciszewski and denied in all other parts; the defendant's motion for summary judgment has been granted with regard to plaintiff's claims for negligence and negligent entrustment and denied with regard to the plaintiff's claim for negligent hiring; the plaintiff's motion in limine has been denied as moot; the defendant's motion in limine has been granted in part, denied in part, and taken under advisement in part; the defendant's motion in limine to exclude evidence regarding proposed safety ratings for AKJ has been denied; the defendant's motion in limine to permit evidence regarding plaintiff's settlement with AKJ and insurance coverage has been granted in part and denied in part; and the defendant's motion in limine to exclude the testimony of Thomas M. Corsi, Ph.D. has been granted in part and denied in part.

The Clerk of Court is hereby directed to send certified copies of this memorandum opinion to all counsel of record.

ENTER:     This _10th_ day of June, 2008.

_Glen Conrad_
United States District Judge

39